**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| In Re: ) | Case No.: 16-01823-als11 |
| ) | |
| **FANSTEEL, INC.** ) | Chapter 11 |
| ) | |
|    Debtor and Debtor in Possession. ) | Hon. Anita L. Shodeen |
| ) | |
| 1746 Commerce Rd. ) | **DECLARATION OF JAMES** |
| Creston, IA  50801 ) | **MAHONEY, CEO OF FANSTEEL, INC.** |
| ) | **IN SUPPORT OF FIRST DAY** |
| EIN:  36-1058780 ) | **MOTIONS** |
| ) | |
| _____ ) | No Hearing Set |

    I, James Mahoney, declare:

    I am the duly appointed, acting and authorized Chief Executive Officer of Fansteel, Inc., ("Fansteel") and Wellman Dynamics Machining & Assembly ("WDMA"), and an Authorized Officer of Wellman Dynamics Corporation ("WDC"), Debtors and Debtors in Possession in this and affiliated cases pending before this Court.  I make this Declaration in support of the Debtors' First Day Motions and if called as a witness, I could and would be competent to testify to the following.

    Fansteel, the parent of WDC and WDMA, is headquartered in Creston Iowa, and between the three companies, employs over 600 people globally. The primary business of Fansteel and its several divisions and wholly-owned subsidiaries, is as a manufacturer of precision-engineered products for the global aerospace, defense, and industrial markets. On a consolidated basis, Fansteel generated approximately $87.4M in annual revenue in FY2015. Fansteel serves its customers through four business units at four locations in the USA and one in Mexico.

    WDC, located in Creston, Iowa, generates approximately 67% of Fansteel's sales. WDC employs approximately 365 people in Creston Iowa.  These employees have an average tenure

1

exceeding 12 years.  Approximately 10% of its workforce is military veterans.  WDC is an industry-leading producer of highly complex precision aluminum and magnesium sand castings for the aerospace and defense industries. WDC's castings are highly differentiated from most of their competitors due to their size and complexity. WDC's largest casting weighs approximately 630 pounds and its most complex casting requires a mold that is hand assembled from 125 individual intricate components, virtually all of which are designed and manufactured in-house. WDC owns the only molds for 79% of its products. In some cases, although another tool exists, WDC is still the sole source on 94% of its castings.  Every U.S. military helicopter program relies upon WDC castings produced in Creston, Iowa.

Intercast, a division of Fansteel, accounts for approximately 15% of Fansteel's annual sales, and conducts operations in Reynosa, Mexico and McAllen, Texas. Intercast produces precision investment cast parts made of stainless steel, copper, nickel and other metals that range in size from several ounces up to 60 pounds. Intercast is the second largest investment casting foundry in Mexico and operates as a maquiladora plant approximately three miles from the Texas border.

WDMA accounts for approximately 3% of Fansteel's annual sales, and conducts operations in York, PA. WDMA is an AS9100-certified CNC machine shop that designs and produces large precision parts and assemblies, primarily for the defense and aerospace markets, including hydraulic accumulators, actuators and energy absorbers critical for use on U.S. Aircraft Carriers.

American Sintered Technologies, Inc. ("AST") accounts for approximately 15% of Fansteel's annual sales, and conducts operations in Emporium, PA. AST is a manufacturer of precision powdered metal parts that range in size from a few ounces to four pounds in weight. AST primarily serves the automotive markets.  In June 2016 Fansteel's new management team conducted a strategic assessment of all operations and determined to divest AST in order to focus

on aerospace castings. Fansteel has received a definitive sales agreement supported with a nonrefundable $300,000 deposit. Net proceeds are anticipated to be $4M.

Fansteel's profitability is driven by demand for helicopter production and replacement parts. The 2013 US military drawdown in Afghanistan followed by the precipitous drop in oil prices in 2015 caused two sharp declines in demand for helicopter parts. In early 2015, Fansteel's commercial lender, Fifth Third Bank, placed their Fansteel loan agreement in "workout," indicating they did not want to renew the loan following its expiration in June 2016. The previous management team first sought to sell Fansteel and secured a tentative sale agreement for the Wellman Dynamics division to a direct competitor. In 4Q 2015 oil fell to $35 per barrel and the prospective buyer abandoned their purchase offer. At that point the previous Fansteel management sought a comprehensive refinancing from a consortium of banks. Given comparatively poor financial performance, Fansteel was required to pay substantial due diligence fees to some of the prospective lenders including a credit fund named TerraMar Capital, based in Los Angeles, California. TerraMar signed a Non-Disclosure Agreement, and invoiced approximately $400,000 of due diligence fees to Fansteel in preparation to offer a loan. In May 2016, the Fansteel Board of Directors rejected the terms of the loan and replaced the Fansteel CEO and COO with a seasoned team of turnaround professionals. The team went to work assessing the business and quickly developed a business plan that projected rapid improvement over six months from a June – July break even (excluding non-reoccurring losses) to a projected $8M cash flow for 2017. On top of the profit improvement created through shared sacrifice by clients, unions, management and the shareholders, the plan proposed to substantially improve liquidity by selling AST in October for $4 million against a collateralized borrowing of $1.5 million. On August 15, this plan was presented to Fifth Third Bank, who expressed appreciation

for the plan, recognizing that the same management team had recently performed similarly for another Fifth Third loan. After the meeting, it was indicated by Fifth Third Bank that a long term forbearance would be considered with the intention of providing the new Fansteel management team sufficient time to implement their turnaround plan and, once proven, to use the demonstrated higher profitability to secure a new loan agreement from another bank or even perhaps Fifth Third Bank under conventional Asset Based Loan terms and rates.

Fansteel has used Fifth Third Bank to provide asset-based lending since 2005. The most recent agreement was secured against collateral of accounts receivable, and inventory subject to defined borrowing base formula constraints. The existing loan agreement has been modified occasionally. In fact, Fifth Third Bank and Fansteel were negotiating in good faith to settle a 29th amendment to the 2005 loan agreement, providing a 16-month forbearance period designed to provide the new Fansteel management team time to fully implement their defined turnaround plan and to use the improved performance as a basis to seek a new lender.

From August 16 until September 1, the Fansteel management team awaited a new term sheet from Fifth Third outlining mutual commitments as a condition to extend the existing loan until the end of 2017. On September 1, TerraMar contacted us via email explaining that an entity owned and controlled by TerraMar, TCTM Financial FS, LLC, had purchased the loan note from Fifth Third Bank and were requesting Fansteel to sign a series of agreements permitting TerraMar access to collections of paid invoices and to control future disbursements for working capital requirements. Concurrently, the independent Chief Restructuring Officer (CRO) hired by Fansteel at the request of Fifth Third Bank also emailed an emphatic message advising us to recognize the new owner of the loan and to sign the proposed new agreements. Subsequently, I received a phone call from Joshua Philips, Managing Partner of TerraMar.

During the call, Mr. Philips outlined a sequence of events whereby he wished to see Fansteel agree to a two-week forbearance agreement with the new owner of the debt note. Under his plan, that two week period would be used to hire both bankruptcy counsel and a new CRO in preparation to enter bankruptcy in Delaware with the intention to request a quick auction sale pursuant to Bankruptcy Code Section 363. That way, at the auction, TerraMar would have the option to "credit bid" the value of their recently purchased debt note in order to buy all the assets of Fansteel, leaving all other liabilities behind. Mr. Philips concluded by saying he expected the clients of Fansteel would be impressed to see a "before" and "after" list of liabilities because it would indicate a financially stable supplier.

The Board of Directors of Fansteel had serious objections to the plan outlined by TerraMar. Given their confidence in the new management's already defined, initiated, and largely implemented turnaround plan, the Board does not see justice, or the necessity in wiping out creditors as a precondition to company survival. Cognizant of this perspective and aware of my duty as CEO to represent the interests of all creditors during this zone of insolvency, the Board of Directors directed and authorized me to retain the well-respected expertise of Ronald Reuter as Chief Restructuring Officer to complement and accelerate Fansteel's performance improvement plan. With this preparation in place, Fansteel is filing for relief under Chapter 11 so that it can propose an "earn-out" plan of reorganization that will pay a 100% dividend to all unsecured creditors and give the equity security holders an opportunity to retain their investments in the company.

I declare under penalty of perjury, under the laws of the State of Iowa and the laws of the United States, that the foregoing is true and correct and is executed this 13th day of September, 2016 at Creston, Iowa.

Dated: September 13, 2016                  */s/ James Mahoney*