**IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF IOWA**

In the Matter of Jointly Administered:

**Fansteel, Inc.**                                                      Case No.  **16-01823-als11 (lead case)**

          Debtor


**Wellman Dynamics Corporation, Inc.**                 Case No.  **16-01825-als11**

          Debtor


**Wellman Dynamics Machinery & Assembly, Inc.**     Case No.  **16-01827-als11**

          Debtor


**MEMORANDUM OF DECISION**
**(date entered on docket: February 28, 2017)**


Before the Court is the Official Unsecured Creditors Committee's ("Committee") Motion to Reduce Exclusivity Period ("Motion") that TCTM Financial, LLC ("TCTM") has joined, and the Debtors' objection to that request.  The Court has jurisdiction of this matter under 28 U.S.C. §§ 157(b)(1) and 1334.  Having considered the evidence, arguments and relevant filings, the Motion is denied.

Fansteel[1] filed a voluntary chapter 11 petition on September 13, 2016.  It filed a disclosure statement and plan within the 120-day exclusivity period required under 11 U.S.C. § 1121(c)(2).  A hearing to approve the disclosure statement was scheduled for February 16, 2017 to address concerns raised by the Court and any objections filed by the parties.  In the interim, the Committee filed this Motion.

The Motion alleges that the major case constituents have substantial concerns about the adequacy of Fansteel's Disclosure Statement, whether the proposed plan can be confirmed, the lack of a process to test the validity of the new value being contributed and whether there will be  sufficient income for the business to operate after confirmation.  The Committee states that these conditions warrant termination of the exclusivity period.  Fansteel, of course, disputes these positions and objects to termination of its exclusivity period.

---

[1] Three separate cases were filed which are being jointly administered and will be referred to collectively as "Fansteel" unless otherwise stated.

**DISCUSSION**

Pursuant to 11 U.S.C. § 1121(b), only the debtor may file a plan until after 120 days after the date of the order for relief.  Fansteel filed a plan within that time, so its exclusivity period is now governed by that same code provision which allows 180 days from the order for relief for that plan to be accepted.  In this case the 180 days expires on March 12, 2017.  Accordingly, the portion of 11 U.S.C. § 1121(c) which allows another party to file a plan is not yet applicable in this case.  The Committee's Motion relies upon 11 U.S.C. § 1121(d) which provides that a party in interest may request that the 120-day or 180-day time periods be shortened or increased for cause which the court may grant after notice and hearing.  The Committee bears a heavy burden of proof to establish cause for the relief requested in its Motion.  *See In re Energy Conversion Devices, Inc.,* 474 B.R. 503, 508 (Bankr. E.D. Mich. 2012); *In re Dow Corning Corp.*, 208 B.R. 661, 663 (Bankr. E.D. Mich. 1997).

The Bankruptcy Code does not define "cause" for terminating the exclusivity period.  Some courts have applied a four factor test to determine whether cause exists to grant these motions: "1) the debtor's use of exclusivity period to force creditors to accept an unsatisfactory or unconfirmable plan; 2) the debtor's delay in filing a plan; 3) gross mismanagement of the debtor's operations; and 4) "acrimonious relations" between the debtor's principals." *In re Situation Mgmt Sys, Inc.*, 252 B.R. 859, 863 (Bankr. D. Mass. 2000). None of these factors are present in Fansteel's case:  1) there is no evidence that the time period since filing has been utilized to coerce creditors to accept a plan; 2) there has been no delay in filing a plan as required by the Code[2]; 3) there has been no allegation of mismanagement or evidence of such conduct; and 4) there is no evidence of an acrimonious relationship between Fansteel's principals.

A majority of courts examine nine factors to determine whether to extend or terminate a debtor's statutory period of exclusivity for cause.  *See In re Energy Conversion Devices, Inc*., 474 B.R. 503, 507 (Bankr. E.D. Mich. 2012).   Each of these factors will be examined based upon the evidence presented.

    **1.  The size and complexity of the case.**

    The parties appear to agree that this case is large and complex.  The jointly administered filing involves Fansteel and two of its affiliates that conduct business in the United States and Mexico.  Scheduled debt is approximately $42 million and assets are valued in excess of $36 million.

    **2. The necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information.**

    At the time of hearing the case had been on file for about 5 months.  During that time the Court has set at least 34 matters for hearing, some of which resulted in evidence being presented over multiple days.  There have been requests and requirements for Fansteel to provide financial information to multiple parties and entities.  While this is not unusual in a chapter 11 case, based upon the Court's observations, some of these requests have been overly broad and at

---

[2] The debtor in the cited case had obtained five extensions of the exclusivity period before the request for termination was filed.

times bordering on the excessive.  Arguably, these circumstances may have limited Fansteel's ability to concentrate its efforts on a disclosure statement, plan and creditor negotiations.

### 3. The existence of good faith progress toward reorganization.

Fansteel filed its initial disclosure statement and plan within the statutory deadline prescribed by 11 U.S.C. § 1121(b).  Approval of the disclosure statement was initially scheduled for hearing on February 16, 2017.  Fansteel filed an amended disclosure statement and plan in response to the filed objections and the Court's concerns.  At the parties' request the Court deferred the disclosure statement hearing to consider the Committee's pending Motion.  The amended disclosure statement is now scheduled for hearing on February 28, 2017.  Nothing in the record suggests that Fansteel lacks good faith in pursuing its reorganization efforts.

### 4. The fact that the debtor is paying its bills as they become due.

The record is silent on this issue. Consequently, the Court infers that Fansteel is paying its bills as they become due.

### 5. Whether the debtor has demonstrated reasonable prospects for filing a viable plan.

Fansteel believes and is committed to a successful reorganization.  Whether or not this is an overly optimistic viewpoint cannot be ascertained at this point in time.  To the contrary, TCTM is committed to the position that Fansteel's prospects are not only speculative, but doomed.  A position which the Committee appears to accept.  This overly pessimistic viewpoint is also not a certainty at this time.  These two opposite perceptions are best described as seeing the glass as either half full or half empty – although the volume in each is identical.

At the hearing there was significant time spent on the proposed credit facility and new value contribution by 510 Ocean Drive or Mr. Levie.  Testimony provided by Fansteel's management and professionals was forthright and did not strike the court as evasive.  But, it was clear that their responses and conclusions were unacceptable to the Committee and TCTM.

Mackinac Partners has steadfastly forecast excessive cash burn and a decline in business operations at Fansteel.  When questioned about these conclusions in the context of eroding profitability margins the witness explained that he simply used the information he was provided, and all of the available data had not been supplied.  There is probably little doubt that historical information would indicate that Fansteel has not enjoyed financial success prior to its filing.  A number of changes have occurred at Fansteel since May 2016 some of which have been ongoing and may have required a year-end correction.  The witness was unwilling or unable to accept any assumptions that called into question his calculations.  This seemed especially true if the application of a particular fact would result in supporting Fanteel's position.

At the hearing, Fansteel agreed with the Committee's witness that there may be additional funds required on the effective date to meet all obligations. Under the available financing options Fansteel is confident that any such amounts will be obtained under its credit facility or by additional contribution from the majority shareholder.

**6. Whether the debtor has made progress in negotiations with its creditors.**

It appears that at least tentative agreements for treatment have been reached with one secured creditor, the Pension Benefit Guaranty Corporation and GMP and Employers Pension Fund. To be sure, there appears to have been little progress in the negotiations with TCTM and the Committee.  To the extent TCTM is being paid the amount of its allowed secured claim and unsecured creditors can elect to have their obligations paid in full over time, it is uncertain whether further negotiations with these two entities are really necessary.

**7.  The amount of time which has elapsed in the case.**

The case has been on file less than 6 months.

**8.  Whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands.**

Fansteel has not filed a request to extend the exclusivity period.

**9. Whether an unresolved contingency exists.**

Uncertainty does exist related to the exact date the commitment on the credit facility will be received.  Fansteel represented that it was confident that documentation would be received in the near future which would satisfy this factor.  It is not unusual for some conditions to remain open prior to final funding of the facility which is scheduled for May.  Standing alone this circumstance does not rise to the level of a contingency that justifies ending the exclusivity period.

Most of these 9 factors weigh in favor of permitting Fansteel's exclusivity to remain in place.

The Committee cites to additional cases to support its Motion.  *See Bank of American Nat'l Trust and Savs. Ass' v. 203 North LaSalle Street P'ship*, 526 U.S. 434 (1999); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 129 (Bankr. D.N.J. 2010); *In re Davis*, 262 B.R. 791 (Bankr. D. Ariz. 2001); *In re Crescent Beach Inn, Inc.,* 22 B.R. 155, 160-61 (Bankr. D. Me. 1982). These opinions are factually distinguishable from those present in this case.

A survey of case law reveals that finding cause to reduce or terminate exclusivity is the exception, not the rule.  *See, e.g,. In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128 (D.N.J. 1995) (District court overruled the bankruptcy court's termination of debtor's exclusivity period in holding that bankruptcy court's belief that permitting the filing of alternative plans would lead to the best of all possible worlds and create a discourse among the parties was not cause for termination.); *In re Lichtin/Wade, LLC*, 478 B.R. 204 (Bankr. E.D.N.C. 2012); *In re Energy Conversion Devices, Inc.*, 474 B.R. 503 (Bankr. E.D. Mich. 2012); *In re Borders Group, Inc.*, No. 11-10614MG, 2011 WL 9155779 (Bankr. S.D.N.Y. June 2, 2011); *In re Adelphia Commc'ns Corp.*, 336 B.R. 610 (Bankr. S.D.N.Y. 2006); *In re Sletteland*, 260 B.R. 657 (Bankr. S.D.N.Y. 2001); *In re Clamp-All Corp.*, 233 B.R. 198 (Bankr. D. Mass.1999); *In re Dow Corning Corp.*, 208 B.R. 661 (Bankr. E.D. Mich. 1997); *In re Moonraker Assoc., Ltd.* 200 B.R. 950 (Bankr. N.D. Ga. 1996) (new value plan did not warrant terminating exclusivity period); *Matter of Homestead Partners, Ltd.*, 197 B.R. 706 (Bankr. N.D. Ga.

1996) (new value plan court held that auction process was preferable to terminating exclusivity); *In re Dunes Hotel Assocs.*, 188 B.R. 162 (Bankr. D.S.C. 1995); *In re Eagle-Picher Indus., Inc.*, 176 B.R. 143 (Bankr. S.D. Ohio 1994).

One case provides a detailed explanation for this tendency.

> The exclusivity period gives the debtor the ability to stabilize its operations and the opportunity to retain control over the reorganization process. The adoption of a limited period of exclusivity also assures speed by motivating the debtor to be more fair and reasonable in its negotiations with creditors, because the debtor knows that the bargaining leverage of exclusivity will soon end.

> In reviewing the legislative history of § 1121, the Third Circuit, in *Century Glove*, seemed to focus solely on Congress' intention to limit a debtor's exclusivity period to prevent unreasonable delays in formulating a reorganization plan. *Century Glove*, 860 F.2d at 102. Specifically the court noted that, "[s]ection 1121 allows a debtor the threat of limited delay to offset the creditors' voting power of approval." *Id.* The court also stated "[t]he costs of delay was a prime reason the debtor was given a limited 'exclusivity period' to present its reorganization plan." *Id.* at 101 n. 7. Employing its interpretation of legislative history, the court held that a plan opponent's submission of an unapproved disclosure statement and reorganization plan to a creditor did not reduce the debtor's threat of limited delay, and, therefore, did not violate the terms of § 1121. *Id.* at 102.

> This Court believes that the *Century Glove* analysis fails to sufficiently recognize Congress' intention to allow the debtor a reasonable time to obtain confirmation of a plan without the threat of a competing plan. Therefore, whether a creditor's action during the exclusivity period violates § 1121(b) must be evaluated not only in terms of its effect on the ability of a debtor to delay reorganization, but also in terms of its interference with the debtor's efforts to propose and confirm a plan of reorganization. *See* Barbara E. Nelan, *Multiple Plans 'On The Table' During the Chapter 11 Exclusivity Period*, 6 Bankr.Dev.J. 451, 476 (Fall, 1989); *see also Temple Retirement*, 80 B.R. at 369 (When a party in interest proposes an unapproved draft plan to other creditors, it is in effect "solicit[ing] rejections by dangling an alternative plan before other creditors, suggesting in essence that, if the debtor's plan were scuttled, then a better alternative could then be proposed.").

> Based on Congress' policy goals as expressed in the Code's legislative history, this Court concludes that § 1121 provides the debtor with the exclusive right to propose a plan during its exclusivity period.

*In re Clamp-All Corp*., 233 B.R. 198, 207–08 (Bankr. D. Mass. 1999).  The Committee asserts that because Fansteel will be unable to confirm a plan, the only solution to avoid further delay, increased administrative expenses and harm to unsecured creditors is to terminate the exclusivity period.  Based upon the evidence, these arguments are not convincing and do not constitute cause.

Based upon the foregoing, the Court concludes that the Committee has failed to meet its burden to establish cause to terminate Fansteel's exclusivity period.   It is therefore ordered that:

1.      Fansteel's objection is sustained.

2.      The Motion and TCTM's Joinder, are denied.


                                              /s/ Anita L. Shodeen
                                              Anita L. Shodeen
                                              U.S. Bankruptcy Judge



Parties receiving this Memorandum of Decision from the Clerk of Court:
Electronic Filers in this Chapter Case