# IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF IOWA

In the Matter of Jointly Administered:

| | |
|---|---|
| **Fansteel, Inc.** | Case No. **16-01823 (lead case)** |
| Debtor | |
| **Wellman Dynamics Corporation, Inc.** | Case No. **16-01825-als11** |
| Debtor | |
| **Wellman Dynamics Machinery & Assembly, Inc.** | Case No. **16-01827-als11** |
| Debtor | |

## NUNC PRO TUNC MEMORANDUM OF DECISION
**(date entered on docket: May 9, 2017)**

Before the Court is the Motion for Allowance and Payment of Professional Fees of TCTM Financial FS, LLC (Weil Billing #1). Weil, Gotshal & Manges LLP ("Weil"), lead counsel for TCTM, filed its first Motion for Allowance and Payment of Professional Fees and disbursements for the period of September 1, 2016 through October 31, 2016 in the amount of $1,040,591.92. The U.S. Trustee objects to the reasonableness of this request. The Court has jurisdiction of this matter under 28 U.S.C. §§ 157(b)(1) and 1334.

## DISCUSSION

In July 2005 Fansteel, Inc. and Wellman Dynamics Corporation[1] entered into a credit transaction with Fifth Third Bank (Chicago) ("Bank") which is evidenced by a Loan and Security Agreement. Over the course of this banking relationship the parties entered into numerous amendments of the original agreements. On September 1, 2016[2] the Bank notified Fansteel and 510

---

[1] Wellman Dynamics Machining And Assembly, Inc. was added as a Guarantor to the Twenty-Second Amendment dated September 8, 2015.

[2] The assignment to TCTM appears to have occurred on August 31, 2016.

Ocean Drive Debt Acquisition, LLC ("510 Ocean Drive") that it had assigned its interests in the loan and credit agreements to TCTM Financial FS LLC ("TCTM"). At that time the loan was in default. The Notice of Assignment also stated:

> [T]he Assignee hereby informs you that it intends to decide in its sole discretion on a "day-by-day" basis whether or not to exercise its rights and remedies, including whether to make further Loans to Borrower pursuant to the Credit Agreement.

TCTM approached Fansteel to discuss new payment terms but the parties were unable to agree on a path forward. On September 13, 2016, Fansteel and its affiliates (collectively "Fansteel") filed petitions under Chapter 11[3].

The relationship between debtors and creditors is often strained by the time a bankruptcy is filed. It was apparent at the commencement of this case that TCTM and Fansteel were at odds and envisioned entirely different outcomes related to the continued operation of the businesses. These differences manifested in a litany of ongoing complaints from all the parties alleging a lack of cooperation, unfair treatment, overly optimistic or pessimistic perceptions, and nefarious intentions.

## DISCUSSION

**I.    PRE-PETITION FEE REQUEST**

There is a threshold issue of what fees the Court is required to review for reasonableness. Weil's Motion includes fees of $31,484.50 for services rendered during the time period of September 1, 2016 through September 12, 2016, which predates the bankruptcy filings. This amount is part of TCTM's secured claim on the petition date which is properly included in its proof of claim. Any evaluation of reasonableness involving this portion of Weil's fee request would be subject to state law standards[4], not 11 U.S.C. § 506(b). No specific objection to the pre-petition fees was raised and the

---

[3] Fansteel, Inc. (Case No. 16-01823); Wellman Dynamics Corporation (Case No. 16-01825) and Wellman Dynamics Machinery & Assembly, Inc. (Case No. 16-01827).
[4] The loan documents were not extensively reviewed to determine what state's law would govern.

Court has no information upon which to reach an informed decision of whether or not these amounts are reasonable. To the extent a dispute exists regarding the reasonableness of the amount of these pre-petition fees it should be raised in the context of an objection to TCTM's filed proof of claim. For this reason, allowance and payment of the amount of $31,484.50 is denied without prejudice.

## II.     PAYMENT OF POST-PETITION FEES AND COSTS

TCTM and Fansteel entered into a stipulation for the use of cash collateral that contained the following language:

> The Debtors shall pay in cash all reasonable and documented out-of-pocket fees and expenses of TCTM that (i) have accrued as of the Commencement Date and (ii) accrue on an [sic] after the Commencement Date. It is expressly agreed that the out-of-pocket fees and expenses of (i) Weil, Gotshal & Manges LLP, (ii) Mackinac Partners, LLC, as financial advisor, and (iii) Davis, Brown, Koehn, Shorts [sic] & Roberts, P.C., as Iowa counsel, shall be covered by section 14.3 of the Loan Agreement. Payments in accordance with this paragraph shall be made in cash within seven (7) calendar days after presentment of invoices (redacted for privilege) to the Debtors. In the event that within seven (7) calendar days from receipt of such invoices the United States trustee raises an objection, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Bankruptcy Court shall hear and determine such dispute; provided, that payment of invoices shall not be delayed based on any such objections and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final order of the Bankruptcy Court. The Debtors and TCTM agree to work in good faith during the two-week interim period to determine the budget for TCTM's professional fees.

Early in the case Fansteel filed a motion, which was joined by the U.S. Trustee, asking the Court to establish procedures for the allowance and payment of any fees and costs claimed under 11 U.S.C. § 506. TCTM objected by arguing that not only was such a request unprecedented and unsupported in the law but that it was contrary to the parties' agreement. TCTM's objection was overruled. To insure that a determination of reasonableness would be made as required by the statute the Court ordered TCTM to "seek allowance of its fees and expenses by filing a Motion, Proof of Claim, or other procedure permitted under the Bankruptcy Code and Rules." Weil's first Motion for Allowance and

Payment of Professional Fees on behalf of TCTM ("Motion") requests allowance and payment of $1,009,107.42 for the time period of September 13 through October 31 ($976,905 in fees and $32,202.42 in disbursements).

## A.  Legal Standards

Allowance of TCTM's request for payment of Weil's post-petition fees by the bankruptcy estate is governed by 11 U.S.C. § 506(b). TCTM bears the burden of proof on three elements:

> (1)  the collateral securing the debt exceeds the amount owed;
> (2)  there is a written agreement, or state statute, that permits recovery of fees, costs and charges; and
> (3)  the amounts requested are reasonable.

*See In re Woods Auto Gallery*, 379 B.R. 875, 884 (Bankr. W.D. Mo. 2007). There is no dispute that TCTM is oversecured and the loan documents provide for payment of the lender's fees and costs which satisfies two of the statutory requirements. The third factor, the reasonableness of the fees and costs, remains at issue. The Court recognizes that TCTM has the right to select counsel of its choice. *In re Irick*, 216 B.R. 433, 434 (Bankr. E.D. Cal. 1997). However, payment from the bankruptcy estate is limited to the amount of attorney fees that are reasonable which may be different from the total amount billed. *See In re Latshaw Drilling*, 481 B.R. 765, 800 (Bankr. N.D. Okla. 2012); *In re Woods Auto Gallery, Inc.*, 379 B.R. at 884. A bankruptcy court's role in determining reasonableness under 11 U.S.C. § 506(b) is critical to "policing the urge of an oversecured creditor to release the full force and fury of its advocates against a debtor's efforts to reorganize." *In re Latshaw Drilling, LLC*, 481 B.R. at 799.

Reasonable is defined as what is "fair, proper, or moderate under the circumstances; sensible." *Black's Law Dictionary*, (10th ed. 2014). Courts apply a variety of factors to assess reasonableness under 11 U.S.C. § 506(b) including: the complexity of the case; the hourly rates charged and the rates in the locality; whether the services were necessary to protect the client's interest; whether attorneys

were able to efficiently and competently provide the required services; whether billing judgment was exercised to avoid duplicate or unnecessary services; the results obtained; and the amounts charged in similar cases. *See In re Latshaw Drilling*, 481 B.R. at 799; *In re Kroh Bros. Dev. Co*., 105 B.R. 515, 521 (Bankr. W.D. Mo. 1989); *In re Wonder Corp. of America*, 72 B.R. 580, 588-89 (Bankr. D. Conn. 1987)); A court may also rely on its observations of the proceedings and how a case has been administered in evaluating the reasonableness of fees requested under § 506(b). *See In re Kroh Bros. Dev. Co.,* 105 B.R. at 521; *In re Wonder Corp. of America,* 72 B.R. at 589.

Courts have broad discretion in reaching a conclusion that fulfills the purpose of the reasonableness element found in 11 U.S.C. § 506(b) which is: "to prevent creditors from 'fail[ing] to exercise restraint in the attorneys' fees and expenses they incur, perhaps exhibiting excessive caution, overzealous advocacy and hyperactive legal efforts'" *In re Wanechek,* 349 B.R. 836, 843 (Bankr. E.D. Wash. 2006) (quoting *In re Gwyn,* 150 B.R. 150, 155 (Bankr. M.D.N.C. 1993)); *see also In re Woods Auto Gallery*, 379 B.R. 875, 885 (Bankr. W.D. Mo. 2007). It is with these objectives in mind and application of the relevant factors that the Court concludes that Weil's request for allowance of fees and costs in the amount of $1,009,107.40 is unreasonable.

**B.    Weil's arguments and application of the factors**

A preliminary telephonic hearing was held on TCTM's Motion and the objection. Weil argued that its services were prudent and reasonable under the circumstances of this case pointing to: the complexity of the case; the non-consensual posture of the case; the need to verify its over secured status and any potential diminution in the value of its collateral; the need to assess Fansteel's financial condition; the need to review and respond to Fansteel's numerous filings; and the need to examine potential actions and strategies. No evidence has been supplied to demonstrate the reasonableness of Weil's fees under any of the applicable factors.[5] Having only Weil's opinion of the reasonableness of

---

[5] An opportunity to present evidence was declined.

its actions in this case leaves the Court to rely upon the docket, the filed documents and its observation of the proceedings to evaluate the reasonableness of the fees requested.

    1.      Complexity of the case

Fansteel's chapter 11 case has multiple affiliates operating in more than one location; the companies have substantial debt; and there are unique aspects to the manufacturing of its product. Weil states that it would have been unable to complete all of the tasks required to effectively represent TCTM without staffing this file with partners, associates, paralegals and local counsel. Lacking from Weil's itemization and its argument is any description of the unique services or expertise demanded by the Fansteel file which would justify so many attorneys and their respective billings. In comparison to any other large chapter 11 case, Weil's description of Fansteel's case as exceedingly complex and "national" in its scope is overstated.

    2.  Non-consensual posture of the case

Fansteel filed a number of first day motions including a request to use cash collateral. After an expedited telephone hearing, the Court approved interim use based upon a stipulation between Fanteel and TCTM that included the following terms: a super priority claim in favor of TCTM for any diminution in its collateral's value; monthly loan payments at the default rate of interest; payment of all professional fees and expenses; financial reporting; access to facilities and records; and the ability to terminate use of cash collateral upon notification of Fansteel's breach of any term or condition unless it was waived by TCTM. During this proceeding Weil has stated that the parties' stipulation was part and parcel of a "negotiated package" for Fansteel's use of TCTM's cash collateral which contradicts Weil's description that the use of cash collateral was "non-consensual." The record clearly demonstrates that Fansteel's request to use cash collateral was vigorously contested in spite of the

conditions dictated by TCTM and the parties' stipulation. The parties' original agreement remained largely unchanged as the effort to reorganize proceeded.[6]

3.   Status of claim and collateral

At the first evidentiary hearing on the continued use of cash collateral TCTM was described as a "nervous lender." Undoubtedly, TCTM could be skeptical of Fansteel's ongoing operations due to its default under the loan held by Fifth Third Bank. But TCTM was certainly aware of this fact and accepted assignment of the loan(s) under that circumstance. At that same hearing, counsel for TCTM admitted that litigating asset value in the context of a cash collateral motion was at best unusual and perhaps completely outside of any norm. This naturally raises the question of whether such a strategy was reasonable, necessary or effective.

There was clearly a disagreement as to the amount of the equity cushion. TCTM's expert testified that collateral value over the loan balance was "razor thin" at $58,000. Fansteel consistently maintained that there was substantial value over and above the outstanding loan balances. In the final analysis, using the values reached by TCTM's own experts and an average of inventory value estimates, the Court calculated TCTM's equity cushion at approximately $7.5 million. The Court consistently overruled TCTM's objections and authorized the use of cash collateral on an interim and final basis.

4.   Fansteel's financial condition

During the relevant billing time period, TCTM filed four separate notices of termination of cash collateral for violation of reporting requirements. Two days prior to the hearing on the continued use of cash collateral, TCTM filed a Notice of Cash Collateral Termination Event alleging that Fansteel had failed to permit copies to be made of certain documents and had not made the CEO

---

[6] See docket numbers: 111 (eliminated TCTM's ability to unilaterally terminate the automatic stay due to any breach of a term under the agreement); 291 (upon parties' request an order to clarify the term under the agreement and consent order on use of cash collateral); 300 (requiring submission of fees for court evaluation of reasonableness).

available to meet with TCTM. The next day, another Notice of Cash Collateral Termination Event was filed stating that Fansteel had failed to provide a variance report under the two business day requirement pursuant to the stipulation. Later, TCTM filed two additional documents explaining that Fansteel continued to be in breach of providing reports in the manner agreed to in the stipulation. There is no question that TCTM's request for current financial information is entirely appropriate under the circumstances of this case. TCTM's need for access to extensive historical financial records is not entirely clear. As a practical matter, TCTM, and Weil as its counsel, would have had access to that information from its transaction in acquiring the Bank's loan. The use of the historical data at the evidentiary hearing resulted in confusing extrapolation and speculation about Fansteel's current financial information. Especially because information and performance data pre-dated the arrival of the turnaround professionals, the implementation of their recommendations, price renegotiations and new customer orders. At the multiple cash collateral hearings TCTM also alleged that Fansteel would be unable to meet its budgeted cash flow projections. TCTM has never alleged that it has not been paid according to the terms of the cash collateral order that is in place and where appropriate, additional safeguards have been ordered to allay concerns raised by TCTM.[7]

    5.        Numerous filings

Weil's argument that multiple filings by Fansteel required attention at the beginning of the case is simply not supported by the docket. A total of 35 motions[8] were filed between September 13 and October 31. The majority of those motions were applications seeking employment of professionals or requests to appear pro hac vice. In addition to the use of cash collateral, there were two filings made by Fansteel that directly involved TCTM. As previously noted, a motion was filed requesting a procedure for TCTM to submit its fees for a review of reasonableness under section 506(b). Apparently prompted by TCTM's multiple ongoing document requests, Fansteel also filed a motion

---

[7] Docket number 251 (order granting TCTM's request for $500,000 reserve under final cash collateral order).
[8] A docket report reflects 44 motions filed but of this number there were 9 corrective entries.

seeking a protective order and compliance with a subpoena request. Weil's argument fails to recognize that TCTM's conduct and demands precipitated both of these filings. It is undeniable that there have been instances where last minute filings, responses and negotiations resulted in additional work for everyone, including the Court. There is nothing in the record to demonstrate why these circumstances disproportionately affected or were a heavier burden on TCTM than any of the other constituencies involved in the case.

      6.      Strategies and case considerations

In its brief Weil states that it is not unusual for a secured creditor to examine whether to offer debtor-in-possession financing. In Fansteel's case this clearly did not appear to be a viable option. Prior to the bankruptcy filings TCTM had proposed repayment terms that Fansteel rejected. It is highly unlikely that over the course of a few days or weeks the parties would have suddenly reversed course on this important issue and nothing before the Court indicates otherwise. Weil has consistently taken the position that TCTM had grave concerns about whether or not it would be paid which seems inconsistent with any true appetite to provide post-petition financing. Substantial legal effort was spent on strategy, research and drafting motions for stay relief and appointment of a trustee. Neither of these items was filed and the evidence presented at various hearings does not demonstrate that either action was necessary or reasonable under the circumstances of this case.

      7.      Billing judgment and time entries

Billing judgment is reflected in staffing a file in a manner that efficiently provides the most cost effective representation necessary to a client's interest without redundant, duplicative, and unnecessary services. At the outset, it is noted that multiple attorneys appeared to monitor hearings by telephone even though there was no apparent reason for such participation, especially because audio recordings and transcripts were ordered for these same proceedings. The need for this duplication in effort is not adequately explained. "Courts have required applicants to state the specific 'purpose, nature and

substance of telephone calls, conferences, legal research, court appearances, depositions and preparation for court appearances or depositions' before fees may be awarded" for those services. *In re Woods Auto Gallery* 379 B.R. at 885 (internal citations omitted); *see also In re Pothoven,* 84 B.R. 579, 584 (Bankr. S.D. Iowa 1988). Regularly appearing in the itemization are generic entries that identify: correspondence, meetings or communications with other counsel or team members on "status" and "next steps," and review of "ongoing case projects" and "ongoing case tasks." Weil's itemization for September lumps the services provided by each attorney by date into a single time entry without any breakdown of the amount of time spent on a specific task which precludes any meaningful determination of reasonableness. While the October billing corrects the lumping of time there is still an inability to meaningfully gauge whether a specific entry is duplicative of work being performed by other attorneys. "When the nature of time entries or individual portions of the time entries make it impossible to determine which items were reasonably necessary for the protection of the creditor's interests, the Court must rely on its own knowledge and experience in arriving at the proper fee award." *In re Oliver*, 183 B.R. 87, 91 (Bankr. W.D. Pa. 1995).

Weil's billing also reflects that attorneys were involved in ministerial tasks such as: gathering, coordinating, and providing documents to local counsel; discussing filing practices with local counsel; attention to notices; and preparation of exhibits. No information has been provided to justify why it was necessary to have attorneys performing many of the functions identified in the itemization. Paralegals are used for only a fraction of the total time billed. From September 13 through October 31 paralegal time accounted for only 21.8 hours and $6,623.50 of Weil's total fee request. Based simply upon the number of attorneys and hours billed leads to the inherent conclusion that there was a distinct lack of billing judgment exercised by Weil in its representation of TCTM. *See In re Bate Land & Timber, LLC*, 541 B.R. 601, 608-09 (Bankr. E.D.N.C. 2015).

8.  Rates

Weil describes itself as a national firm, with experience in providing representation in complex bankruptcy cases. Because Weil was involved in the transaction to obtain the Bank's loan it made sense for it to be hired to handle the bankruptcy matters. On all of these points the Court agrees. None of these points, however, is relevant or solely dispositive of whether Weil's billings in *this* case are reasonable. The hourly rates charged by Weil range from $510 to $1,350. During 18 days in September, Weil logged 546.7 hours and fees of $428,418.50 resulting in an average daily burn rate of $23,801.03. The month of October saw 669.4 hours logged with fees billed of $548,486.50 resulting in an average daily burn rate of $17,693.11. According to the itemized bill, on any given day a minimum of 3 lawyers to over a dozen lawyers were billing work to TCTM in the Fansteel case.[9]

"Absent unusual circumstances, when a creditor is entitled to assess fees against the debtor or its estate, reasonable hourly rates are those in line with those prevailing in [the] community [where the bankruptcy case is pending] for similar services by lawyers of reasonably comparable skill, experience and reputation." *In re Latshaw Drilling, LLC,* 481 B.R. at 802 (citation omitted). There is a clear lack of parity between Weil's fees and the other professionals in this case. (*See* Appendix 1). By comparison both the hourly rates and the amount of time billed are simply unreasonable.

**C.    Conclusion**

By any measure the fees requested in Weil's Motion are staggering. An oversecured creditor is certainly entitled to determine the level of services it wants provided in any given bankruptcy case. Whether such fees were sensibly incurred is another matter.

> The purpose of the reasonableness requirement of section 506(b) is to ensure that a creditor is not given a blank check to incur attorneys' fees which will be reimbursed out of its collateral. If proper restraint is not

---

[9] The calculations contained here do not include the hours billed and fees requested under 11 U.S.C. § 506(b) by TCTM's local counsel in the amount of $110,500.

        exercised the costs of any 'overlawyering' should be borne by the [c]reditor, rather than [d]ebtors.

*In re 900 Corp.*, 327 B.R. 585, 593 (Bankr. N.D. Tex. 2005) (citation omitted).  Based upon the amounts requested there appears to have been little, if any, effort to restrain the fees and costs incurred by or on behalf of TCTM.  For the reasons stated the Court concludes that TCTM has failed to meet its burden to establish that the amount requested of $976,905.00 is reasonable under 11 U.S.C. § 506(b).  Attorney fees for the time period of September 13 through October 31, 2016 are determined to be reasonable and allowed under 11 U.S.C. § 506(b) in the amount of $488,452.50.

**D.**    **Costs**

Disbursements are also identified and requested in both the September and October billings attached to the Motion.  The described categories include:  Meals-Legal O/T; Travel, Airport Transportation; Duplicating; Corporation Services; and Outside Counsel Services.  A total of $3,719.01 and $28,483.41 is set forth in the respective invoices.  *In re Pothoven* details the information required for expenses to be allowed.  84 B.R. at 586.  The information submitted does not contain sufficient information related to these disbursements.  Computerized research is designated in this district as an overhead expense and is not compensable.  *Id.*

For the reasons stated the disbursement incurred for computerized research in the amount of $7,382 is denied.  Disbursements totaling $24,820.42 are denied without prejudice subject to additional documentation in support of the expenses and their reasonableness being submitted.

IT IS HEREBY ORDERED that:

1.    The Motion is granted in part and denied in part.

2.    Allowance of pre-petition fees in the amount of $32,202.42 is denied without prejudice.

3.    Fees in the amount of $488,452.50 are allowed as reasonable under 11 U.S.C. § 506(b).

4.	The disbursement for computerized research in the amount of $7,382.00 is denied.

5.	Disbursements in the amount of $24,820.42 are denied without prejudice.

/s/ Anita L. Shodeen
Anita L. Shodeen
U.S. Bankruptcy Judge

Parties receiving this Memorandum of Decision from the Clerk of Court:
Electronic Filers in this Chapter Case