# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| In Re: | ) Case No.   16-01823-als11 |
| | ) |
| **FANSTEEL, INC.** | ) Chapter 11 |
| | ) |
| Debtor and Debtor in Possession. | ) Hon. Anita L. Shodeen |
| | ) |
| c/o Robert Compernolle | ) **DEBTOR'S MOTION FOR ORDER** |
| 5518 Mulford Street | ) **APPROVING COMPROMISE AND** |
| Skokie, IL. 60077 | ) **ENVIRONMENTAL SETTLEMENT** |
| | ) **AGREEMENT** |
| EIN:  36-1058780 | ) |
| _____ | ) No Hearing Set |

**COMES NOW** Fansteel, Inc., Debtor and Debtor in Possession herein in the above captioned-case, ("Fansteel" or the "Debtor"), by and through its duly-employed General Reorganization Counsel, Jeffrey D. Goetz, Esq. of the law firm of Bradshaw, Fowler, Proctor & Fairgrave, PC, and pursuant to Federal Rule of Bankruptcy Procedure 9019, hereby asks the Court to enter an Order approving the compromise and settlement reached between Fansteel, FMRI, Inc. ("FMRI"), the United States of America, on behalf of the Nuclear Regulatory Commission ("NRC") and the Environmental Protection Agency ("EPA"), and the Oklahoma Department of Environmental Quality ("ODEQ") ("Environmental Authorities"), (collectively referred to herein as the "Settling Parties") in the above referenced Chapter 11 case (the "Chapter 11 Case").

1.      On September 13, 2016 (the "Petition Date"), Fansteel, Wellman Dynamics Corp. ("WDC"), and Wellman Dynamics Machining & Assembly, Inc. ("WDMA" and together with Fansteel and WDC, the "Debtors") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Iowa (the "Bankruptcy Court").

2.      In 2002, Fansteel commenced voluntary cases under chapter 11 of title 11 of the

Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  In that

case, Fansteel and the NRC reached a settlement agreement that was incorporated into Fansteel's

2003 Plan of Reorganization ("Fansteel I Plan"). Under the Fansteel I Plan, Fansteel created a

wholly owned subsidiary, FMRI, as a "special purpose vehicle to fulfill all obligations mandated

by the NRC License and the Amended Decommissioning Plan, as modified or supplemented by

amendment of the NRC License."  Under the Fansteel I Plan, Fansteel agreed to provide financial

assurance for the decommissioning and remediation of the Muskogee Site as follows: (a) FMRI

Primary Note:  Fansteel agreed to pay FMRI $30,600,000; (b) FMRI Secondary Note: Fansteel

agreed to pay FMRI $4,200,000 (to cover estimated costs of groundwater treatment and

monitoring); and (c) FMRI Contingent Note.

3.      On January 17, 2017, the United States filed a Proof of Claim in the instant

bankruptcy case at the request of the NRC ("U.S. Proof of Claim").

4.      The U.S. Proof of Claim asserts that the Debtor is liable to the United States to

comply with Sections 62, 63, and 161 of the Atomic Energy Act, 42 U.S.C. §§ 2092, 2093, 2201,

applicable regulations under 10 C.F.R. Parts 20 and 40, 10 C.F.R. § 40.36, NRC license SMB-

911, and the Amended Decommissioning Plan to perform the decommissioning and remediation

of the facility owned or formerly owned by Debtor and operated by FMRI in Muskogee,

Oklahoma (the "Muskogee Property").

5.      In the alternative, the U.S. Proof of Claim asserts that the NRC holds a general

unsecured claim as a third-party beneficiary to the amounts still owed by Fansteel to FMRI under

the notes created under the Fansteel I Plan: the FMRI primary note ($16,711,207), the secondary

2

note ($3,636,000), a contingent note (unliquidated), and the right to certain insurance proceeds ($1,238,680) required to be used to decommission and remediate the Muskogee Site.

6.      The United States on behalf of the EPA, asserts that the Debtor and FMRI are liable under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") 42 U.S.C. §§ 9601-9675, for costs incurred and to be incurred by the United States in response to releases and threats of releases of hazardous substances at or in connection with the Muskogee Property.

7.      On January 17, 2017, the ODEQ filed a Proof of Claim.  The ODEQ Proof of Claim asserts that the Debtor is liable to the State of Oklahoma to comply with Environmental Quality Code 27A, Oklahoma Statutes § 2-1-101 *et seq.*, Oklahoma Administrative Code, OAC 252, and OPDES Permit No. OK0001643 to perform the required remediation at the Muskogee Property.

8.      On February 17, 2020, the Debtor filed its Fourth Amended Plan of Liquidation ("Amended Plan").

9.      The Debtor and the Settling Parties have reached a compromise and settlement, the particular terms and conditions of which are memorialized in the attached Environmental Settlement Agreement executed by the parties and attached as Exhibit "A" and incorporated by reference herein.

10.     The United States filed a Notice of Lodging of Environmental Settlement Agreement with the Court on April 1, 2020, a copy of which is attached as Exhibit "B" and incorporated by reference herein.

11.     As indicated in the Notice of Lodging of Environmental Settlement Agreement,

the United States caused to be published in the Federal Register a Notice of Lodging of the

Environmental Settlement Agreement for public comment on April 8, 2020, a copy of which is

attached as Exhibit C.  The United States did not receive any comments on the proposed

Environmental Settlement Agreement during the public comment period.

12.     Pursuant to the Amended Plan and the Environmental Settlement Agreement, and

after the effective date of the Environmental Settlement Agreement: (1) the Debtor will transfer

Parcel D of the Muskogee Property to FMRI; (2) FMRI will use funds received from the

Decommissioning Trust, the Plan Administrator, or other sources for, *inter alia* , activities

necessary to maintain health and safety, to fulfill obligations mandated by the NRC license and

Amended Decommissioning Plan, or conduct response actions pursuant to CERCLA, 42 U.S.C.

§§ 9601-9675, or Oklahoma Environmental Quality Code 27A, Oklahoma Statutes § 2-1-101 *et*

*seq.*, at the Muskogee Property; (3) the Debtor will transfer any and all causes of action the

Debtor may have against any and all potentially responsible parties under CERCLA and

Oklahoma Law to FMRI; (4) the Debtor and the Environmental Authorities will allocate between

them as described in the Environmental Settlement Agreement, any net proceeds received from

the sale of Parcel B of the Muskogee Property, any settlement reached with the Port of Muskogee

regarding environmental liability, and any other net proceeds received; (5) Environmental

Authorities will receive one hundred percent (100%) of any net insurance proceeds for losses

related to environmental liabilities with respect to the Muskogee Property; and (6) the

Environmental Authorities and FMRI will share (as further provided in the Environmental

Settlement Agreement) on a fifty percent/fifty percent (50%/50%) basis the proceeds from any

4

settlement or adjudication of the third party environmental claims transferred from the Debtor to FMRI.

13.    Pursuant to Federal Rule of Bankruptcy Procedure 9019(a), "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement . . . ."

14.    The standard in determining whether to approve a settlement is "'whether the settlement is fair and equitable and in the best interests of the estate.'" *In re Hildreth*, No. 09-00293, 2012 WL 4520635, at *6 (Bankr. N.D. Iowa Oct. 1, 2012) (quoting *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006); *see also In re Tri-State Fin., LLC*, Case 16-01825-als11 Doc 557 Entered 03/30/18 16:16:29 Desc Main Document Page 4 of 93 *Lovald*, 525 F.3d 649, 654 (8th Cir. 2008) (citing *In re Martin*, 212 B.R. 316, 319 (8th Cir. B.A.P. 1997). "A settlement is not required to constitute 'the best result possible. . . . . Rather, the court need only canvass the issues to determine that the settlement does not fall below the lowest point in the range of reasonableness.'" *Id.*

15.    Courts generally examine four factors in determining whether to approve a settlement or compromise: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Id.; *see also In re Tri-State Financial, LLC*, 525 F.3d at 654 (citing *In re Martin*, 212 B.R. 316, 319 (8th Cir. B.A.P. 1997); *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006).

16.    Without the Environmental Settlement Agreement, the Debtor likely would be compelled to engage in complex and expensive additional litigation against the Environmental Authorities (with an uncertain result) at a time when virtually no liquid assets remain in the

5

estate.  The proposed Environmental Settlement Agreement will facilitate the maximum recovery

of the assets, and potential assets, that remain both for the Environmental Authorities and the

creditors of the estate.  As such, the attached Environmental Settlement Agreement should be

approved by the Court.

17.    The Debtor is informed and believes and thereupon alleges that approval of the

Environmental Settlement Agreement is in the best interests of this bankruptcy estate and its

creditors, and does not fall below the lowest point of reasonableness.

18.    Further, the Debtor believes that the proposed terms and conditions set out in the

attached Environmental Settlement Agreement represent a fair and reasonable settlement, and the

Debtor respectfully requests that the Court approve the Environmental Settlement Agreement.

**WHEREFORE**, the Debtor respectfully requests that this Court, after notice and

opportunity for hearing pursuant to Bankruptcy Rules 2002 and 9019, approve the attached

Environmental Settlement Agreement; authorize the Settling Parties to thereafter proceed with

performance pursuant to the terms and conditions of the attached Environmental Settlement

Agreement; and for such other and further relief as the Court may deem just and equitable under

the circumstances.

Dated: May 13, 2020

Respectfully submitted,

*/s/Jeffrey D. Goetz*
Jeffrey D. Goetz, Esq., AT0002832
Bradshaw Fowler Proctor & Fairgrave P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
515/246-5817
515/246-5808 FAX

6

goetz.jeffrey@bradshawlaw.com
*General Reorganization Counsel for the Debtor*

## CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filling.

*/s/Barbara Warner*
Barbara Warner

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF IOWA

EXHIBIT A

| | |
|---|---|
| In Re: | ) Bankruptcy Case No. 16-01823-als11 |
| | ) Affiliated Case Nos: 16-01825 & 16-01827 |
| **FANSTEEL, INC.** | ) |
| | ) Chapter 11 (Jointly Administered) |
| Debtor and Debtor in Possession. | ) |
| | ) Hon. Anita L. Shodeen |
| 1746 Commerce Rd. | ) |
| Creston, IA 50801 | ) **ENVIRONMENTAL SETTLEMENT** |
| | ) **AGREEMENT AMONG DEBTOR,** |
| EIN: 36-1058780 | ) **FMRI, UNITED STATES, AND ODEQ** |
| | ) |
| | ) Courtroom: 1 |
| | ) |
| | ) Date Entered on Docket:_____ |
| | ) |

THIS SETTLEMENT AGREEMENT is made as of March 31, 2020, by and between Fansteel, Inc. ("Fansteel" or the "Debtor"), FMRI, Inc. ("FMRI"), the United States of America, on behalf of the Nuclear Regulatory Commission ("NRC") and the Environmental Protection Agency ("EPA"), and the Oklahoma Department of the Environmental Quality ("ODEQ") (collectively referred to herein as the "Settling Parties") in the above referenced chapter 11 case (the "Chapter 11 Case");

WHEREAS, on September 13, 2016 (the "Petition Date"), Fansteel, Wellman Dynamics Corp. ("WDC"), and Wellman Dynamics Machining & Assembly, Inc. ("WDMA" and together with Fansteel and WDC, the "Debtors") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Iowa (the "Bankruptcy Court").

WHEREAS, in 2002, Fansteel commenced voluntary cases under chapter 11 of title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. In that

case, Fansteel and the NRC reached a settlement agreement that was incorporated into Fansteel's 2003 Plan of Reorganization ("Fansteel I Plan"). Under the Fansteel I Plan, Fansteel created a wholly owned subsidiary, FMRI, as a "special purpose vehicle to fulfill all obligations mandated by the NRC License and the Amended Decommissioning Plan, as modified or supplemented by amendment of the NRC License. Under the Fansteel I Plan, Fansteel agreed to provide financial assurance for the decommissioning and remediation of the Muskogee Site as follows: (a) FMRI Primary Note. Fansteel agreed to pay FMRI $30,600,000; (b) FMRI Secondary Note. Fansteel agreed to pay FMRI $4,200,000 (to cover estimated costs of groundwater treatment and monitoring); and (c) FMRI Contingent Note.

WHEREAS, on January 17, 2017, the United States filed a Proof of Claim in the instant bankruptcy case at the request of the NRC ("U.S. Proof of Claim");

WHEREAS, the U.S. Proof of Claim asserts that the Debtor is liable to the United States to comply with Sections 62, 63, and 161 of the Atomic Energy Act, 42 U.S.C. §§ 2092, 2093, 2201, applicable regulations under 10 C.F.R. Parts 20 and 40, 10 C.F.R. § 40.36, NRC license SMB-911, and the Amended Decommissioning Plan to perform the decommissioning and remediation of the facility owned or formerly owned by Debtor and operated by FMRI, a wholly owned subsidiary of the Debtor, in Muskogee, Oklahoma (the "Muskogee Property");

WHEREAS, in the alternative, the U.S. Proof of Claim asserts that the NRC holds a general unsecured claim as a third party beneficiary to the amounts still owed by Fansteel to FMRI under the notes created under the Fansteel I Plan: the FMRI primary note ($16,711,207), the secondary note ($3,636,000), a contingent note (unliquidated), and the right to certain insurance proceeds ($1,238,680) required to be used to decommission and remediate the Muskogee Site.

WHEREAS, the United States on behalf of EPA asserts that the Debtor and FMRI are liable under the Comprehensive Environmental Response, Compensation, and Liability Act

("CERCLA") 42 U.S.C. §§ 9601-9675, for costs incurred and to be incurred by the United States in response to releases and threats of releases of hazardous substances at or in connection with the Muskogee Property;

WHEREAS, on January 17, 2017, the ODEQ filed a Proof of Claim ("ODEQ Proof of Claim");

WHEREAS, the ODEQ Proof of Claim asserts that the Debtor is liable to the State of Oklahoma to comply with Environmental Quality Code 27A, Oklahoma Statutes § 2-1-101 *et seq.*, Oklahoma Administrative Code, OAC 252, and OPDES Permit No. OK0001643 to perform the required remediation at the Muskogee Property;

WHEREAS, on February 17, 2020, the Debtor filed its Fourth Amended Plan of Liquidation;

WHEREAS, pursuant to the Plan and this Settlement Agreement and after the Effective Date of this Settlement Agreement: (1) the Debtor will transfer Parcel D of the Muskogee Property to FMRI; (2) FMRI will use  funds received from the Decommissioning Trust, the Plan Administrator, or other sources for activities necessary to maintain health and safety, fulfill obligations mandated by the NRC license and Amended Decommissioning Plan, or conduct response actions pursuant to CERCLA, 42 U.S.C. §§ 9601-9675, or Oklahoma Environmental Quality Code 27A, Oklahoma Statutes § 2-1-101 *et seq.*, at the Muskogee Property; (3) the Debtor will transfer any and all causes of action the Debtor may have against any and all potentially responsible parties under CERCLA and Oklahoma Law to FMRI; (4) the Debtor and the Environmental Authorities will allocate between them as described herein any Net Proceeds received from the sale of Parcel B of the Muskogee Property, any settlement reached with the Port of Muskogee regarding environmental liability, and any other Net Proceeds received; (5) the

3

Environmental Authorities will receive one hundred percent (100%) of any Net Insurance Proceeds for losses related to environmental liabilities with respect to the Muskogee Property; and (6) the Environmental Authorities and FMRI will share as further provided herein on a fifty percent/fifty percent (50%/50%) basis the proceeds from any settlement or adjudication of the third party environmental claims transferred from the Debtor to FMRI.

WHEREAS, in consideration of, and in exchange for, the promises and covenants herein, including, without limitation, the covenants and reservations set forth in Paragraphs 18-27, intending to be legally bound hereby, the Settling Parties hereby agree to the terms and provisions of this Settlement Agreement;

WHEREAS, this Settlement Agreement is fair and reasonable and in the public interest, and is an appropriate means of resolving these matters.

NOW, THEREFORE, without any adjudication on any issue of fact or law, and upon the consent and agreement of the parties by their attorneys and authorized officials, it is hereby agreed as follows:

## I. DEFINITIONS

1. Unless otherwise expressly provided herein, terms used in this Settlement Agreement that are defined in CERCLA, the AEA, other Environmental Laws, or their regulations or in the Bankruptcy Code shall have the meaning assigned to them therein. In addition, terms defined in the Settlement Agreement shall have the meaning set forth herein.

"AEA" shall mean the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011 *et seq.*, as amended.

"Amended Decommissioning Plan" means the decommissioning plan for the Muskogee Property, dated January 14, 2003, as supplemented by letters dated May 8, 2003 and May 9, 2003, and resubmitted by Fansteel for review by the NRC on July 24, 2003, as the same may be further amended, modified, or supplemented at the request, or with the consent, of Fansteel.

"Cash" means legal tender of the United States of America and its equivalents.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended.

"Confirmation Date" means the date of entry of the Confirmation Order.

"Confirmation Order" means the order confirming the Plan.

"Decommissioning Trust" means the decommissioning trust fund established by TNB Financial Services and FMRI for the benefit of NRC.

"Decommissioning Activities" shall mean those activities that reduce the residual radioactivity to a level such that the NRC may terminate the Muskogee License and release the Muskogee Property for unrestricted use or terminate the Muskogee License and release the Muskogee Property under restricted conditions or use.

"Effective Date" shall mean the date on which this Settlement Agreement is approved by the Bankruptcy Court

"Environmental Activities" shall mean any and all environmental activities authorized or required under Environmental Laws that occur after the Effective Date and that are related to the Muskogee Property, including but not limited to response or remedial actions, removal actions, corrective action, closure, or post-closure care, reclamation, investigations, studies, remediation, interim actions, final actions, emergency actions, water treatment, implementation of engineered structures and controls, monitoring, repair and replacement of engineered structures, monitoring equipment and controls, operation and maintenance, implementation, operation and maintenance of institutional controls, coordination and integration of reuse and remedial efforts and initiatives (including, without limitation, multi-stakeholder communications), and, if required, long-term stewardship and perpetual custodial care activities. "Environmental Activities" also include the above environmental activities relating to the migration of hazardous substances emanating from the Muskogee Property. For the avoidance of doubt, "Environmental Activities" shall not include natural resource assessment or restoration.

"Environmental Authorities" means, collectively, the NRC, EPA, and ODEQ.

"Environmental Costs" means the costs and expenses incurred or to be incurred in connection with implementing Maintenance Activities, Decommissioning Activities and Environmental Activities and the payment of certain oversight costs incurred or to be incurred by the Environmental Authorities with respect to the Muskogee Property.

"Environmental Information" shall mean all environmental reports, audits, analyses, records, studies and other documents containing information prepared by or otherwise in the possession, custody or control of Debtor, FMRI or their technical consultants that are based on or otherwise reflect information related to environmental activities, but does not include records that must be maintained in accordance with the NRC's record keeping requirements in Title 10 of the *Code of Federal Regulations*, including, but not limited to, records of information important to decommissioning of the Muskogee Property in accordance with 10 C.F.R. §40.36(f).

"Environmental Laws" means, whenever in effect, all federal, tribal, state and local statutes, regulations, ordinances and similar provisions having the force or effect of law; all judicial and administrative orders and determinations and all common law concerning public health and safety, worker health and safety, pollution or protection of the environment, including, without limitation, the AEA, CERCLA, Clean Water Act ("CWA"), Clean Air Act ("CAA"), Emergency Planning and Community Right-to-Know Act ("EPCRA"), Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), Resource Conservation and Recovery Act ("RCRA"), Safe Drinking Water Act ("SDWA"), Toxic Substances Control Act ("TSCA"), and any tribal, state or local equivalents.

"Fansteel I Bankruptcy" shall mean and refer to that Chapter 11 bankruptcy case filed by Fansteel, Inc., in the United States Bankruptcy Court for the District of Delaware, which was filed on January 15, 2002, was assigned case number 02-10109-KJC, and in which a plan of reorganization was confirmed on November 17, 2003.

"FMRI" shall mean and refer to FMRI, Inc., which is a corporation formed as a special purpose entity to fulfill all obligations mandated by NRC license SMB-911 and the Amended Decommissioning Plan, as modified or supplemented by amendment of the NRC license as part of the Fansteel I Bankruptcy.

"Maintenance Activities" means any and all activities other than Decommissioning Activities that are necessary to ensure the adequate protection of public health and safety with respect to the Muskogee Property, including, but not limited to, securing licensed materials, water treatment and monitoring, airborne particulate and effluent monitoring, radon monitoring, personnel exposure monitoring, contamination monitoring, and the implementation and maintenance of engineered structures and controls to prevent the release of radiological and non-radiological hazardous materials from the Muskogee Property or the ponds which contain process waste exceeding regulatory release criteria.

"Muskogee License" means the Radioactive Materials License SMB-911, held by FMRI, Inc.

"Muskogee Licensee" means the person or entity approved by NRC to hold the Muskogee License.

"Muskogee Permit" means the Oklahoma Department of Environmental Quality permit No. OK0001643 held by FMRI, Inc.

"Muskogee Permittee" means the person or entity approved by ODEQ to hold the Muskogee Permit.

"Muskogee Property" means the real property, any and all structures and fixtures, appurtenances to, and rights associated with that real property, owned or formerly owned by the Debtor and located at Ten Tantalum Place, in Muskogee, Muskogee County, Oklahoma. The Muskogee Property is comprised of the four parcels of real property described in the Appendix A.

"Net Insurance Proceeds" means the amount of insurance proceeds received by the Plan Administrator from time to time with respect to any and all claims made by Fansteel and/or any subsidiary for insurance coverage in respect of the Muskogee Property, net of the reasonable or necessary costs incurred in connection with obtaining such proceeds, including reasonable fees and expenses of the Plan Administrator's legal counsel.

"Net Proceeds" means the Cash proceeds received by the Plan Administrator from time to time from the sale or disposition, through litigation, settlement, or otherwise, of the Reorganized Debtor's Assets, net of the reasonable or necessary costs of such sale or other disposition, including without limitation, title survey, escrow and closing costs and real property taxes accumulated after the Effective Date and reasonable fees and expenses of the Plan Administrator's legal counsel and other Professionals, that are incurred in connection with obtaining the Cash proceeds. Net Proceeds shall not include any consideration or payment received by EPA or ODEQ in exchange for any covenant not to sue provided by EPA or ODEQ to the purchaser of any of the Debtor's Assets. Net Proceeds shall also not include the proceeds obtained by FMRI from settlements or proceeds with respect to Causes of Action the Debtor may have against potentially responsible parties as set forth in §6.2.1(b).(iii) of the Plan.    Net Proceeds shall not include the Net Insurance Proceeds received by the Plan Administrator.   Net Proceeds shall not include the proceeds obtained by the Environmental Authorities from settlements or litigation against potentially responsible parties related to the existing contamination at the Muskogee Property.

"Person" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

"Plan" means Debtor's Plan of Liquidation, as it may be modified or amended.

"Plan Administrator" means the Person designated by the Debtor prior to the Confirmation Date to administer the Estate and make Distributions in accordance with the Plan. The Debtor has designated David Sands of Dorset Partners LLC, whose address is set forth in §9.17 below, to serve as Plan Administrator in this case.

"Port Authority" means the Muskogee City-County Port Authority.

"Proofs of Claim" shall mean the Proofs of Claim filed by the Governments as set forth in the Recitals.

"Real Property Information" shall mean all documents in Fansteel's and FMRI's possession, custody, or control related to property taxes, leases, contracts, security, insurance, or administration or potential sales (but with respect to potential sales, only information reasonably locatable dated 2008 or later) of an Muskogee Property.

"State" shall mean the State of Oklahoma.

"Superfund" shall mean the "Hazardous Substance Trust Fund" established by 26 U.S.C. § 9507 or, in the event such Hazardous Substance Superfund no longer exists, any successor fund

or comparable account of the Treasury of the United States to be used for removal or remedial actions to address releases or threats of releases of hazardous substances.

"United States" shall mean the United States of America and all of its agencies, departments, and instrumentalities, including EPA and NRC.

## II. JURISDICTION

2.      The Court has jurisdiction over the subject matter hereof pursuant to 28 U.S.C. §§ 157, 1331, and 1334.

## III. PARTIES BOUND

3.      This Settlement Agreement applies to, is binding upon, and shall inure to the benefit of the signatories hereto, their legal successors and assigns, and any trustee, examiner or receiver appointed in the Bankruptcy Cases.

## IV. THE MUSKOGEE PROPERTY

4.      Pursuant to the Plan, the Debtor will transfer and convey any and all of its right, title, and interest in Parcel D of the Muskogee Property to FMRI.

5.      Pursuant to the Plan, the Debtor shall pay to or otherwise resolve with the applicable tax authorities all unpaid real property taxes relating to the Muskogee Property due on or before the Effective Date.  The Debtor shall not transfer or cause to be transferred its rights, title, and interests in and to Parcel D of the Muskogee Property, or any other property owned by the Debtor, to FMRI until the Debtor has provided documentation to the Environmental Authorities that it has paid, or otherwise resolved, all real property taxes and bills to service providers (including electric, gas, water, sewer, phone, internet, trash removal, and office supplies) as provided herein that have accumulated prior to the Effective Date relating to the Muskogee Property.

6.      FMRI shall be responsible for performing or causing to be performed Maintenance Activities, Decommissioning Activities and Environmental Activities including but not limited to activities necessary to maintain health and safety, and for fulfilling all obligations mandated by

the Muskogee License; the Amended Decommissioning Plan, as modified or supplemented by amendment of the Muskogee License; and the Muskogee Permit at the Muskogee Property.

7.    FMRI will use  funds received from the Decommissioning Trust, Plan Administrator, and any other sources for performing or causing to be performed Maintenance Activities, Decommissioning Activities and Environmental Activities including but not limited to activities necessary to maintain health and safety, fulfill obligations mandated by the Muskogee license and Amended Decommissioning Plan, or conduct response actions pursuant to CERCLA, 42 U.S.C. §§ 9601-9675, or Oklahoma Environmental Quality Code 27A, Oklahoma Statutes § 2-1-101 *et seq.*, at the Muskogee Property.  FMRI shall use funds received from the Decommissioning Trust only as approved by the NRC.  Within 180 days after the Effective Date, the Environmental Authorities shall initiate discussions toward reaching an agreement on how the funding is to be expended following deposit in the Decommissioning Trust.

8.    FMRI shall provide the NRC, the State of Oklahoma, EPA, and their representatives and contractors access to all portions of the Muskogee Property at all reasonable times for the purposes of overseeing Maintenance Activities, Decommissioning Activities and Environmental Activities at or near the Muskogee Property.  FMRI shall execute and record with the appropriate recorder's office any easements or deed restrictions requested by NRC, EPA and the State of Oklahoma for restrictions on activities or use of the Muskogee Property in order to protect public health, welfare or safety or the environment or ensure non-interference with or protectiveness of any Maintenance Activity, Decommissioning Activity or Environmental Activity. Any existing easements or deed restrictions of record as to the Muskogee Property prior to the Effective Date shall survive the Settlement Agreement.

9.    Pursuant to the Plan, , the Debtor also shall transfer to FMRI any and all causes of action the Debtor might have against any and all potentially responsible parties related to the

Muskogee Property including, but not limited to, those causes of action under §113 of CERCLA, Oklahoma Law, Oklahoma Environmental Quality Code, 27A O.S. §§1-3-101, 2-3-202 and 2-3-506, and any and all applicable causes of action under any federal and/or state laws, rules, and regulations with regard to or related to the Muskogee Property, provided, however, that any causes of action against the Port Authority shall be transferred to the Plan Administrator.

## V. **THE TREATMENT OF THE DEBTOR'S LIABILITIES TO THE ENVIRONMENTAL AUTHORITIES**

10.     Pursuant to the Plan, the Debtor and the Environmental Authorities shall allocate between them the Net Proceeds received from the sale of Parcel B (*See* §6.2.1.(A).(i), *infra*), any settlement reached with the Port Authority regarding environmental liability (*See* §6.2.1.(B).(i), *infra*), and any other Net Proceeds received as follows:

(1)     beginning with the first dollar in Net Proceeds received by the Plan Administrator and up until the Plan Administrator has received a total of $1.5 million ($1,500,000.00) in Net Proceeds, the Plan Administrator, on behalf of the Reorganized Debtor, will be entitled to and will receive seventy-five percent (75%) of such Net Proceeds, and the Environmental Authorities will be entitled to and will receive twenty-five percent (25%) of such Net Proceeds;

(2)     beginning with the first dollar in Net Proceeds received by the Plan Administrator in excess of $1.5 million ($1,500,000.00) and up until the Plan Administrator has received a total of $2.5 million ($2,500,000.00) in Net Proceeds, the Plan Administrator, on behalf of the Reorganized Debtor, will be entitled to and will receive twenty-five percent (25%) of such Net Proceeds, and the Environmental Authorities will be entitled to and will receive seventy-five percent (75%) of such Net Proceeds; and,

(3)     beginning with the first dollar in Net Proceeds received by the Plan Administrator in excess of $2.5 million ($2,500,000.00), the Plan Administrator, on behalf of the Reorganized Debtor, will be entitled to and will receive fifty percent (50%) of such Net Proceeds, and the Environmental

Authorities will be entitled to fifty percent (50%) of such Net Proceeds until, pursuant to the provisions of the Plan, the Plan Administrator has made distributions to the Holders of Claims referred to in Section 3 of the Plan and the Holders of Claims in Class 1 and Class 2 of the Plan in full, and to the Holders of other Claims set forth in the Plan.

(4)     Of the Net Proceeds allocated to the Environmental Authorities, all of those proceeds shall be deposited in the Decommissioning Trust, at the following address, unless the Environmental Authorities agree and notify the Plan Administrator otherwise:

> TNB Financial Services, Inc., a Division of Thomasville Bank
> 5101 Washington St., Suite 1101
> Gurnee, Illinois  60031

11.     The Plan Administrator shall prosecute and use commercially reasonable efforts to obtain payment from its insurers for claims under all applicable insurance policies for losses related to environmental liabilities with respect to the Muskogee Property. Settlements by the Plan Administrator with insurers of any such insurance claims shall require the prior consent of the Environmental Authorities or the approval of the Bankruptcy Court or other court of competent jurisdiction, on appropriate notice. The Environmental Authorities shall receive one hundred percent (100%) of the Net Insurance Proceeds, provided, however, that the Plan Administrator shall not enter into any contingent fee arrangement for the prosecution or defense of such claims without the prior consent in writing from the United States.  All of the Net Insurance Proceeds received shall be deposited in the Decommissioning Trust, unless the Environmental Authorities agree and notify the Plan Administrator otherwise.

## VI. <u>LIQUIDATION OF THE DEBTOR'S PROPERTY</u>

12.     As soon as is practicable following the Effective Date, the Plan Administrator will continue liquidating the Reorganized Debtor's Assets by reducing or converting them to Cash.

13.     *Real Property:*

(a)     Continued Efforts to Sell Parcel B.  During the pendency of this Case, the Debtor initiated efforts to sell Parcel B. With the assistance of counsel and in coordination with the Environmental Authorities, the Plan Administrator will, on behalf of the Reorganized Debtor, continue to pursue efforts to market and sell Parcel B. However, the Plan Administrator shall not grant, bargain, sell, or convey any interest in Parcel B without the prior written approval of the Environmental Authorities.

(b)     Transfer of Parcel D to FMRI.  In conformity with the stated intention of the Debtor in connection with and as part of the Fansteel I Bankruptcy Case, with the assistance of counsel and in coordination and cooperation with the Environmental Authorities, the Plan Administrator will, on behalf of the Reorganized Debtor, transfer all the Debtor's right, title, and interest in and to Parcel D to FMRI.

(c)     Utilization of Buildings on Parcel B.  The Plan Administrator will oversee, supervise, and administer the utilization, for the benefit of the Reorganized Debtor, of the Service Building, the Sintering Building, and the EB Building, all three of which are located on Parcel B. As part of these duties, the Plan Administrator will oversee, supervise, and administer the existing lease of these buildings (the "Lease") between the Debtor and Bruce Oakley, Inc. ("Oakley") which will include collection of the $4,500.00 monthly rent paid by Oakley to the Debtor pursuant to the Lease which the Plan Administrator will use and otherwise administer in accordance with the terms of the Plan. The Plan Administrator shall reimburse the Decommissioning Trust for any utilities or insurance provided or paid by FMRI for the benefit of Parcel B, as set forth in the Letter Agreement attached hereto as Appendix B.

14.     *Claims, Rights, and Causes of Action.*

(a)     Efforts toward Settlement with the Port Authority Regarding Environmental Liability. With the assistance of counsel and in consultation with the Environmental Authorities, the Plan

Administrator will, on behalf of the Reorganized Debtor, continue to pursue good faith settlement discussions with the Port Authority regarding the Port Authority's potential liability, as the current owner of Parcel A of the Muskogee Property, to the Debtor under CERCLA, Oklahoma law, and any and all applicable federal and/or state rules and regulations for its share of response costs incurred and to be incurred in connection with the investigation and remediation of existing contamination at the Muskogee Property.

(b)     Efforts toward Settlement with Insurers Regarding Environmental Liability.  With the assistance of counsel and in consultation with the Environmental Authorities, the Plan Administrator will, on behalf of the Reorganized Debtor, continue to pursue good faith settlement discussions with any and all insurers that currently provide or may have, in the past, provided the Debtor with liability or other insurance policies that may provide coverage for claims for property damages, bodily injury or other losses arising out of or in any way related to the existing contamination in, on or at the Muskogee Property.

(c)     Settlement or Adjudication of FMRI's Third Party Environmental Claims.  With the assistance of counsel and in consultation with the Environmental Authorities, FMRI shall pursue good faith settlement discussions and litigation, if necessary and appropriate, with respect to all causes of action the Debtor might have against any and all potentially responsible parties, including ,but not limited to, those causes of action under §113 of CERCLA, Oklahoma Law, Oklahoma Environmental Quality Code, 27A O.S. §§1-3-101, 2-3-202 and 2-3-506, and any and all applicable causes of action under any federal and/or state laws, rules and regulations with regard to or related to the Muskogee Property, provided, however, that any causes of action against the Port Authority shall be transferred to the Plan Administrator.

(d)     The proceeds from such settlements or litigation shall be allocated among the Environmental Authorities and FMRI, on a fifty/fifty percent (50%)/50%) basis as provided below, net of the reasonable or necessary costs incurred in connection with obtaining such proceeds, including

13

reasonable fees and expenses of FMRI's legal counsel, provided however, that FMRI shall not enter into any contingent fee arrangement for the prosecution or defense of such claims without the prior consent in writing from the United States. FMRI will use funds received from such settlements for Maintenance Activities, Decommissioning Activities and Environmental Activities including but not limited to activities necessary to maintain health and safety, fulfill obligations mandated by the NRC license and Amended Decommissioning Plan, or conduct response actions pursuant to CERCLA, 42 U.S.C. §§ 9601-9675, or Oklahoma Environmental Quality Code 27A, Oklahoma Statutes § 2-1-101 *et seq.*, at the Muskogee Property; provided however, that of the fifty percent (50%) of the proceeds allocated to FMRI, after the payment of FMRI's administrative costs, such as real property taxes and general liability insurance, FMRI may use such funds received for the payment of any post-confirmation, post-petition administrative expense and priority claims approved by the Court under the Plan in addition to activities necessary to maintain health and safety, fulfill obligations mandated by the NRC license and Amended Decommissioning Plan, or response actions pursuant to CERCLA, or Oklahoma Environmental Quality Code 27A at the Muskogee Property. Nothing herein shall preclude the Environmental Authorities from pursuing good faith settlement discussions and litigation and entering into settlements with and providing contribution protection to with potentially responsible parties related to the existing contamination in, on, or at the Muskogee Property. Of the fifty percent (50%) of the proceeds allocated to the Environmental Authorities, all of those proceeds shall be deposited in the Decommissioning Trust, unless the Environmental Authorities agree and notify FMRI otherwise.

## VII. **QUARTERLY REPORTS**

15.     The Plan Administrator shall periodically prepare and submit to the Environmental Authorities Quarterly Reports containing:

(a)    a description of all distributions to holders of allowed claims during the period covered by the Quarterly Report;

(b)    a summary of receipts and disbursements during the period covered by the Quarterly Report;

(c)    a summary description of the Reorganized Debtor's assets; and

(d)    a summary of the status of the sale and administration of Parcel B, any settlement with the Port Authority regarding Parcel A, and any settlements with insurers regarding environmental liability.

16.    FMRI shall periodically prepare and submit to the Environmental Authorities Quarterly Reports containing:

(a)    a summary of receipts and disbursements during the period covered by such Quarterly Report;

(b)    a summary of the status of the performance of Maintenance Activities, Decommissioning Activities or Environmental Activities including activities performed to maintain health and safety, fulfill obligations mandated by the Muskogee License and Amended Decommissioning Plan, or conduct response actions pursuant to CERCLA, 42 U.S.C. §§ 9601-9675, or Oklahoma Environmental Quality Code 27A, Oklahoma Statutes § 2-1-101 *et seq.*, at the Muskogee Property; and

(c)    a summary of the status of any settlement or adjudication of FMRI's third party environmental claims.

## VIII. <u>POLICE OR REGULATORY RIGHTS OF THE ENVIRONMENTAL AUTHORITIES</u>

17.    Nothing in the Plan, Confirmation Order or this Settlement Agreement shall discharge, release, preclude, or enjoin, nor shall anything in the Plan, Confirmation Order, or this Settlement

15

Agreement enjoin or otherwise bar the Environmental Authorities or any of them from asserting or enforcing, in the Bankruptcy Court or any other court of competent jurisdiction.

(a)     any liability to the Environmental Authorities that is not a "claim" as defined in 11 U.S.C. §101(5) ("Claim");

(b)     any Claim of an Environmental Authority arising on or after the Confirmation Date;

(c)     any police or regulatory liability to an Environmental Authority that any entity would be subject to as the owner or operator of property after the Confirmation Date; or

(d)     any liability to an Environmental Authority on the part of any Person who is not the Debtor.

## IX. COVENANTS RESERVATIONS AND CONTRIBUTION PROTECTION

18.     Except as specifically provided in Paragraph 20 (Reservation of Rights), in consideration of the actions that will be performed and the payments that will be made by Debtor under the terms of this Settlement Agreement, and except as otherwise specifically provided in this Settlement Agreement, upon the Effective Date, the United States on behalf of the NRC, covenants not to sue or take any other civil or administrative action against the Debtor pursuant to the Atomic Energy Act, 42 U.S.C. §§ 2092 *et seq.* with respect to Existing Contamination at the Muskogee Property.     Except as specifically provided in Paragraph 20 (Reservation of Rights), in consideration of the actions that will be performed and the payments that will be made by Debtor and FMRI under the terms of this Settlement Agreement, and except as otherwise specifically provided in this Settlement Agreement, upon the Effective Date, the United States on behalf of the NRC and EPA, covenants not to sue or take any other civil or administrative action against the Debtor and FMRI pursuant to CERCLA Sections 106 and 107(a), 42 U.S.C. §§ 9606 and 9607(a) with respect to Existing Contamination at the Muskogee Property.     For purposes of this Settlement Agreement, "Existing Contamination" means (a) any hazardous substances, pollutants or contaminants present

or existing on or under the Muskogee Property as of the Effective Date;  (b) any hazardous substances, pollutants or contaminants that migrated from the Muskogee Property prior to the Effective Date; and/or (c) any hazardous substances, pollutants, or contaminants presently at the Muskogee Property that migrate from the Muskogee Property after the Effective Date.

19.     Except as specifically provided in Paragraph 20 (Reservation of Rights), upon the Effective Date, the ODEQ covenants not to sue or take any other civil or administrative action against the Debtor pursuant to the Environmental Quality Code, 27A Oklahoma Statutes § 2-1-101 *et seq*. with respect to Existing Contamination at the Muskogee Property.

20.     The covenants not to sue set forth above do not pertain to any matters other than those expressly specified therein (United States' and ODEQ's Covenant Not to Sue).  The United States and ODEQ reserve, and this Settlement Agreement is without prejudice to, all rights against the Debtor, FMRI, or other persons with respect to all matters  not expressly included within the United States' and ODEQ's Covenants Not to Sue.   Notwithstanding any other provision of the Settlement Agreement, the United States and ODEQ reserve all rights against the Debtor or FMRI with respect to:

(a)     any action to enforce the United States and ODEQ's rights pursuant to this Settlement Agreement, including but not limited to the enforcement of Muskogee  License SMB-911 or the Muskogee  Permit.;

(b)     any liability resulting from exacerbation of Existing Contamination by the Debtor, FMRI, or their successors, assignees, lessees or sublessees;

(c)     any liability resulting from the release or threat of release of hazardous substances, pollutants, or contaminants, at the Muskogee Property after the Effective Date, not within the definition of Existing Contamination;

(d)      any liability under Section 107 of CERCLA, 42 U.S.C. § 9607, for recovery of natural resource damages arising as a result of post-petition or ongoing releases of hazardous substances at or from the Muskogee Property;

(e)      any liability resulting from violations of the NRC's deliberate misconduct regulations (40 C.F.R. § 40.10); and

(f)      criminal liability.

21.      Nothing in this Settlement Agreement is intended as a release or covenant not to sue for any claim or cause of action, administrative or judicial, civil or criminal, past or future, in law or in equity, which the United States and ODEQ may have against any person, firm, corporation or other entity not a party to this Settlement Agreement.  The United States, ODEQ, and  Debtor and FMRI expressly reserve all claims, demands, and causes of action, either judicial or administrative, past, present, or future, in law or equity, which they may have against all other persons, firms, corporations, entities, or predecessors of the Debtors for any matter arising at or relating in any manner to the Muskogee Property.  Further, nothing in this Settlement Agreement diminishes the right of the United States or ODEQ, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to enter into any settlement that gives rise to contribution protection for any person not a party to this Settlement Agreement.

22.      The parties hereto agree, and by entering this Settlement Agreement the Bankruptcy Court finds, that this Settlement Agreement constitutes a judicially-approved settlement pursuant to which Debtor and FMRI have, as of the Effective Date, resolved liability to the United States and ODEQ within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law,

for the "matters addressed" in this Settlement Agreement. The "matters addressed" in this Settlement Agreement are all Maintenance Activities, Decommissioning Activities and Environmental Activities including all response actions taken or to be taken, and all response costs incurred or to be incurred, at or in connection with Existing Contamination at Muskogee Property by the United States or any potentially responsible parties, provided, however, that, if EPA exercises rights under the reservations in Paragraph 20, other than for failure to meet a requirement of this Settlement Agreement, the "matters addressed" in this Settlement Agreement shall no longer include those response costs or response actions that are within the scope of the exercised reservation.

23.      This Settlement Agreement constitutes a judicially-approved settlement pursuant to which Debtor and FMRI have, as of the Effective Date, resolved liability to the United States and ODEQ within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B) with respect to Existing Contamination.

24.      Nothing in this Settlement Agreement is intended to limit the right of the United States and ODEQ to undertake future response actions at the Muskogee Property or to seek to compel parties other than the Debtor or FMRI to perform or pay for response actions at the Muskogee Property. Nothing in this Settlement Agreement shall in any way restrict or limit the nature or scope of response actions which may be taken or be required by the United States and ODEQ in exercising its authority under federal or state law.

25.      In the event the Debtor or FMRI becomes aware of any action or occurrence which causes or threatens a release of hazardous substances, pollutants or contaminants at or from the Muskogee Property that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment prior to the Effective Date, the Debtor or FMRI shall

immediately take all appropriate action to prevent, abate, or minimize such release or threat of release.

26.     In consideration of the United States and ODEQ's Covenant Not To Sue as provided in Paragraphs 18-19 above,  the Debtor and FMRI covenant not to sue and not to assert any claims or causes of action against the United States or the State of Oklahoma, their authorized officers, employees, or representatives with respect to the Muskogee Property or this Settlement Agreement, pursuant to CERCLA Sections 106 and 107(a), 42 U.S.C. §§ 9606 and 9607(a), and the Atomic Energy Act, 42 U.S.C. §§ 2092 *et seq.* or  the Environmental Quality Code, 27A Oklahoma Statutes § 2-1-101 *et seq.* with respect to Existing Contamination at the Muskogee Property; provided, however, that Debtor and FMRI reserve, and this Settlement Agreement is without prejudice to, claims by Debtor or FMRI against the United States on behalf of the United States General Services Administration pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), with respect to Existing Contamination.

27.     This Settlement Agreement shall apply to and be binding upon the United States, ODEQ and shall apply to and be binding upon the Debtor, FMRI, and their officers, directors, and employees.  The United States and ODEQ's Covenant Not to Sue shall apply to the Debtor's and FMRI's current shareholders (see Appendix C), officers and directors to the extent that the alleged liability of the shareholder, officer or director is based solely on his or her status and in his or her capacity as an officer, director, or employee of the Debtor or FMRI, and not to the extent that the alleged liability arose independently of the alleged liability of the Debtor or FMRI.  Each signatory of a Party to this Settlement Agreement represents that he or she is fully authorized to enter into the terms and conditions of this Settlement Agreement and to legally bind such Party.

## X. TRANSFERS OF REAL PROPERTY INFORMATION AND ENVIRONMENTAL INFORMATION

28.     *Electronic Files.* The Plan Administrator shall provide to FMRI, at the Debtor's expense, within 30 days after the Effective Date, a hard drive(s) containing electronic files of Environmental Information and Real Property Information related to the Muskogee Property; provided, however, that in the event that the Debtor determines that any such provision of Environmental Information or Real Property Information violates any law or legal proceeding or waives any applicable privilege, protection or immunity, including, without limitation, the attorney-client privilege or the work-product doctrine, the Debtor shall take all reasonable measures to provide such Environmental Information or Real Property Information in a manner that avoids any such harm or consequence, including retention of the specific electronic files.

29.     Hard Copy Files Stored On-Site: Hard copy files of Environmental Information and Real Property Information located at any of the Muskogee Property before the Effective Date shall remain on-Site after the Effective Date and shall thereafter remain in the possession, custody, and control of FMRI.

30.     *Document Retention.*

(a)     FMRI shall at all times maintain ownership and control of the original form of the Environmental Information and Real Property Information.

(b)     FMRI will preserve the Environmental Information and Real Property Information that is the property of the Debtor and FMRI in its present state or condition.

(c)     At any time after three years following the Effective Date, FMRI may elect to relinquish control and/or destroy any Environmental Information, Real Property Information or other records located at Muskogee Property.  FMRI shall provide written notice to the United States and the State of Oklahoma that it will no longer maintain the Environmental Information, Real Property Information or other records identified and provide the responding parties the

21

opportunity to object to the FMRI's relinquishment of control, destruction, or take possession of such Environmental Information, Real Property Information, or other records within 60 days following such notification. If more than one of the aforementioned parties objects to the relinquishment of control, destruction, or requests to take possession of the documents, FMRI shall not relinquish control or destroy such information, or such parties shall reach an agreement as to which entity shall take possession of such Environmental Information, Real Property Information, or other records and notify FMRI of same.

(d)     No party shall have any liability to any other party on account of any Environmental Information or Real Property Information being destroyed after all reasonable efforts have been taken by such party to comply with the provisions of Subparagraph 30(d) above.

(e)     Neither the Debtor nor FMRI make any warranty as to the completeness or accuracy of the Environmental Information or Real Property Information provided pursuant to Paragraphs 28 and 29 above.

31.     The United States and the State of Oklahoma reserve, and this Settlement Agreement is without prejudice to, all rights to obtain information regarding the Muskogee Property from the Debtor and FMRI pursuant to their information-gathering authority under Sections 104 and 122 of CERCLA, 42 U.S.C. §§ 9604 and 9622, or any other applicable federal, or state Environmental Laws.

## XII. **NOTICES**

32.     Notices. Any notices required to be given hereunder must be in writing and shall be served in person or by overnight mail upon the respective parties as follows (or to such other addressees as may hereafter be designated):

if to Fansteel:

22

David Sands
Dorset Partners LLC
P.O. Box 67
1044 Dorset West Road
Dorset, VT 05251
Chapter 11 Plan Administrator


if to FMRI:

Robert Compernolle
5318 Mulford Street
Skokie, IL 60077


with a copy to:
Mark Steger
Clark Hill
130 East Randolph, Suite 3900
Chicago, Illinois 60601


if to the DOJ (any notice to DOJ also shall be sent to the NRC and EPA):

Richard M. Gladstein, Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044

if to the NRC:

Deputy Director,
Division of Decommissioning, Uranium Recovery, and Waste Programs
Office of Nuclear Material Safety and Safeguards
U.S. Nuclear Regulatory Commission
Washington, DC 20555-0001


if to the EPA (any notice to EPA also shall be sent to DOJ):

Lance Nixon
Enforcement Officer

Superfund Division, Enforcement and Cost Recovery Section (SEDAE)
120 Elm St, Suite 500
Dallas, TX 75270

if to the ODEQ:

Pamela Brown Dizikes, Esq.
Office of General Counsel
Oklahoma Department of Environmental Quality
707 N. Robinson
Oklahoma City, OK 73101

## XIV. <u>PUBLIC COMMENT</u>

33.     This Settlement Agreement shall be lodged with the Bankruptcy Court and shall thereafter be subject to a period of public comment following publication of notice of the Settlement Agreement in the *Federal Register*. After the conclusion of the public comment period, the United States will file with the Bankruptcy Court any comments received, as well as the United States' responses to the comments, and at that time, if appropriate, the United States will request approval of the Settlement Agreement. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Settlement Agreement disclose facts or considerations which indicate that the Settlement Agreement is not in the public interest.

34.     If for any reason (i) the Settlement Agreement is withdrawn by the United States or the State of Oklahoma as provided in Paragraph 18; or (ii) the Settlement Agreement is not approved: (a) this Settlement Agreement shall be null and void and the parties shall not be bound hereunder or under any documents executed in connection herewith; (b) the parties shall have no liability to one another arising out of or in connection with this Settlement Agreement or under any documents executed in connection herewith; and (c) this Settlement Agreement and any documents prepared in connection herewith shall have no residual or probative effect or value, and it shall be as if they had never been executed.

## XV. <u>JUDICIAL APPROVAL</u>

35.    The Debtor's entry into this Settlement Agreement shall be subject to approval of the Bankruptcy Court.  The Debtors shall promptly seek approval of their entry into this Settlement Agreement under Bankruptcy Rule 9019 or applicable provisions of the Bankruptcy Code.

## XVI. <u>RETENTION OF JURISDICTION</u>

36.    The Court shall retain jurisdiction over both the subject matter of this Settlement Agreement and the parties hereto, for the duration of the performance of the terms and provisions of this Settlement Agreement for the purpose of enabling any of the parties to apply to the Court at any time for such further order, direction and relief as may be necessary or appropriate for the construction or interpretation of this Settlement Agreement, or to effectuate or enforce compliance with its terms.

## XVII. <u>EFFECTIVE DATE</u>

37.    The Effective Date shall be the date on which this Settlement Agreement is approved by the Bankruptcy Court.

## XVIII. <u>PLAN OF LIQUIDATION</u>

38.    The Debtor shall incorporate this Settlement Agreement into the Plan by reference and approval of this Settlement Agreement shall be a condition precedent to confirmation of the Plan, which may not be waived. The Debtor shall not file a Plan or amend the Plan or the proposed order confirming the Plan in a manner inconsistent with the terms and provisions of this Settlement Agreement, take any other action in the Bankruptcy Cases that is inconsistent with the terms and provisions of this Settlement Agreement, or propose terms for any order confirming the Plan that

are inconsistent with this Settlement Agreement. The Governments shall not oppose any term or provision of the Plan or an order confirming the Plan that is addressed by and is consistent with this Settlement Agreement, unless the United States withdraws or withholds its consent to this agreement based on public comment. The Parties reserve all other rights or defenses that they may have with respect to the Plan. In the event of any inconsistency between the Plan, any order confirming the Plan, and this Settlement Agreement, the terms of this Settlement Agreement shall control.

### XIX. <u>AMENDMENTS/INTEGRATION AND COUNTERPARTS</u>

39.     This Settlement Agreement and any other documents to be executed in connection herewith or referred to herein shall constitute the sole and complete agreement of the parties hereto with respect to the matters addressed herein. This Settlement Agreement may not be amended except by a writing signed by all the parties.

40.     The signatories for the parties each certify that he or she is authorized to enter into the terms and conditions of this Settlement Agreement after the close of any applicable comment period(s) and provisions of comments by the Governments to the Court, and to execute and bind legally such party to this document.

41.     This Settlement Agreement may be executed in counterparts, each of which shall constitute an original, and all of which shall constitute one and the same agreement.

GOOD CAUSE APPEARING, IT IS SO ORDERED:


_____
Judge, U.S. Bankruptcy Court


APPROVED AS TO FORM AND CONTENT:

*/s/ Jeffrey D. Goetz*

Jeffrey D. Goetz, Esq.
Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309
Telephone: 515-246-5817

*Attorney for Debtors and Debtors in Possession*


*/s/ Jeffrey D. Goetz*

Jeffrey D. Goetz, Esq.
Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309
Telephone: 515-246-5817

*Attorneys for FMRI, Inc.*


*/s/ Richard M. Gladstein*

Richard M. Gladstein DC362404
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
601 D Street, Room 2121
Washington, D.C.
Telephone: (202) 514-1711
Facsimile: (202) 616-6584
Email: Richard.Gladstein@usdoj.gov


*Attorney for the United States on behalf of the NRC and EPA*

27

*/s/ Wren Stenger*
_____

Wren Stenger, Director
Superfund and Emergency Management Division
U.S. EPA Region 6
1201 Elm Street, Suite 500,
Dallas, Texas 75270
Telephone: 800-887-606


*Environmental Protection Agency, Region 6*



*/s/ Gary Henry*
_____

Gary Henry, Esq.
Pamela Brown Dizikes, Esq.
Environmental Attorneys
Office of General Counsel
Oklahoma Department of Environmental Quality
707 N. Robinson
Oklahoma City, OK 73101
Telephone: 405-702-7175

*Attorneys for the Oklahoma Department of Environmental* Assistant Attorney General

## APPENDIX A

The **Muskogee Property** shall mean the real property, any and all structures and fixtures, appurtenances to, and rights associated with that real property, owned or formerly owned by the Debtor and located in Muskogee County, Oklahoma. The Muskogee Property is comprised of the following four parcels of real property.

**Parcel A** shall mean that portion of the Muskogee Property commonly known and referred to as Parcel A and any and all structures and fixtures, appurtenances to, and rights associated with the real property known as Parcel A. Parcel A is currently owned by the Port Authority. The legal description of Parcel A is as follows:

> A tract of land located in the east half of Section 17, Township 15 North, Range 19 East, Muskogee County, Oklahoma, more particularly described as follows: Beginning at a point that is S 89°54'22" W a distance of 45 feet from the Northeast corner of the Southeast quarter of said Section 17; thence S 00°01'30" E a distance of 437.77 feet; thence S 89°20'45" W a distance of 1071.40 feet; thence N 03°05'09" W a distance of 448.05 feet; thence N 89°54'22" E a distance of 480.30 feet; thence N 00°05'43" W a distance of 660.00 feet; thence N 89°54'22" E a distance of 560.00 feet; thence S 00°05'43" E a distance of 660.00 feet; thence N 89°54'22" E a distance of 55.00 feet to the point of beginning; containing 19.51 acres, more or less.

**Parcel B** shall mean and refer to that portion of the Muskogee Property commonly known and referred to as Parcel B and any and all structures and fixtures, appurtenances to, and rights associated with the real property known as Parcel B. Parcel B is currently owned by the Debtor. Parcel B consists of all the Muskogee Property that is not comprised of Parcels A, C, or D.

> A detailed and correct legal description of Parcel B will be supplied prior to any transfer or conveyance of Parcel B.

**Parcel C** shall mean and refer to that portion of the Muskogee Property commonly known and referred to as Parcel C and any and all structures and fixtures, appurtenances to, and rights associated with the real property known as Parcel C. Parcel C is currently owned by FMRI. The legal description of Parcel C is as follows:

> A tract of land located in the Southwest Quarter of the Northwest Quarter (SW1/4 NW1/4) of Section 16, Township 15 North, Range 19 East, Muskogee County, Oklahoma, more particularly described as follows:
> Beginning at a point that is N 89°54'22" E a distance of 20.00 feet and N 00°05'43" W a distance of 12.03 feet from the Southwest Corner of the Northwest Quarter of said Section 16; running thence N 00°05'43" W a distance of 647.97 feet; thence N 89°54'22" E a distance 744.4 feet; thence S 10°35'05" W a distance of 674.67 feet; thence N 88°46'08" W a distance of 649.59 feet to the Point of Beginning.

**Parcel D** shall mean and refer to that portion of the Muskogee Property commonly known and referred to as Parcel D and any and all structures and fixtures, appurtenances to, and rights associated with the real property known as Parcel D. Parcel D consists of all the Muskogee Property that is not described above as or comprised of Parcels A, B, or C. Parcel D is currently owned by the Debtor.

A detailed and correct legal description of Parcel D will be supplied prior to any transfer or conveyance of Parcel D.

**APPENDIX B**

February 13, 2020
[TO]
[Address]
[City, State & Zip]

     **RE:**    **Letter Agreement – Exhibit A to Fansteel Plan of Liquidation**

Dear _____:

     This Letter Agreement has been prepared in accordance with Section 6.2.1.(A)(iii)-Utilization of Buildings on Parcel B- of Fansteel's Plan of Liquidation to confirm that the Plan Administrator shall reimburse the Decommissioning Trust on a monthly basis by the last day of each month for any utilities or insurance on that portion of the Muskogee Property identified as "Parcel B", that is paid by FMRI for the benefit of Parcel B. The utilities include, but are not limited to, any electric, gas, or telephone payments made by FMRI for the benefit of Parcel B.

                    Sincerely yours,

                    Plan Administrator

## APPENDIX C

Current Shareholders of Debtor

Marie E. Tsoukalas
Nicholas P. Tsoukalas
Morgan Stanley
Charles Schwab & Co., Inc.
TD Ameritrade Clearing, Inc.
J.P. Morgan Clearing Corp.
Pershing LLC
E*Trade Securities LLC
National Financial Services LLC
Aerocraft Heat Treating Co.
Saegertown Manufacturing Corporation
Aldyne Powder Technologies
Spyridon Tsoukalas
American Express CPA Remittance Processing
Eular American Credit Indemnity as assignee of Southwestern Scrap
Michael Mocniak
Ramius Securities LLC as transferee of Bank One, N.A.
Mattco Forge Inc.
Leonard Levie
Curtis Zamec

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF IOWA**

Exhibit B

| | | |
|---|---|---|
| In Re: | ) | Case No. 16-01825-als11 |
| | ) | |
| **FANSTEEL, INC.** | ) | |
| | ) | Chapter 11 |
| Debtor and Debtor in Possession. | ) | |
| | ) | Hon. Anita L. Shodeen |
| c/o Robert Compernolle | ) | |
| 5518 Mulford Street | ) | |
| Skokie, IL. 60077 | ) | |
| | ) | |
| EIN:  36-1058780 | ) | |
| | ) | |

_____

**NOTICE OF LODGING OF ENVIRONMENTAL SETTLEMENT AGREEMENT**

PLEASE TAKE NOTICE that the United States of America, on behalf of the Nuclear Regulatory Commission ("NRC") and the Environmental Protection Agency ("EPA") today is lodging with the Court the attached Environmental Settlement Agreement between the United States, the Oklahoma Department of Environmental Quality, Fansteel, Inc. and FMRI, Inc. in the above-captioned case.

Pursuant to Paragraphs 33 and 35 of the Environmental Settlement Agreement:

This Settlement Agreement shall be lodged with the Bankruptcy Court and shall thereafter be subject to a period of public comment following publication of notice of the Settlement Agreement in the *Federal Register*. After the conclusion of the public comment period, the United States will file with the Bankruptcy Court any comments received, as well as the United States' responses to the comments, and at that time, if appropriate, the United States will request approval of the Settlement Agreement. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Settlement Agreement disclose facts or considerations which indicate that the Settlement Agreement is not in the public interest.

The Debtor's entry into this Settlement Agreement shall be subject to approval of the Bankruptcy Court. The Debtors shall promptly seek approval of their entry into this Settlement Agreement under Bankruptcy Rule 9019 or applicable provisions of the Bankruptcy Code.

Accordingly, the United States requests that the Court take no action on the proposed

Environmental Settlement Agreement until after expiration of the public comment period.  After

expiration of the public comment period, the United States will move the Court for entry of the

Environmental Settlement Agreement if entry is appropriate in light of any comments received.

Dated: April 1, 2020

Respectfully submitted,

*/s/Richard M. Gladstein*
Richard M. Gladstein DC362404
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
150 M Street, N.E., Room 6.111
Washington, D.C.
Telephone: (202) 514-1711
Facsimile: (202) 616-6584
Email: Richard.Gladstein@usdoj.gov

## CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through
CM/ECF as listed on CM/ECF's notice of electronic filling.

*/s/Richard M. Gladstein*
Richard M. Gladstein
Senior Counsel

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF IOWA

In Re:

**FANSTEEL, INC.**

      Debtor and Debtor in Possession.

1746 Commerce Rd.
Creston, IA 50801

EIN: 36-1058780

      Bankruptcy Case No. 16-01823-als11
      Affiliated Case Nos: 16-01825 & 16-01827

      Chapter 11 (Jointly Administered)

      Hon. Anita L. Shodeen

      **ENVIRONMENTAL SETTLEMENT AGREEMENT AMONG DEBTOR, FMRI, UNITED STATES, AND ODEQ**

      Courtroom: 1

      Date Entered on Docket:_____

THIS SETTLEMENT AGREEMENT is made as of March 31, 2020, by and between Fansteel, Inc. ("Fansteel" or the "Debtor"), FMRI, Inc. ("FMRI"), the United States of America, on behalf of the Nuclear Regulatory Commission ("NRC") and the Environmental Protection Agency ("EPA"), and the Oklahoma Department of the Environmental Quality ("ODEQ") (collectively referred to herein as the "Settling Parties") in the above referenced chapter 11 case (the "Chapter 11 Case");

WHEREAS, on September 13, 2016 (the "Petition Date"), Fansteel, Wellman Dynamics Corp. ("WDC"), and Wellman Dynamics Machining & Assembly, Inc. ("WDMA" and together with Fansteel and WDC, the "Debtors") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Iowa (the "Bankruptcy Court").

WHEREAS, in 2002, Fansteel commenced voluntary cases under chapter 11 of title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. In that

case, Fansteel and the NRC reached a settlement agreement that was incorporated into Fansteel's 2003 Plan of Reorganization ("Fansteel I Plan"). Under the Fansteel I Plan, Fansteel created a wholly owned subsidiary, FMRI, as a "special purpose vehicle to fulfill all obligations mandated by the NRC License and the Amended Decommissioning Plan, as modified or supplemented by amendment of the NRC License. Under the Fansteel I Plan, Fansteel agreed to provide financial assurance for the decommissioning and remediation of the Muskogee Site as follows: (a) FMRI Primary Note. Fansteel agreed to pay FMRI $30,600,000; (b) FMRI Secondary Note. Fansteel agreed to pay FMRI $4,200,000 (to cover estimated costs of groundwater treatment and monitoring); and (c) FMRI Contingent Note.

WHEREAS, on January 17, 2017, the United States filed a Proof of Claim in the instant bankruptcy case at the request of the NRC ("U.S. Proof of Claim");

WHEREAS, the U.S. Proof of Claim asserts that the Debtor is liable to the United States to comply with Sections 62, 63, and 161 of the Atomic Energy Act, 42 U.S.C. §§ 2092, 2093, 2201, applicable regulations under 10 C.F.R. Parts 20 and 40, 10 C.F.R. § 40.36, NRC license SMB-911, and the Amended Decommissioning Plan to perform the decommissioning and remediation of the facility owned or formerly owned by Debtor and operated by FMRI, a wholly owned subsidiary of the Debtor, in Muskogee, Oklahoma (the "Muskogee Property");

WHEREAS, in the alternative, the U.S. Proof of Claim asserts that the NRC holds a general unsecured claim as a third party beneficiary to the amounts still owed by Fansteel to FMRI under the notes created under the Fansteel I Plan: the FMRI primary note ($16,711,207), the secondary note ($3,636,000), a contingent note (unliquidated), and the right to certain insurance proceeds ($1,238,680) required to be used to decommission and remediate the Muskogee Site.

WHEREAS, the United States on behalf of EPA asserts that the Debtor and FMRI are liable under the Comprehensive Environmental Response, Compensation, and Liability Act

("CERCLA") 42 U.S.C. §§ 9601-9675, for costs incurred and to be incurred by the United States in response to releases and threats of releases of hazardous substances at or in connection with the Muskogee Property;

WHEREAS, on January 17, 2017, the ODEQ filed a Proof of Claim ("ODEQ Proof of Claim");

WHEREAS, the ODEQ Proof of Claim asserts that the Debtor is liable to the State of Oklahoma to comply with Environmental Quality Code 27A, Oklahoma Statutes § 2-1-101 *et seq.*, Oklahoma Administrative Code, OAC 252, and OPDES Permit No. OK0001643 to perform the required remediation at the Muskogee Property;

WHEREAS, on February 17, 2020, the Debtor filed its Fourth Amended Plan of Liquidation;

WHEREAS, pursuant to the Plan and this Settlement Agreement and after the Effective Date of this Settlement Agreement: (1) the Debtor will transfer Parcel D of the Muskogee Property to FMRI; (2) FMRI will use  funds received from the Decommissioning Trust, the Plan Administrator, or other sources for activities necessary to maintain health and safety, fulfill obligations mandated by the NRC license and Amended Decommissioning Plan, or conduct response actions pursuant to CERCLA, 42 U.S.C. §§ 9601-9675, or Oklahoma Environmental Quality Code 27A, Oklahoma Statutes § 2-1-101 *et seq.*, at the Muskogee Property; (3) the Debtor will transfer any and all causes of action the Debtor may have against any and all potentially responsible parties under CERCLA and Oklahoma Law to FMRI; (4) the Debtor and the Environmental Authorities will allocate between them as described herein any Net Proceeds received from the sale of Parcel B of the Muskogee Property, any settlement reached with the Port of Muskogee regarding environmental liability, and any other Net Proceeds received; (5) the

3

Environmental Authorities will receive one hundred percent (100%) of any Net Insurance Proceeds for losses related to environmental liabilities with respect to the Muskogee Property; and (6) the Environmental Authorities and FMRI will share as further provided herein on a fifty percent/fifty percent (50%/50%) basis the proceeds from any settlement or adjudication of the third party environmental claims transferred from the Debtor to FMRI.

WHEREAS, in consideration of, and in exchange for, the promises and covenants herein, including, without limitation, the covenants and reservations set forth in Paragraphs 18-27, intending to be legally bound hereby, the Settling Parties hereby agree to the terms and provisions of this Settlement Agreement;

WHEREAS, this Settlement Agreement is fair and reasonable and in the public interest, and is an appropriate means of resolving these matters.

NOW, THEREFORE, without any adjudication on any issue of fact or law, and upon the consent and agreement of the parties by their attorneys and authorized officials, it is hereby agreed as follows:

## I. DEFINITIONS

1.    Unless otherwise expressly provided herein, terms used in this Settlement Agreement that are defined in CERCLA, the AEA, other Environmental Laws, or their regulations or in the Bankruptcy Code shall have the meaning assigned to them therein.  In addition, terms defined in the Settlement Agreement shall have the meaning set forth herein.

"AEA" shall mean the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011 *et seq.*, as amended.

"Amended Decommissioning Plan" means the decommissioning plan for the Muskogee Property, dated January 14, 2003, as supplemented by letters dated May 8, 2003 and May 9, 2003, and resubmitted by Fansteel for review by the NRC on July 24, 2003, as the same may be further amended, modified, or supplemented at the request, or with the consent, of Fansteel.

"Cash" means legal tender of the United States of America and its equivalents.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended.

"Confirmation Date" means the date of entry of the Confirmation Order.

"Confirmation Order" means the order confirming the Plan.

"Decommissioning Trust" means the decommissioning trust fund established by TNB Financial Services and FMRI for the benefit of NRC.

"Decommissioning Activities" shall mean those activities that reduce the residual radioactivity to a level such that the NRC may terminate the Muskogee License and release the Muskogee Property for unrestricted use or terminate the Muskogee License and release the Muskogee Property under restricted conditions or use.

"Effective Date" shall mean the date on which this Settlement Agreement is approved by the Bankruptcy Court

"Environmental Activities" shall mean any and all environmental activities authorized or required under Environmental Laws that occur after the Effective Date and that are related to the Muskogee Property, including but not limited to response or remedial actions, removal actions, corrective action, closure, or post-closure care, reclamation, investigations, studies, remediation, interim actions, final actions, emergency actions, water treatment, implementation of engineered structures and controls, monitoring, repair and replacement of engineered structures, monitoring equipment and controls, operation and maintenance, implementation, operation and maintenance of institutional controls, coordination and integration of reuse and remedial efforts and initiatives (including, without limitation, multi-stakeholder communications), and, if required, long-term stewardship and perpetual custodial care activities. "Environmental Activities" also include the above environmental activities relating to the migration of hazardous substances emanating from the Muskogee Property. For the avoidance of doubt, "Environmental Activities" shall not include natural resource assessment or restoration.

"Environmental Authorities" means, collectively, the NRC, EPA, and ODEQ.

"Environmental Costs" means the costs and expenses incurred or to be incurred in connection with implementing Maintenance Activities, Decommissioning Activities and Environmental Activities and the payment of certain oversight costs incurred or to be incurred by the Environmental Authorities with respect to the Muskogee Property.

"Environmental Information" shall mean all environmental reports, audits, analyses, records, studies and other documents containing information prepared by or otherwise in the possession, custody or control of Debtor, FMRI or their technical consultants that are based on or otherwise reflect information related to environmental activities, but does not include records that must be maintained in accordance with the NRC's record keeping requirements in Title 10 of the *Code of Federal Regulations*, including, but not limited to, records of information important to decommissioning of the Muskogee Property in accordance with 10 C.F.R. §40.36(f).

"Environmental Laws" means, whenever in effect, all federal, tribal, state and local statutes, regulations, ordinances and similar provisions having the force or effect of law; all judicial and administrative orders and determinations and all common law concerning public health and safety, worker health and safety, pollution or protection of the environment, including, without limitation, the AEA, CERCLA, Clean Water Act ("CWA"), Clean Air Act ("CAA"), Emergency Planning and Community Right-to-Know Act ("EPCRA"), Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), Resource Conservation and Recovery Act ("RCRA"), Safe Drinking Water Act ("SDWA"), Toxic Substances Control Act ("TSCA"), and any tribal, state or local equivalents.

"Fansteel I Bankruptcy" shall mean and refer to that Chapter 11 bankruptcy case filed by Fansteel, Inc., in the United States Bankruptcy Court for the District of Delaware, which was filed on January 15, 2002, was assigned case number 02-10109-KJC, and in which a plan of reorganization was confirmed on November 17, 2003.

"FMRI" shall mean and refer to FMRI, Inc., which is a corporation formed as a special purpose entity to fulfill all obligations mandated by NRC license SMB-911 and the Amended Decommissioning Plan, as modified or supplemented by amendment of the NRC license as part of the Fansteel I Bankruptcy.

"Maintenance Activities" means any and all activities other than Decommissioning Activities that are necessary to ensure the adequate protection of public health and safety with respect to the Muskogee Property, including, but not limited to, securing licensed materials, water treatment and monitoring, airborne particulate and effluent monitoring, radon monitoring, personnel exposure monitoring, contamination monitoring, and the implementation and maintenance of engineered structures and controls to prevent the release of radiological and non-radiological hazardous materials from the Muskogee Property or the ponds which contain process waste exceeding regulatory release criteria.

"Muskogee License" means the Radioactive Materials License SMB-911, held by FMRI, Inc.

"Muskogee Licensee" means the person or entity approved by NRC to hold the Muskogee License.

"Muskogee Permit" means the Oklahoma Department of Environmental Quality permit No. OK0001643 held by FMRI, Inc.

"Muskogee Permittee" means the person or entity approved by ODEQ to hold the Muskogee Permit.

"Muskogee Property" means the real property, any and all structures and fixtures, appurtenances to, and rights associated with that real property, owned or formerly owned by the Debtor and located at Ten Tantalum Place, in Muskogee, Muskogee County, Oklahoma. The Muskogee Property is comprised of the four parcels of real property described in the Appendix A.

6

"Net Insurance Proceeds" means the amount of insurance proceeds received by the Plan Administrator from time to time with respect to any and all claims made by Fansteel and/or any subsidiary for insurance coverage in respect of the Muskogee Property, net of the reasonable or necessary costs incurred in connection with obtaining such proceeds, including reasonable fees and expenses of the Plan Administrator's legal counsel.

"Net Proceeds" means the Cash proceeds received by the Plan Administrator from time to time from the sale or disposition, through litigation, settlement, or otherwise, of the Reorganized Debtor's Assets, net of the reasonable or necessary costs of such sale or other disposition, including without limitation, title survey, escrow and closing costs and real property taxes accumulated after the Effective Date and reasonable fees and expenses of the Plan Administrator's legal counsel and other Professionals, that are incurred in connection with obtaining the Cash proceeds. Net Proceeds shall not include any consideration or payment received by EPA or ODEQ in exchange for any covenant not to sue provided by EPA or ODEQ to the purchaser of any of the Debtor's Assets. Net Proceeds shall also not include the proceeds obtained by FMRI from settlements or proceeds with respect to Causes of Action the Debtor may have against potentially responsible parties as set forth in §6.2.1(b).(iii) of the Plan.  Net Proceeds shall not include the Net Insurance Proceeds received by the Plan Administrator.  Net Proceeds shall not include the proceeds obtained by the Environmental Authorities from settlements or litigation against potentially responsible parties related to the existing contamination at the Muskogee Property.

"Person" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

"Plan" means Debtor's Plan of Liquidation, as it may be modified or amended.

"Plan Administrator" means the Person designated by the Debtor prior to the Confirmation Date to administer the Estate and make Distributions in accordance with the Plan. The Debtor has designated David Sands of Dorset Partners LLC, whose address is set forth in §9.17 below, to serve as Plan Administrator in this case.

"Port Authority" means the Muskogee City-County Port Authority.

"Proofs of Claim" shall mean the Proofs of Claim filed by the Governments as set forth in the Recitals.

"Real Property Information" shall mean all documents in Fansteel's and FMRI's possession, custody, or control related to property taxes, leases, contracts, security, insurance, or administration or potential sales (but with respect to potential sales, only information reasonably locatable dated 2008 or later) of an Muskogee Property.

"State" shall mean the State of Oklahoma.

"Superfund" shall mean the "Hazardous Substance Trust Fund" established by 26 U.S.C. § 9507 or, in the event such Hazardous Substance Superfund no longer exists, any successor fund

or comparable account of the Treasury of the United States to be used for removal or remedial actions to address releases or threats of releases of hazardous substances.

"United States" shall mean the United States of America and all of its agencies, departments, and instrumentalities, including EPA and NRC.

## II. JURISDICTION

2.    The Court has jurisdiction over the subject matter hereof pursuant to 28 U.S.C. §§ 157, 1331, and 1334.

## III. PARTIES BOUND

3.    This Settlement Agreement applies to, is binding upon, and shall inure to the benefit of the signatories hereto, their legal successors and assigns, and any trustee, examiner or receiver appointed in the Bankruptcy Cases.

## IV. THE MUSKOGEE PROPERTY

4.    Pursuant to the Plan, the Debtor will transfer and convey any and all of its right, title, and interest in Parcel D of the Muskogee Property to FMRI.

5.    Pursuant to the Plan, the Debtor shall pay to or otherwise resolve with the applicable tax authorities all unpaid real property taxes relating to the Muskogee Property due on or before the Effective Date.  The Debtor shall not transfer or cause to be transferred its rights, title, and interests in and to Parcel D of the Muskogee Property, or any other property owned by the Debtor, to FMRI until the Debtor has provided documentation to the Environmental Authorities that it has paid, or otherwise resolved, all real property taxes and bills to service providers (including electric, gas, water, sewer, phone, internet, trash removal, and office supplies) as provided herein that have accumulated prior to the Effective Date relating to the Muskogee Property.

6.    FMRI shall be responsible for performing or causing to be performed Maintenance Activities, Decommissioning Activities and Environmental Activities including but not limited to activities necessary to maintain health and safety, and for fulfilling all obligations mandated by

8

the Muskogee License; the Amended Decommissioning Plan, as modified or supplemented by amendment of the Muskogee License; and the Muskogee Permit at the Muskogee Property.

7.      FMRI will use  funds received from the Decommissioning Trust, Plan Administrator, and any other sources for performing or causing to be performed Maintenance Activities, Decommissioning Activities and Environmental Activities including but not limited to activities necessary to maintain health and safety, fulfill obligations mandated by the Muskogee license and Amended Decommissioning Plan, or conduct response actions pursuant to CERCLA, 42 U.S.C. §§ 9601-9675, or Oklahoma Environmental Quality Code 27A, Oklahoma Statutes § 2-1-101 *et seq.*, at the Muskogee Property.   FMRI shall use funds received from the Decommissioning Trust only as approved by the NRC.  Within 180 days after the Effective Date, the Environmental Authorities shall initiate discussions toward reaching an agreement on how the funding is to be expended following deposit in the Decommissioning Trust.

8.      FMRI shall provide the NRC, the State of Oklahoma, EPA, and their representatives and contractors access to all portions of the Muskogee Property at all reasonable times for the purposes of overseeing Maintenance Activities, Decommissioning Activities and Environmental Activities at or near the Muskogee Property.  FMRI shall execute and record with the appropriate recorder's office any easements or deed restrictions requested by NRC, EPA and the State of Oklahoma for restrictions on activities or use of the Muskogee Property in order to protect public health, welfare or safety or the environment or ensure non-interference with or protectiveness of any Maintenance Activity, Decommissioning Activity or Environmental Activity. Any existing easements or deed restrictions of record as to the Muskogee Property prior to the Effective Date shall survive the Settlement Agreement.

9.      Pursuant to the Plan, , the Debtor also shall transfer to FMRI any and all causes of action the Debtor might have against any and all potentially responsible parties related to the

Muskogee Property including, but not limited to, those causes of action under §113 of CERCLA, Oklahoma Law, Oklahoma Environmental Quality Code, 27A O.S. §§1-3-101, 2-3-202 and 2-3-506, and any and all applicable causes of action under any federal and/or state laws, rules, and regulations with regard to or related to the Muskogee Property, provided, however, that any causes of action against the Port Authority shall be transferred to the Plan Administrator.

## V. <u>THE TREATMENT OF THE DEBTOR'S LIABILITIES TO THE ENVIRONMENTAL AUTHORITIES</u>

10.     Pursuant to the Plan, the Debtor and the Environmental Authorities shall allocate between them the Net Proceeds received from the sale of Parcel B (*See* §6.2.1.(A).(i), *infra*), any settlement reached with the Port Authority regarding environmental liability (*See* §6.2.1.(B).(i), *infra*), and any other Net Proceeds received as follows:

(1)     beginning with the first dollar in Net Proceeds received by the Plan Administrator and up until the Plan Administrator has received a total of $1.5 million ($1,500,000.00) in Net Proceeds, the Plan Administrator, on behalf of the Reorganized Debtor, will be entitled to and will receive seventy-five percent (75%) of such Net Proceeds, and the Environmental Authorities will be entitled to and will receive twenty-five percent (25%) of such Net Proceeds;

(2)     beginning with the first dollar in Net Proceeds received by the Plan Administrator in excess of $1.5 million ($1,500,000.00) and up until the Plan Administrator has received a total of $2.5 million ($2,500,000.00) in Net Proceeds, the Plan Administrator, on behalf of the Reorganized Debtor, will be entitled to and will receive twenty-five percent (25%) of such Net Proceeds, and the Environmental Authorities will be entitled to and will receive seventy-five percent (75%) of such Net Proceeds; and,

(3)     beginning with the first dollar in Net Proceeds received by the Plan Administrator in excess of $2.5 million ($2,500,000.00), the Plan Administrator, on behalf of the Reorganized Debtor, will be entitled to and will receive fifty percent (50%) of such Net Proceeds, and the Environmental

Authorities will be entitled to fifty percent (50%) of such Net Proceeds until, pursuant to the provisions of the Plan, the Plan Administrator has made distributions to the Holders of Claims referred to in Section 3 of the Plan and the Holders of Claims in Class 1 and Class 2 of the Plan in full, and to the Holders of other Claims set forth in the Plan.

(4)     Of the Net Proceeds allocated to the Environmental Authorities, all of those proceeds shall be deposited in the Decommissioning Trust, at the following address, unless the Environmental Authorities agree and notify the Plan Administrator otherwise:

>TNB Financial Services, Inc., a Division of Thomasville Bank
>5101 Washington St., Suite 1101
>Gurnee, Illinois  60031

11.     The Plan Administrator shall prosecute and use commercially reasonable efforts to obtain payment from its insurers for claims under all applicable insurance policies for losses related to environmental liabilities with respect to the Muskogee Property. Settlements by the Plan Administrator with insurers of any such insurance claims shall require the prior consent of the Environmental Authorities or the approval of the Bankruptcy Court or other court of competent jurisdiction, on appropriate notice. The Environmental Authorities shall receive one hundred percent (100%) of the Net Insurance Proceeds, provided, however, that the Plan Administrator shall not enter into any contingent fee arrangement for the prosecution or defense of such claims without the prior consent in writing from the United States.  All of the Net Insurance Proceeds received shall be deposited in the Decommissioning Trust, unless the Environmental Authorities agree and notify the Plan Administrator otherwise.

## VI. <u>LIQUIDATION OF THE DEBTOR'S PROPERTY</u>

12.     As soon as is practicable following the Effective Date, the Plan Administrator will continue liquidating the Reorganized Debtor's Assets by reducing or converting them to Cash.

13.     *Real Property:*

(a)     Continued Efforts to Sell Parcel B.  During the pendency of this Case, the Debtor initiated efforts to sell Parcel B. With the assistance of counsel and in coordination with the Environmental Authorities, the Plan Administrator will, on behalf of the Reorganized Debtor, continue to pursue efforts to market and sell Parcel B. However, the Plan Administrator shall not grant, bargain, sell, or convey any interest in Parcel B without the prior written approval of the Environmental Authorities.

(b)     Transfer of Parcel D to FMRI.  In conformity with the stated intention of the Debtor in connection with and as part of the Fansteel I Bankruptcy Case, with the assistance of counsel and in coordination and cooperation with the Environmental Authorities, the Plan Administrator will, on behalf of the Reorganized Debtor, transfer all the Debtor's right, title, and interest in and to Parcel D to FMRI.

(c)     Utilization of Buildings on Parcel B.  The Plan Administrator will oversee, supervise, and administer the utilization, for the benefit of the Reorganized Debtor, of the Service Building, the Sintering Building, and the EB Building, all three of which are located on Parcel B. As part of these duties, the Plan Administrator will oversee, supervise, and administer the existing lease of these buildings (the "Lease") between the Debtor and Bruce Oakley, Inc. ("Oakley") which will include collection of the $4,500.00 monthly rent paid by Oakley to the Debtor pursuant to the Lease which the Plan Administrator will use and otherwise administer in accordance with the terms of the Plan. The Plan Administrator shall reimburse the Decommissioning Trust for any utilities or insurance provided or paid by FMRI for the benefit of Parcel B, as set forth in the Letter Agreement attached hereto as Appendix B.

14.     *Claims, Rights, and Causes of Action.*

(a)     Efforts toward Settlement with the Port Authority Regarding Environmental Liability. With the assistance of counsel and in consultation with the Environmental Authorities, the Plan

Administrator will, on behalf of the Reorganized Debtor, continue to pursue good faith settlement discussions with the Port Authority regarding the Port Authority's potential liability, as the current owner of Parcel A of the Muskogee Property, to the Debtor under CERCLA, Oklahoma law, and any and all applicable federal and/or state rules and regulations for its share of response costs incurred and to be incurred in connection with the investigation and remediation of existing contamination at the Muskogee Property.

(b)    Efforts toward Settlement with Insurers Regarding Environmental Liability.  With the assistance of counsel and in consultation with the Environmental Authorities, the Plan Administrator will, on behalf of the Reorganized Debtor, continue to pursue good faith settlement discussions with any and all insurers that currently provide or may have, in the past, provided the Debtor with liability or other insurance policies that may provide coverage for claims for property damages, bodily injury or other losses arising out of or in any way related to the existing contamination in, on or at the Muskogee Property.

(c)    Settlement or Adjudication of FMRI's Third Party Environmental Claims.  With the assistance of counsel and in consultation with the Environmental Authorities, FMRI shall pursue good faith settlement discussions and litigation, if necessary and appropriate, with respect to all causes of action the Debtor might have against any and all potentially responsible parties, including ,but not limited to, those causes of action under §113 of CERCLA, Oklahoma Law, Oklahoma Environmental Quality Code, 27A O.S. §§1-3-101, 2-3-202 and 2-3-506, and any and all applicable causes of action under any federal and/or state laws, rules and regulations with regard to or related to the Muskogee Property, provided, however, that any causes of action against the Port Authority shall be transferred to the Plan Administrator.

(d)    The proceeds from such settlements or litigation shall be allocated among the Environmental Authorities and FMRI, on a fifty/fifty percent (50%)/50%) basis as provided below, net of the reasonable or necessary costs incurred in connection with obtaining such proceeds, including

13

reasonable fees and expenses of FMRI's legal counsel, provided however, that FMRI shall not enter into any contingent fee arrangement for the prosecution or defense of such claims without the prior consent in writing from the United States. FMRI will use  funds received from such settlements for Maintenance Activities, Decommissioning Activities and Environmental Activities including but not limited to activities necessary to maintain health and safety, fulfill obligations mandated by the NRC license and Amended Decommissioning Plan, or conduct response actions pursuant to CERCLA, 42 U.S.C. §§ 9601-9675, or Oklahoma Environmental Quality Code 27A, Oklahoma Statutes § 2-1-101 *et seq.*, at the Muskogee Property; provided however, that of the fifty percent (50%) of the proceeds allocated to FMRI, after the payment of FMRI's administrative costs, such as real property taxes and general liability insurance, FMRI may use such funds received for the payment of any post-confirmation, post-petition administrative expense and priority claims approved by the Court under the Plan in addition to activities necessary to maintain health and safety, fulfill obligations mandated by the NRC license and Amended Decommissioning Plan, or response actions pursuant to CERCLA, or Oklahoma Environmental Quality Code 27A at the Muskogee Property.  Nothing herein shall preclude the Environmental Authorities from pursuing good faith settlement discussions and litigation and entering into settlements with and providing contribution protection to with potentially responsible parties related to the existing contamination in, on, or at the Muskogee Property.  Of the fifty percent (50%) of the proceeds allocated to the Environmental Authorities, all of those proceeds shall be deposited in the Decommissioning Trust, unless the Environmental Authorities agree and notify FMRI otherwise.

## VII. **QUARTERLY REPORTS**

15.      The Plan Administrator shall periodically prepare and submit to the Environmental Authorities Quarterly Reports containing:

(a)     a description of all distributions to holders of allowed claims during the period covered by the Quarterly Report;

(b)     a summary of receipts and disbursements during the period covered by the Quarterly Report;

(c)     a summary description of the Reorganized Debtor's assets; and

(d)     a summary of the status of the sale and administration of Parcel B, any settlement with the Port Authority regarding Parcel A, and any settlements with insurers regarding environmental liability.

16.     FMRI shall periodically prepare and submit to the Environmental Authorities Quarterly Reports containing:

(a)     a summary of receipts and disbursements during the period covered by such Quarterly Report;

(b)     a summary of the status of the performance of Maintenance Activities, Decommissioning Activities or Environmental Activities including activities performed to maintain health and safety, fulfill obligations mandated by the Muskogee License and Amended Decommissioning Plan, or conduct response actions pursuant to CERCLA, 42 U.S.C. §§ 9601-9675, or Oklahoma Environmental Quality Code 27A, Oklahoma Statutes § 2-1-101 *et seq.*, at the Muskogee Property; and

(c)     a summary of the status of any settlement or adjudication of FMRI's third party environmental claims.

## VIII. <u>POLICE OR REGULATORY RIGHTS OF THE ENVIRONMENTAL AUTHORITIES</u>

17.     Nothing in the Plan, Confirmation Order or this Settlement Agreement shall discharge, release, preclude, or enjoin, nor shall anything in the Plan, Confirmation Order, or this Settlement

Agreement enjoin or otherwise bar the Environmental Authorities or any of them from asserting or enforcing, in the Bankruptcy Court or any other court of competent jurisdiction.

(a)    any liability to the Environmental Authorities that is not a "claim" as defined in 11 U.S.C. §101(5) ("Claim");

(b)    any Claim of an Environmental Authority arising on or after the Confirmation Date;

(c)    any police or regulatory liability to an Environmental Authority that any entity would be subject to as the owner or operator of property after the Confirmation Date; or

(d)    any liability to an Environmental Authority on the part of any Person who is not the Debtor.

## IX. COVENANTS RESERVATIONS AND CONTRIBUTION PROTECTION

18.    Except as specifically provided in Paragraph 20 (Reservation of Rights), in consideration of the actions that will be performed and the payments that will be made by Debtor under the terms of this Settlement Agreement, and except as otherwise specifically provided in this Settlement Agreement, upon the Effective Date, the United States on behalf of the NRC, covenants not to sue or take any other civil or administrative action against the Debtor pursuant to the Atomic Energy Act, 42 U.S.C. §§ 2092 *et seq.* with respect to Existing Contamination at the Muskogee Property.   Except as specifically provided in Paragraph 20 (Reservation of Rights), in consideration of the actions that will be performed and the payments that will be made by Debtor and FMRI under the terms of this Settlement Agreement, and except as otherwise specifically provided in this Settlement Agreement, upon the Effective Date, the United States on behalf of the NRC and EPA, covenants not to sue or take any other civil or administrative action against the Debtor and FMRI pursuant to CERCLA Sections 106 and 107(a), 42 U.S.C. §§ 9606 and 9607(a) with respect to Existing Contamination at the Muskogee Property.   For purposes of this Settlement Agreement, "Existing Contamination" means (a) any hazardous substances, pollutants or contaminants present

16

or existing on or under the Muskogee Property as of the Effective Date; (b) any hazardous substances, pollutants or contaminants that migrated from the Muskogee Property prior to the Effective Date; and/or (c) any hazardous substances, pollutants, or contaminants presently at the Muskogee Property that migrate from the Muskogee Property after the Effective Date.

19.     Except as specifically provided in Paragraph 20 (Reservation of Rights), upon the Effective Date, the ODEQ covenants not to sue or take any other civil or administrative action against the Debtor pursuant to the Environmental Quality Code, 27A Oklahoma Statutes § 2-1-101 *et seq*. with respect to Existing Contamination at the Muskogee Property.

20.     The covenants not to sue set forth above do not pertain to any matters other than those expressly specified therein (United States' and ODEQ's Covenant Not to Sue). The United States and ODEQ reserve, and this Settlement Agreement is without prejudice to, all rights against the Debtor, FMRI, or other persons with respect to all matters not expressly included within the United States' and ODEQ's Covenants Not to Sue. Notwithstanding any other provision of the Settlement Agreement, the United States and ODEQ reserve all rights against the Debtor or FMRI with respect to:

(a)     any action to enforce the United States and ODEQ's rights pursuant to this Settlement Agreement, including but not limited to the enforcement of Muskogee License SMB-911 or the Muskogee Permit.;

(b)     any liability resulting from exacerbation of Existing Contamination by the Debtor, FMRI, or their successors, assignees, lessees or sublessees;

(c)     any liability resulting from the release or threat of release of hazardous substances, pollutants, or contaminants, at the Muskogee Property after the Effective Date, not within the definition of Existing Contamination;

17

(d)      any liability under Section 107 of CERCLA, 42 U.S.C. § 9607, for recovery of natural resource damages arising as a result of post-petition or ongoing releases of hazardous substances at or from the Muskogee Property;

(e)      any liability resulting from violations of the NRC's deliberate misconduct regulations (40 C.F.R. § 40.10); and

(f)      criminal liability.

21.      Nothing in this Settlement Agreement is intended as a release or covenant not to sue for any claim or cause of action, administrative or judicial, civil or criminal, past or future, in law or in equity, which the United States and ODEQ may have against any person, firm, corporation or other entity not a party to this Settlement Agreement.  The United States, ODEQ, and  Debtor and FMRI expressly reserve all claims, demands, and causes of action, either judicial or administrative, past, present, or future, in law or equity, which they may have against all other persons, firms, corporations, entities, or predecessors of the Debtors for any matter arising at or relating in any manner to the Muskogee Property.  Further, nothing in this Settlement Agreement diminishes the right of the United States or ODEQ, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to enter into any settlement that gives rise to contribution protection for any person not a party to this Settlement Agreement.

22.      The  parties  hereto  agree,  and  by  entering  this  Settlement  Agreement  the Bankruptcy  Court  finds,  that  this  Settlement  Agreement  constitutes  a  judicially-approved settlement pursuant to which Debtor and FMRI have, as of the Effective Date, resolved liability to the United States and ODEQ within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law,

for the "matters addressed" in this Settlement Agreement. The "matters addressed" in this Settlement Agreement are all Maintenance Activities, Decommissioning Activities and Environmental Activities including all response actions taken or to be taken, and all response costs incurred or to be incurred, at or in connection with Existing Contamination at Muskogee Property by the United States or any potentially responsible parties, provided, however, that, if EPA exercises rights under the reservations in Paragraph 20, other than for failure to meet a requirement of this Settlement Agreement, the "matters addressed" in this Settlement Agreement shall no longer include those response costs or response actions that are within the scope of the exercised reservation.

23.     This Settlement Agreement constitutes a judicially-approved settlement pursuant to which Debtor and FMRI have, as of the Effective Date, resolved liability to the United States and ODEQ within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B) with respect to Existing Contamination.

24.     Nothing in this Settlement Agreement is intended to limit the right of the United States and ODEQ to undertake future response actions at the Muskogee Property or to seek to compel parties other than the Debtor or FMRI to perform or pay for response actions at the Muskogee Property. Nothing in this Settlement Agreement shall in any way restrict or limit the nature or scope of response actions which may be taken or be required by the United States and ODEQ in exercising its authority under federal or state law.

25.     In the event the Debtor or FMRI becomes aware of any action or occurrence which causes or threatens a release of hazardous substances, pollutants or contaminants at or from the Muskogee Property that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment prior to the Effective Date, the Debtor or FMRI shall

immediately take all appropriate action to prevent, abate, or minimize such release or threat of release.

26.     In consideration of the United States and ODEQ's Covenant Not To Sue as provided in Paragraphs 18-19 above,  the Debtor and FMRI covenant not to sue and not to assert any claims or causes of action against the United States or the State of Oklahoma, their authorized officers, employees, or representatives with respect to the Muskogee Property or this Settlement Agreement, pursuant to CERCLA Sections 106 and 107(a), 42 U.S.C. §§ 9606 and 9607(a), and the Atomic Energy Act, 42 U.S.C. §§ 2092 *et seq*. or  the Environmental Quality Code, 27A Oklahoma Statutes § 2-1-101 *et seq*. with respect to Existing Contamination at the Muskogee Property; provided, however, that Debtor and FMRI reserve, and this Settlement Agreement is without prejudice to, claims by Debtor or FMRI against the United States on behalf of the United States General Services Administration pursuant to Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), with respect to Existing Contamination.

27.     This Settlement Agreement shall apply to and be binding upon the United States, ODEQ and shall apply to and be binding upon the Debtor, FMRI, and their officers, directors, and employees.  The United States and ODEQ's Covenant Not to Sue shall apply to the Debtor's and FMRI's current shareholders (see Appendix C), officers and directors to the extent that the alleged liability of the shareholder, officer or director is based solely on his or her status and in his or her capacity as an officer, director, or employee of the Debtor or FMRI, and not to the extent that the alleged liability arose independently of the alleged liability of the Debtor or FMRI.  Each signatory of a Party to this Settlement Agreement represents that he or she is fully authorized to enter into the terms and conditions of this Settlement Agreement and to legally bind such Party.

## X. TRANSFERS OF REAL PROPERTY INFORMATION AND ENVIRONMENTAL INFORMATION

28.    *Electronic Files*. The Plan Administrator shall provide to FMRI, at the Debtor's expense, within 30 days after the Effective Date, a hard drive(s) containing electronic files of Environmental Information and Real Property Information related to the Muskogee Property; provided, however, that in the event that the Debtor determines that any such provision of Environmental Information or Real Property Information violates any law or legal proceeding or waives any applicable privilege, protection or immunity, including, without limitation, the attorney-client privilege or the work-product doctrine, the Debtor shall take all reasonable measures to provide such Environmental Information or Real Property Information in a manner that avoids any such harm or consequence, including retention of the specific electronic files.

29.    Hard Copy Files Stored On-Site: Hard copy files of Environmental Information and Real Property Information located at any of the Muskogee Property before the Effective Date shall remain on-Site after the Effective Date and shall thereafter remain in the possession, custody, and control of FMRI.

30.    *Document Retention*.

(a)    FMRI shall at all times maintain ownership and control of the original form of the Environmental Information and Real Property Information.

(b)    FMRI will preserve the Environmental Information and Real Property Information that is the property of the Debtor and FMRI in its present state or condition.

(c)    At any time after three years following the Effective Date, FMRI may elect to relinquish control and/or destroy any Environmental Information, Real Property Information or other records located at Muskogee Property.  FMRI shall provide written notice to the United States and the State of Oklahoma that it will no longer maintain the Environmental Information, Real Property Information or other records identified and provide the responding parties the

21

opportunity to object to the FMRI's relinquishment of control, destruction, or take possession of such Environmental Information, Real Property Information, or other records within 60 days following such notification. If more than one of the aforementioned parties objects to the relinquishment of control, destruction, or requests to take possession of the documents, FMRI shall not relinquish control or destroy such information, or such parties  shall reach an agreement as to which entity shall take possession of such Environmental Information, Real Property Information, or other records and notify FMRI of same.

(d)     No party shall have any liability to any other party on account of any Environmental Information or Real Property Information being destroyed after all reasonable efforts have been taken by such party to comply with the provisions of Subparagraph 30(d) above.

(e)     Neither the Debtor nor FMRI make any warranty as to the completeness or accuracy of the Environmental Information or Real Property Information provided pursuant to Paragraphs 28 and 29 above.

31.     The United States and the State of Oklahoma reserve, and this Settlement Agreement is without prejudice to, all rights to obtain information regarding the Muskogee Property from the Debtor and FMRI pursuant to their information-gathering authority under Sections 104 and 122 of CERCLA, 42 U.S.C. §§ 9604 and 9622, or any other applicable federal, or state Environmental Laws.

## XII. <u>NOTICES</u>

32.     Notices. Any notices required to be given hereunder must be in writing and shall be served in person or by overnight mail upon the respective parties as follows (or to such other addressees as may hereafter be designated):

if to Fansteel:

        David Sands
        Dorset Partners LLC
        P.O. Box 67
        1044 Dorset West Road
        Dorset, VT 05251
        Chapter 11 Plan Administrator


if to FMRI:

        Robert Compernolle
        5318 Mulford Street
        Skokie, IL 60077


with a copy to:
        Mark Steger
        Clark Hill
        130 East Randolph, Suite 3900
        Chicago, Illinois 60601



if to the DOJ (any notice to DOJ also shall be sent to the NRC and EPA):

        Richard M. Gladstein, Senior Counsel
        Environmental Enforcement Section
        Environment and Natural Resources Division
        United States Department of Justice
        P.O. Box 7611
        Washington, D.C. 20044

if to the NRC:

        Deputy Director,
        Division of Decommissioning, Uranium Recovery, and Waste Programs
        Office of Nuclear Material Safety and Safeguards
        U.S. Nuclear Regulatory Commission
        Washington, DC 20555-0001


if to the EPA (any notice to EPA also shall be sent to DOJ):

        Lance Nixon
        Enforcement Officer

Superfund Division, Enforcement and Cost Recovery Section (SEDAE)
120 Elm St, Suite 500
Dallas, TX 75270

if to the ODEQ:

Pamela Brown Dizikes, Esq.
Office of General Counsel
Oklahoma Department of Environmental Quality
707 N. Robinson
Oklahoma City, OK 73101

## XIV. <u>PUBLIC COMMENT</u>

33.     This Settlement Agreement shall be lodged with the Bankruptcy Court and shall
thereafter be subject to a period of public comment following publication of notice of the
Settlement Agreement in the *Federal Register*.  After the conclusion of the public comment period,
the United States will file with the Bankruptcy Court any comments received, as well as the United
States' responses to the comments, and at that time, if appropriate, the United States will request
approval of the Settlement Agreement.  The United States reserves the right to withdraw or
withhold its consent if the comments regarding the Settlement Agreement disclose facts or
considerations which indicate that the Settlement Agreement is not in the public interest.

34.     If for any reason (i) the Settlement Agreement is withdrawn by the United States
or the State of Oklahoma as provided in Paragraph 18; or (ii) the Settlement Agreement is not
approved: (a) this Settlement Agreement shall be null and void and the parties shall not be bound
hereunder or under any documents executed in connection herewith; (b) the parties shall have no
liability to one another arising out of or in connection with this Settlement Agreement or under
any documents executed in connection herewith; and (c) this Settlement Agreement and any
documents prepared in connection herewith shall have no residual or probative effect or value, and
it shall be as if they had never been executed.

## XV. <u>JUDICIAL APPROVAL</u>

35.     The Debtor's entry into this Settlement Agreement shall be subject to approval of the Bankruptcy Court.  The Debtors shall promptly seek approval of their entry into this Settlement Agreement under Bankruptcy Rule 9019 or applicable provisions of the Bankruptcy Code.

## XVI. <u>RETENTION OF JURISDICTION</u>

36.     The Court shall retain jurisdiction over both the subject matter of this Settlement Agreement and the parties hereto, for the duration of the performance of the terms and provisions of this Settlement Agreement for the purpose of enabling any of the parties to apply to the Court at any time for such further order, direction and relief as may be necessary or appropriate for the construction or interpretation of this Settlement Agreement, or to effectuate or enforce compliance with its terms.

## XVII. <u>EFFECTIVE DATE</u>

37.     The Effective Date shall be the date on which this Settlement Agreement is approved by the Bankruptcy Court.

## XVIII. <u>PLAN OF LIQUIDATION</u>

38.     The Debtor shall incorporate this Settlement Agreement into the Plan by reference and approval of this Settlement Agreement shall be a condition precedent to confirmation of the Plan, which may not be waived. The Debtor shall not file a Plan or amend the Plan or the proposed order confirming the Plan in a manner inconsistent with the terms and provisions of this Settlement Agreement, take any other action in the Bankruptcy Cases that is inconsistent with the terms and provisions of this Settlement Agreement, or propose terms for any order confirming the Plan that

are inconsistent with this Settlement Agreement. The Governments shall not oppose any term or provision of the Plan or an order confirming the Plan that is addressed by and is consistent with this Settlement Agreement, unless the United States withdraws or withholds its consent to this agreement based on public comment. The Parties reserve all other rights or defenses that they may have with respect to the Plan. In the event of any inconsistency between the Plan, any order confirming the Plan, and this Settlement Agreement, the terms of this Settlement Agreement shall control.

## XIX. <u>AMENDMENTS/INTEGRATION AND COUNTERPARTS</u>

39.     This Settlement Agreement and any other documents to be executed in connection herewith or referred to herein shall constitute the sole and complete agreement of the parties hereto with respect to the matters addressed herein. This Settlement Agreement may not be amended except by a writing signed by all the parties.

40.     The signatories for the parties each certify that he or she is authorized to enter into the terms and conditions of this Settlement Agreement after the close of any applicable comment period(s) and provisions of comments by the Governments to the Court, and to execute and bind legally such party to this document.

41.     This Settlement Agreement may be executed in counterparts, each of which shall constitute an original, and all of which shall constitute one and the same agreement.

GOOD CAUSE APPEARING, IT IS SO ORDERED:


_____
Judge, U.S. Bankruptcy Court


APPROVED AS TO FORM AND CONTENT:

*/s/  Jeffrey D. Goetz*

Jeffrey D. Goetz, Esq.
Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309
Telephone: 515-246-5817

*Attorney for Debtors and Debtors in Possession*


*/s/  Jeffrey D. Goetz*

Jeffrey D. Goetz, Esq.
Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309
Telephone: 515-246-5817

*Attorneys for FMRI, Inc.*


*/s/  Richard M. Gladstein*

Richard M. Gladstein DC362404
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
601 D Street, Room 2121
Washington, D.C.
Telephone: (202) 514-1711
Facsimile: (202) 616-6584
Email: Richard.Gladstein@usdoj.gov


*Attorney for the United States on behalf of the NRC and EPA*

/s/ Wren Stenger
_____

Wren Stenger, Director
Superfund and Emergency Management Division
U.S. EPA Region 6
1201 Elm Street, Suite 500,
Dallas, Texas 75270
Telephone: 800-887-606


*Environmental Protection Agency, Region 6*



/s/ Gary Henry
_____

Gary Henry, Esq.
Pamela Brown Dizikes, Esq.
Environmental Attorneys
Office of General Counsel
Oklahoma Department of Environmental Quality
707 N. Robinson
Oklahoma City, OK 73101
Telephone: 405-702-7175

*Attorneys for the Oklahoma Department of Environmental* Assistant Attorney General

## APPENDIX A

The **Muskogee Property** shall mean the real property, any and all structures and fixtures, appurtenances to, and rights associated with that real property, owned or formerly owned by the Debtor and located in Muskogee County, Oklahoma. The Muskogee Property is comprised of the following four parcels of real property.

**Parcel A** shall mean that portion of the Muskogee Property commonly known and referred to as Parcel A and any and all structures and fixtures, appurtenances to, and rights associated with the real property known as Parcel A. Parcel A is currently owned by the Port Authority. The legal description of Parcel A is as follows:

> A tract of land located in the east half of Section 17, Township 15 North, Range 19 East, Muskogee County, Oklahoma, more particularly described as follows: Beginning at a point that is S 89°54'22" W a distance of 45 feet from the Northeast corner of the Southeast quarter of said Section 17; thence S 00°01'30" E a distance of 437.77 feet; thence S 89°20'45" W a distance of 1071.40 feet; thence N 03°05'09" W a distance of 448.05 feet; thence N 89°54'22" E a distance of 480.30 feet; thence N 00°05'43" W a distance of 660.00 feet; thence N 89°54'22" E a distance of 560.00 feet; thence S 00°05'43" E a distance of 660.00 feet; thence N 89°54'22" E a distance of 55.00 feet to the point of beginning; containing 19.51 acres, more or less.

**Parcel B** shall mean and refer to that portion of the Muskogee Property commonly known and referred to as Parcel B and any and all structures and fixtures, appurtenances to, and rights associated with the real property known as Parcel B. Parcel B is currently owned by the Debtor. Parcel B consists of all the Muskogee Property that is not comprised of Parcels A, C, or D.

> A detailed and correct legal description of Parcel B will be supplied prior to any transfer or conveyance of Parcel B.

**Parcel C** shall mean and refer to that portion of the Muskogee Property commonly known and referred to as Parcel C and any and all structures and fixtures, appurtenances to, and rights associated with the real property known as Parcel C. Parcel C is currently owned by FMRI. The legal description of Parcel C is as follows:

> A tract of land located in the Southwest Quarter of the Northwest Quarter (SW1/4 NW1/4) of Section 16, Township 15 North, Range 19 East, Muskogee County, Oklahoma, more particularly described as follows:
> Beginning at a point that is N 89°54'22" E a distance of 20.00 feet and N 00°05'43" W a distance of 12.03 feet from the Southwest Corner of the Northwest Quarter of said Section 16; running thence N 00°05'43" W a distance of 647.97 feet; thence N 89°54'22" E a distance 744.4 feet; thence S 10°35'05" W a distance of 674.67 feet; thence N 88°46'08" W a distance of 649.59 feet to the Point of Beginning.

**Parcel D** shall mean and refer to that portion of the Muskogee Property commonly known and referred to as Parcel D and any and all structures and fixtures, appurtenances to, and rights associated with the real property known as Parcel D. Parcel D consists of all the Muskogee Property that is not described above as or comprised of Parcels A, B, or C. Parcel D is currently owned by the Debtor.

A detailed and correct legal description of Parcel D will be supplied prior to any transfer or conveyance of Parcel D.

# APPENDIX B

February 13, 2020
[TO]
[Address]
[City, State & Zip]

**RE:    Letter Agreement – Exhibit A to Fansteel Plan of Liquidation**

Dear _____:

     This Letter Agreement has been prepared in accordance with Section 6.2.1.(A)(iii)- Utilization of Buildings on Parcel B- of Fansteel's Plan of Liquidation to confirm that the Plan Administrator shall reimburse the Decommissioning Trust on a monthly basis by the last day of each month for any utilities or insurance on that portion of the Muskogee Property identified as "Parcel B", that is paid by FMRI for the benefit of Parcel B.  The utilities include, but are not limited to, any electric, gas, or telephone payments made by FMRI for the benefit of Parcel B.

     Sincerely yours,

     Plan Administrator

31

**APPENDIX C**

Current Shareholders of Debtor

Marie E. Tsoukalas
Nicholas P. Tsoukalas
Morgan Stanley
Charles Schwab & Co., Inc.
TD Ameritrade Clearing, Inc.
J.P. Morgan Clearing Corp.
Pershing LLC
E*Trade Securities LLC
National Financial Services LLC
Aerocraft Heat Treating Co.
Saegertown Manufacturing Corporation
Aldyne Powder Technologies
Spyridon Tsoukalas
American Express CPA Remittance Processing
Eular American Credit Indemnity as assignee of Southwestern Scrap
Michael Mocniak
Ramius Securities LLC as transferee of Bank One, N.A.
Mattco Forge Inc.
Leonard Levie
Curtis Zamec

## INTERNATIONAL TRADE COMMISSION

[Investigation No. 337–TA–1189]

## Certain Dissolving Microneedle Patches for Cosmetic and Pharmaceutical Use; Commission Determination Not To Review an Initial Determination Terminating the Investigation Based on Withdrawal of the Complaint; Termination of the Investigation

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission has determined not to review the Administrative Law Judge's ("ALJ") initial determination ("ID") (Order No. 7) terminating the investigation in its entirety based on withdrawal of the complaint. The investigation is terminated.

**FOR FURTHER INFORMATION CONTACT:** Lynde Herzbach, Office of the General Counsel, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436, telephone (202) 205–3228. Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov*. For help accessing EDIS, please email *EDIS3Help@usitc.gov*. General information concerning the Commission may also be obtained by accessing its internet server at *https://www.usitc.gov*. Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal, telephone 202–205–1810.

**SUPPLEMENTARY INFORMATION:** On January 15, 2020, the Commission instituted this investigation based on a complaint, as supplemented and amended, filed on behalf of TheraJect, Inc. of Fremont, California. 85 FR 2439–40 (Jan. 15, 2020). The amended complaint alleges violations of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain dissolving microneedle patches for cosmetic and pharmaceutical use by reason of infringement of one or more of claims of U.S. Patent No. 6,945,952. *Id.* The amended complaint also alleges that a domestic industry is in the process of being established. The Commission's notice of investigation names one

respondent, Raphas Co., Ltd. of Seoul, South Korea. *Id.* The Office of Unfair Import Investigations is also named as a party in this investigation. *Id.*

On March 9, 2020, the complainant filed an unopposed motion to terminate the investigation in its entirety.

On March 18, 2020, the ALJ issued the subject ID (Order No. 7) pursuant to 19 CFR 210.21(a)(1), granting Complainant's motion. ID at 1. The ID finds that the motion for termination of this investigation complies with the Commission's rules. *Id.* at 1–2. The ID further finds that there are no extraordinary circumstances that warrant denying the motion. *Id.* at 2. No party petitioned for review of the ID.

The Commission has determined not to review the subject ID. The investigation is terminated.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR part 210).

By order of the Commission.

Issued: April 3, 2020.

Lisa Barton,

*Secretary to the Commission.*

[FR Doc. 2020–07366 Filed 4–7–20; 8:45 am]

**BILLING CODE 7020–02–P**

## DEPARTMENT OF JUSTICE

## Notice of Lodging of Proposed Settlement Agreement Under the Atomic Energy Act and Comprehensive Environmental Response, Compensation and Liability Act

On April 1, 2020, the Department of Justice lodged a proposed Settlement Agreement between the United States, on behalf of the Nuclear Regulatory Commission ("NRC") and the Environmental Protection Agency ("EPA"), the Oklahoma Department of Environmental Quality ("ODEQ"), Fansteel, Inc. ("Debtor" or "Fansteel"), and FMRI, Inc. with the United States Bankruptcy Court for the District of Iowa in the case entitled *In re Fansteel, Inc.,* Case No. 16–01823–als11 (Bankr. S.D. Iowa).

The United States, on behalf of the NRC, filed a protective proof of claim on January 17, 2017, in this bankruptcy action, which, *inter alia,* asserted that Fansteel is liable to the United States to comply with Sections 62, 63, and 161 of the Atomic Energy Act, 42 U.S.C. 2092, 2093, 2201, applicable regulations under 10 CFR parts 20 and 40, 10 CFR

40.36, NRC license SMB–911, and the Amended Decommissioning Plan for the Muskogee Property, the facility owned by Debtor and operated by FMRI, a wholly owned subsidiary of the Debtor, and to perform the decommissioning and remediation of that Property.

Under the Settlement Agreement: (1) The Debtor will transfer Parcel D of the Muskogee property to FMRI; (2) FMRI will use funds received from the Decommissioning Trust under the Amended Decommissioning Plan, from the Plan Administrator under Fansteel's Plan of Reorganization, or from other sources for activities necessary to maintain health and safety, fulfill obligations mandated by the NRC License and Amended Decommissioning Plan, or conduct response actions pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. 9601–9675, or the Oklahoma Environmental Quality Code 27A, Oklahoma Statutes § 2–1–101 *et seq.,* at the Muskogee Property; (3) the Debtor will transfer any and all causes of action the Debtor may have against potentially responsible parties at the Muskogee Property under CERCLA and Oklahoma law to FMRI; (4) the Debtor and the "Environmental Authorities" (NRC, EPA, and ODEQ) will allocate between them as provided in the Settlement Agreement any Net Proceeds received from the sale of Parcel B, any settlement reached with the Port of Muskogee regarding environmental liability for the Muskogee Property, and any other Net Proceeds received; (5) the Environmental Authorities will receive one hundred percent (100%) of any net insurance proceeds for losses related to environmental liabilities with respect to the Muskogee Property; and (6) the Environmental Authorities and FMRI will share on a fifty/fifty percent (50%/50%) basis as provided in the Settlement Agreement the proceeds from any settlement or adjudication of the third party environmental claims transferred from the Debtor to FMRI.

The publication of this notice opens a period for public comment on the proposed Settlement Agreement. Comments should be addressed to the Assistant Attorney General, Environment and Natural Resources Division, and should refer to *In re Fansteel, Inc.,* Case No. 16–01823 als–11 (Bankr. S.D. Iowa) and DJ #90–10–07797/2. All comments must be submitted no later than fifteen (15) days after the publication date of this notice. Comments may be submitted either by email or by mail:

| To submit comments: | Send them to: |
|---|---|
| By email ....... | pubcomment-ees.enrd@usdoj.gov. |
| By mail ......... | Assistant Attorney General, U.S. DOJ—ENRD, P.O. Box 7611, Washington, D.C. 20044–7611. |

During the public comment period, the proposed Settlement Agreement may be examined and downloaded at this Justice Department website: *http://www.usdoj.gov/enrd/Consent_Decrees.html*. We will provide a paper copy of the proposed consent decree upon written request and payment of reproduction costs. Please mail your request and payment to: Consent Decree Library, U.S. DOJ—ENRD, P.O. Box 7611, Washington, DC 20044–7611.

Please enclose a check or money order for $8.00 (25 cents per page reproduction cost) payable to the United States Treasury.

**Thomas Carroll,**
*Assistant Section Chief, Environmental Enforcement Section, Environment and Natural Resources Division.*

[FR Doc. 2020–07324 Filed 4–7–20; 8:45 am]

**BILLING CODE 4410–15–P**

# DEPARTMENT OF LABOR

**Employment and Training Administration Proposed Disposal and Reuse of Excess Property; Joliet Job Corps Center, Joliet, IL**

**ACTION:** Final finding of no significant impact, Joliet Job Corps Center proposed disposal and reuse of excess property, located at 1101 Mills Road, Joliet, Illinois.

**SUMMARY:** Pursuant to the Council on Environmental Quality Regulations implementing procedural provisions of the National Environmental Policy Act (NEPA), the Department of Labor, ETA, gives final notice of the proposed disposal and reuse of a 25-acre area of excess property at the Joliet Job Corps Center, and that this project will not have a significant adverse impact on the environment.

**DATES:** These findings are applicable as of April 8, 2020.

**ADDRESSES:** For further information contact Delilah LumHo, Department of Labor, 200 Constitution Avenue NW, Room N–4460, Washington, DC 20210; Telephone (202) 693–8010 (this is not a toll free number).

**SUPPLEMENTARY INFORMATION:** A public notice of availability of the draft environmental assessment (EA) was published in the Herald-News serving Joliet and Will County, Illinois, on December 3, 2019. The review period extended for 15 days, ending on December 18, 2019. No public comments were received. No changes to the findings of the EA have been made.

Implementation of the proposed action alternative will not have significant impacts on the human environment. The determination is sustained by the analysis in the EA, agency consultation, the inclusion and consideration of public review, and the capability of mitigations to reduce or avoid impacts. Any adverse environmental effects that could occur are no more than moderate in intensity, duration and context and less-than-significant. As described in the EA, there are no highly uncertain or controversial impacts, unique or unknown risks, significant cumulative effects, or elements of precedence. There are no previous, planned, or implemented actions, which, in combination with the proposed action alternative, would have significant effects on the human environment. Requirements of NEPA have been satisfied, and preparation of an Environmental Impact Statement is not required.

**John Pallasch,**
*Assistant Secretary for Employment and Training.*

[FR Doc. 2020–07114 Filed 4–7–20; 8:45 am]

**BILLING CODE 4510–FN–P**

# DEPARTMENT OF LABOR

**Employment and Training Administration**

**Final Finding of No Significant Impact, Roswell Job Corps Center Proposed Disposal and Reuse of Excess Property, Located at 57 G Street, Roswell, New Mexico**

**SUMMARY:** The Department of Labor's (DOL) Employment and Training Administration Pursuant to the Council on Environmental Quality Regulations implementing procedural provisions of the National Environmental Policy Act (NEPA), gives final notice of the proposed disposal and reuse of a 13.6-acre area of excess property at the Roswell Job Corps Center, and that this project will not have a significant adverse impact on the environment.

**DATES:** These findings are applicable as of April 8, 2020.

**ADDRESSES:** For further information contact Delilah LumHo, Department of Labor, 200 Constitution Avenue NW, Room N–4460, Washington, DC 20210; Telephone (202) 693–8010 (this is not a toll free number).

**SUPPLEMENTARY INFORMATION:** A public notice of availability of the draft environmental assessment (EA) was published in the Roswell Daily Record in Roswell, New Mexico, on December 3, 2019. The review period extended for 15 days, ending on December 18, 2019. No public comments were received. No changes to the findings of the EA has been made.

Implementation of the proposed action alternative will not have significant impacts on the human environment. The determination is sustained by the analysis in the EA, agency, and Native American tribal consultation, the inclusion and consideration of public review, and the capability of mitigations to reduce or avoid impacts. Any adverse environmental effects that could occur are no more than minor in intensity, duration and context and less-than-significant. As described in the EA, there are no highly uncertain or controversial impacts, unique or unknown risks, significant cumulative effects, or elements of precedence. There are no previous, planned, or implemented actions, which, in combination with the proposed action alternative, would have significant effects on the human environment. Requirements of NEPA have been satisfied, and preparation of an Environmental Impact Statement is not required.

**John Pallasch,**
*Assistant Secretary for Employment and Training.*

[FR Doc. 2020–07113 Filed 4–7–20; 8:45 am]

**BILLING CODE 4510–FN–P**

# DEPARTMENT OF LABOR

**Office of Workers' Compensation Programs**

**Proposed Extension of Existing Collection; Comment Request; Employer's First Report of Injury or Occupational Disease (LS–202), Employer's Supplementary Report of Accident or Occupational Illness (LS–210)**

**AGENCY:** Division of Longshore and Harbor Workers' Compensation, Office of Workers' Compensation Programs, Labor.

**ACTION:** Notice.

**SUMMARY:** The Department of Labor (DOL) is soliciting comments concerning a proposed extension for the authority to conduct the information