## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | Case No. 16-01823-als11 |
| | ) | |
| FANSTEEL, INC. | ) | Chapter 11 |
| | ) | |
| | ) | |
| DEBTOR. | ) | |

## FINAL REPORT OF POST CONFIRMATION INVESTIGATOR

COMES NOW, Elizabeth Lally, Post-Confirmation Investigator ("Investigator") for Fansteel, Inc., Reorganized Debtor (the "Debtor") in the above-captioned Chapter 11 case and hereby submits this Final Report in accordance with Section 6.2.1(B).(vi) of the Debtor's Sixth Amended Plan of Liquidation (the "Plan") (Docket No.1532), and respectfully states as follows:

## I. EXECUTIVE SUMMARY

The Investigator and her professionals investigated twenty-two (22) entities and individuals believed to be Insiders of the Debtor and as defined under Section 2.1.35 of the Plan. The Investigator and her professionals reviewed over 1,600 related financial transactions between the Debtor, its Insiders, and other entities affiliated, owned, or controlled by its Insiders. These transactions took place over a five-year period pre-petition and continued into 2016 until the Debtor filed its Chapter 11 bankruptcy on September 13, 2016. One of the principal questions being investigated was whether, in structuring and implementing these transactions, were assets removed from the Debtor to the detriment of the Debtor and its creditors. The simple answer to this question is "Yes."

However, the more important question, is whether there are or remain any causes of action against the Debtor's Insiders ("Insider Claims" as defined in the Plan under

1

Section 2.1.36) to avoid these transactions or recover assets for the benefit of the bankruptcy estate and the Debtor's creditors.  The answer to this question is "No".

The Investigator and her professionals thoroughly investigated the potential claims and causes of actions against the Insiders, and has considered the benefits and drawbacks of litigating those claims, including:  the uncertainty of results, given available defenses; the time it would take to achieve a positive outcome if any; and the costs to the bankruptcy estate to do so.  Furthermore, out of the over 1,600 financial transactions investigated, the Investigator found no transactions believed to rise to the level of constructively fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors), and/or preferential transfers to Insiders out of the ordinary course of business or financial affairs of the Debtor.

As set forth below, after conducting the investigation, the Investigator does not believe that there are any bona fide claims that can be pursued against the Insiders, and has concluded, even if there were Insider Claims to prosecute, such claims may be barred by a previous order entered by this Court.

## II.  BACKGROUND

### A.  General Background

1.      Prior to filing bankruptcy, the Debtor and its several subsidiaries were primarily in the business of manufacturing precision engineered products for the global aerospace, defense, and industrial markets. The Debtor's wholly-owned subsidiary, Wellman Dynamics Corp. ("Wellman Dynamics") was a foundry, producing helicopter parts.

2.      The Debtor's profitability was driven by demand for helicopter production and replacement parts. Demand declined in 2011 and 2013 after the U.S. military drawdown in Iraq and Afghanistan, respectively.

3.      After the decline in demand for helicopters and replacement parts, the Debtor unsuccessfully attempted to sell Wellman Dynamics to a competitor.

4.      The Debtor had used Fifth Third Bank to provide asset-based lending since 2005.  In 2015, Fifth Third Bank indicated that it did not want to renew its loan agreement with the Debtor following its expiration in June 2016.  The Debtor unsuccessfully sought to refinance the loan with several banks, but, eventually, Fifth Third Bank sold the loan note to TCTM Financial FS, LLC ("TCTM").

5.      The Debtor went through several executives, officers, and management changes over the years in an attempt to turnaround the company (as discussed in greater detail below), including retaining a chief restructuring officers, before finally deciding to seek reorganization under Chapter 11.

6.      The Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") on September 13, 2016 (the "Petition Date") (Docket No. 1).

7.      On the same date, Wellman Dynamics, filed its Chapter 11 Petition at Case No. 16-01825 (the "Wellman Dynamics Case"). Wellman Dynamics failed to confirm a plan of reorganization and was eventually forced to sell the majority of its assets.

8.      In the case at bar, the Debtor initially proposed its Chapter 11 Plan of Reorganization and Disclosure Statement on January 11, 2017 (Docket Nos. 393 and 394

respectively), which were subsequently amended three (3) times until the Debtor withdrew its Plan of Reorganization on April 13, 2017 (Docket No. 807).

9.      On April 17, 2020, the Debtor filed its Fourth Amended Plan of Liquidation and Third Amended Disclosure Statement (Docket Nos. 1474 and 1475, respectively). On May 8, 2020 the Debtor filed its Fourth Amended Disclosure Statement and Fifth Amended Plan of Liquidation (Docket Nos. 1505 and 1507, respectively).

### B. **Appointment and Mandate to Investigate Insider Claims**

10.     On June 25, 2020, the Debtor filed its Fifth Amended Disclosure Statement and Sixth Amended Plan of Liquidation (the "Plan") (Docket Nos. 1531 and 1532, respectively).

11.     On August 6, 2020, this Court entered an order confirming the Debtor's Sixth Amended Plan of Liquidation (Docket No. 1567).

12.     Pursuant to Section 9.12 of the Plan, the Debtor satisfied all Conditions Precedent to the Effective Date of the Plan, and, therefore, the Plan Effective Date was August 21, 2020 (the "Effective Date"). The occurrence of the Effective Date resulted in the appointment of the Plan Administrator and Investigator.

13.     The Investigator is disinterested and meets the standards, qualifications, and duties ordinarily considered by the United States Trustee and the Court in the appointment of an examiner under 11 U.S.C. §§ 104 and 106.

14.     Pursuant to Section 6.2.1 (B)(vi) of the Plan, a Post-Confirmation Investigator for the Debtor was engaged on the confirmation date of the Plan, to investigate, assess, research, and evaluate whether the Debtor has any Insider Claims and to engage special counsel to prosecute any such Insider Claims, if necessary.

15.     Pursuant to Section 6.2.1 (B)(vi) of the Plan, within one hundred and twenty (120) days after confirmation, the Investigator was to file with the Bankruptcy Court a Final Report. If the Investigator was unable to complete the Final Report within one hundred and twenty (120) days after confirmation, the Investigator was to file a status report with the Court.   The Final Report must be filed by the Post-Confirmation Investigator no later than one hundred and eighty (180) days after Confirmation.

16.     The deadline to file the Investigator's Final Report is February 2, 2021, and, therefore, this Final Report is timely filed.

### III. <u>SCOPE OF INVESTIGATON</u>

17.     In connection with the Debtor's liquidation efforts, and pursuant to the Plan, the Investigator was appointed to determine, in summary, whether: (1) there were any rights, claims of actions, or causes of actions against any of the Debtor's Insiders, including, but not limited to its directors, officers, managers, subsidiaries and affiliates; and (2) whether there were any preferential or fraudulent transfers to Insiders that may be avoidable pursuant to 11 U.S.C. § 544, 547, 548 (the "Investigation")[1].

18.     The Investigation was narrow in scope and limited in duration, as the Plan only provided 180 days to investigate and submit this Final Report. The Investigator, while not limited to pre-petition transfers to Insiders, focused largely on the five (5) year period between September 13, 2011 and September 13, 2016 ("Avoidance Period").

---

[1] The Investigator takes not position on the merits of the potential causes of action identified below. The determination of those causes of action will be left for the trier of fact to whom such causes are presented. Importantly, the Investigator's analysis neither precludes the existence of valid defenses, which may defeat or significantly reduce any liability, nor predicts how a court or a jury may ultimately decide any contested legal, factual, or credibility issues. Moreover, the Investigators made various assumptions in conducting her analysis, which are set forth below.

19.    The Investigation included three principal components: (i) extending the statute of limitations to bring causes of actions against Insiders; (ii) a review of the Debtor's historical financial records, including non-public documents provided to the Investigator by the Debtor in response to document requests made by the Investigator; and (iii) review and analysis of the Debtor's Director and Officers Insurance Policies ("D&O Policies") and prior settlement agreements concerning Insider Claims for potential claims preclusion.

**A.  <u>Extending the Statute of Limitations</u>**

20.    After being appointed, the Investigator sought to extend the statute of limitations relating to Insider Claims as required under Section 6.2.1 (B)(vi) of the Plan.

21.    Before commencing the Investigation, it was imperative to extend the statute of limitations for Insider Claims under 11 U.S.C. § 544, 547, 548 ("Avoidance Actions"). Investigating Insider Claims at the expense of the bankruptcy estate would be futile if the Investigator was time barred from pursuing any potential Insider Claims that she may discover.

22.    The Investigator filed a Motion for Order to Extend Deadline to File Avoidance Actions Under 11 U.S.C. § 546 ("Motion to Extend") (Docket No. 1586) on September 18, 2020.

23.    On November 3, 2020, a hearing was held on the Motion to Extend and the Court subsequently entered an Order (Docket No. 1600) extending the deadline for filing avoidance action until August 3, 2021.

24.     In extending the deadline for filing avoidance actions, neither the Investigator nor the Court were opining or determining whether or not such causes of actions would survive a motion to dismiss based on a statute of limitations defense[2].

### B.  Review of Debtor's Historical Financial Records

25.     Having extended the deadline for filing avoidance actions, the Investigator and her professionals commenced the Investigation of the Debtor's pre-petition transactions for the five (5) year period preceding the Debtor's bankruptcy filing on September 13, 2016.

26.     In connection with the second component, the Investigator sent her first set of document request related to the investigation to the Plan Administrator on August 24, 2020. The Debtor, through the Plan Administrator, agreed to work cooperatively with the Investigator and produced documents voluntarily.

27.     As the Investigator reviewed and analyzed the productions, she and her professionals made further documents requests September 24, 2020, September 28, 2020, November 13, 2020, and November 23, 2020. The Investigator and her professionals worked with the Plan Administrator and Debtor's former Chief Financial Officer, Bob Compernolle ("CFO"), to prioritize and refine the scope of the requests. The Plan Administrator and CFO worked diligently to satisfy the Investigator's requests and where relevant documents exists[3], they were provided to the Investigator.

---

[2] Pursuant to Iowa Code § 684 Voidable Transactions, sub-section 684.9 a claim for relief with respect to a transfer is extinguished unless such action is bought no later than four years after the transfer was made or not later than one year after the transfer was or could reasonably have been discovered by the claimant.

[3] Formal Board Meetings were never held by the Debtor, and, therefore, there are no board minutes or documents subsequent to November, 2008. While informal minutes or notes may exist, along with other board agreements, they were never made available to management.

28.    The Investigator and her professionals using the Debtor's Amended Statement of Financial Affairs (Doc. No. 144) and court filings in the companion bankruptcy, Wellman Dynamics Case, identified the Debtor's Insiders during the five (5) year period preceding the Debtor's bankruptcy filing.

29.    The Investigator and her professionals analyzed the connections and extent of the Debtor's relationship with its Insiders and the interconnections amongst the Insiders and Debtor's subsidiaries and affiliates.

30.    The Investigator and her professionals undertook a thorough, multi-step analysis to understand the factual and legal backgrounds necessary to evaluate financial transactions between the Debtor and its Insiders.

31.    The Investigator and her professionals worked with the Plan Administrator and CFO to obtain and summarize financial transactions within the five (5) year Avoidance Period.

32.    The Investigator and her professionals reviewed the summary of financial transactions and identified the transactional amounts to Insiders that met the statutory minimum of 11 U.S.C. § 547. The statutory minimum only being $6,425[4], the Investigator further narrowed the number of financial transactions to investigate that would be in the best interest of the bankruptcy estate and creditors under a cost-benefit analysis if such transactions were avoidable.

33.    The Investigator and her professionals identified 13 Insider transfers for further investigation and continued to work with the Plan Administrator and CFO to obtain

---

[4] Aggregate amount of the transfers that could not be subject to avoidance as preferential in a non-consumer debtor case under Section 547(c)(9) of the Bankruptcy Code in 2016. Pursuant to Section 104(a) dollar amounts are adjusted every 3 years.

additional financial records regarding said transfers.  In the course of the Investigation, the Investigator and her professionals performed the following tasks:

a.  reviewed and analyzed the Debtor's accounts payable payment internal records detailing all actual payments made to Insiders;

b.  reviewed and analyzed the Debtor's internal payroll records for Insiders;

c.  reviewed and analyzed directors' fees paid to Insiders;

d.  reviewed and analyzed professional fees to Insider, Black Management Advisors;

e.  reviewed and analyzed travel and all other expense reimbursement payments made through expense reports;

f.  reviewed and analyzed the Debtor's Consulting Agreement with Black Management Advisors;

g.  reviewed and analyze all the Debtor's payments made to former subsidiary, Fansteel ENA USA, Inc;

h.  reviewed and analyzed the 22nd Amendment with Fifth Third Bank, which formalized $1.4 million Fansteel ENA USA, Inc. Acquisition Note; and

i.  reviewed and analyzed the sale documentation of Fansteel ENA USA, Inc. to Innovative Ventures, LLC.

34.    The Investigator and her professionals reviewed in excess of 1,600 transactions and numerous documents produced by the Debtor. The Investigator and her professionals conducted significant factual and legal analysis regarding the pre-petition transactions, including evaluating the viability of potential claims and causes of action.

35.    The Insider Claims considered by the Investigator, included *inter alia*, actual and/or constructively fraudulent conveyances, breaches of fiduciary duties, corporate waste, and alter ego of subsidiaries and affiliated companies, piercing the corporate veil, and equitable subordination.

**C.  Claims Preclusion**

36.    In connection with the third component, the Investigator and her professionals worked with the Plan Administrator and CFO to obtain the Debtor's D&O Policies and reviewed said policies for liability coverage for potential fraudulent and avoidable claims to Insiders.

37.    After identifying insurance coverage for insider claims, the Investigator and her professionals further analyzed the D&O Policies for retrospective coverage for prior wrongful acts during the Avoidance Period. The D&O Policies provided the insured up to $5,000,000 of insurance coverage retroactively to October 23, 2009 for wrongful acts, excluding deliberate criminal or deliberate fraudulent or dishonest acts, or willful violation of statute or rule of law. In the course of the Investigation, the Investigator and her professionals performed the following tasks:

    a.  reviewed and analyzed D&O Policies for 2008, 2010, 2015, 2016, 2017, 2018, and 2020.

    b.  reviewed and analyzed D&O Policies endorsements and riders, including run-off endorsement coverage for wind-down executive.

38.    The Investigator also requested documents from Kristina Stanger, legal counsel for the Official Committee of Unsecured Creditors. Ms. Stanger was also one of the attorneys representing Daniel F. Dooley, Wellman Dynamics Liquidation Trustee

("Liquidation Trustee") who investigated directors and officers claims against the insiders

in the Wellman Dynamics Case.  Ms. Stanger was similarly cooperative and searched for

relevant documents in her possession, but did not have any responsive documents.

39.    The Investigator reviewed and analyzed the Liquidation Trustee's Motion in

Aid of Execution of Joint Combined Disclosure Statement and Plan of Liquidation Dated

June 22, 2018[5], settlement agreement, and Claims Bar Order[6] between the Wellman

Dynamics Liquidation Trustee and Insiders in the Wellman Dynamics Case.

40.    The Investigator and her professionals reviewed and analyzed the party

releasees and preclusive effects of the settlement agreement and Claims Bar Order in the

Wellman Dynamics Case on subsequent litigation that may be based in whole and part on

any allegation, claims, demand, cause of action, matter or fact directly or indirectly relating

in any way to or arising in connection with the same Insiders being investigated by the

Investigator in this case.

41.    In order to keep fees and expenses to a minimum, the Investigator thought it

was in the best interest of the bankruptcy estate and its creditors to conduct interviews

only in the event that she discovered a likely prosecutable Insider Claim after reviewing the

Debtor's financial records and other documents.

### IV. LAW GOVERNING AVOIDANCE AND RECOVERY OF INSIDER TRANSFERS

42.    Under the Bankruptcy Code, the Trustee, or, in this case, the Investigator

pursuant to the Plan, may bring claims to avoid and recover preferential and fraudulent

transfers under federal and applicable state law[7].

---

[5] *See* Docket No. 1102 in the Wellman Dynamics Case No. 16-01825
[6] *See* Docket No. 1103 in the Wellman Dynamics Case No. 16-01825
[7] *See* 11 U.S.C. §§ 544, 547, 548.

11

A.  **Iowa Uniform Voidable Transactions Act**

43.    11 U.S.C § 544 authorizes the Investigator to step into the shoes of a hypothetical creditor to bring fraudulent transfer claims under applicable state law, in this case the Iowa Uniform Voidable Transactions Act[8] would apply. Importantly, the Investigator may not bring such claims, unless "an actual, unsecured creditor can, on the date of the bankruptcy, reach property that the debtor has transferred to a third party."[9] For that reason, the Investigator is subject to any defenses that could be asserted against the unsecured creditor, such as the statute of limitations.

44.    Like the Bankruptcy Code, Iowa law provides for both intentionally and constructively fraudulent transfer claims.  Specifically, Iowa law provides for the avoidance of transfers made "[w]ith actual intent to hinder delay or defraud any creditor of the debtor" or "[w]ithout receiving reasonably equivalent value in exchange for the transfer" at a time when the debtor was or was about to become insolvent[10]. Under Iowa law, a debtor may be deemed insolvent if its liabilities exceed its assets, or the debtor is generally not paying its debts as they become due. Moreover, intent to defraud can be established through badges of fraud, which are codified under the Act. And the value of any avoidable transfer may be recovered from the initial or any subsequent transferee of such transfer.

B.  **Preferential Transfers Pursuant to 11 U.S.C. 547**

45.    The Bankruptcy Code authorizes the avoidance of preferential transfers by a debtor of an interest in property between 90 days and one year before the date of the

---

[8] *See* 11 U.S.C. § 544(b)(1); Iowa Code § 684 Voidable Transactions
[9] *Cadle Co. v. Mims* (*In re Moore*), 608 F.3d 253, 260 (5th Cir. 2010); *see also Sherman v. FSC Realty LLC (In re Brentwood-Lexford Partners, LLC)*, 292 B.R. 255, 262 (Bankr. N.D. Tex. 2003)
[10] *See* Iowa Code § 684.4

bankruptcy filing, to or for the benefit of a creditor who is an insider.[11] To be avoidable the transfer has to be made on an account of an antecedent debt owed by the debtor to the creditor, and enables the creditor to receive more than such creditor would receive under Chapter 7 or more than if the transfer had not been made.

46.     Section 547 of the Bankruptcy Code codifies specific limitations to avoidance under this section. Specifically, preferential transfers are not avoidable if (i) "the transfer was intended by the debtor and creditor to be a contemporaneous exchange for new value given to the debtor"; or (ii) the "transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor"[12].

**C.   Fraudulent Transfers Pursuant 11 U.S.C. § 548**

47.     The Bankruptcy Code authorizes the avoidance of any transfer by a debtor of an interest in property made with the intent to defraud the debtor's present or future creditors and within two years of the petition date[13]. The definition of "transfer" is broad, and includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with-- (i) property; or (ii) an interest in property."[14]

48.     To prove that a transfer was intentionally fraudulent under the Bankruptcy Code, the plaintiff must show that the transfer was made "with actual intent to hinder, delay, or defraud."[15] Because direct evidence of fraudulent intent is often unavailable, courts generally rely on circumstantial evidence to infer fraudulent intent.[16] When

---

[11] *See* 11 U.S.C. § 547(b)(4)
[12] *See* 11 U.S.C. § 547(C)(1) and (2)
[13] *See* 11 U.S.C. § 548(a)(1); *In re Fedders N. Am., Inc.*, 405 B.R. at 544.
[14] 11 U.S.C. § 101(54).
[15] 11 U.S.C. § 548(a)(1)(A).
[16] *See In re Fedders N. Am., Inc.*, 405 B.R. at 545 (citing *Liquidation Tr. of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del., Inc.)*, 327 B.R. 537, 550-51 (D. Del. 2005)).

examining the circumstances of a transaction, courts typically look to "badges of fraud," which include: (i) the relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency or indebtedness of the debtor; (iv) how much of the debtor's estate was transferred; (v) reservation of benefits, control or dominion by the debtor; and (vi) secrecy or concealment of the transaction.[17]

49.    To prove that a transfer was constructively fraudulent under the Bankruptcy Code, the plaintiff must show (i) the debtor received less than reasonably equivalent value in exchange for the transfer, and (ii) the debtor: (a) was insolvent on the date of the transfer or became insolvent as a result of the transfer; (b) was left with unreasonably small capital; (c) intended to incur, or believed the debtor would incur, debts beyond its ability to pay as debts matured; or (d) made such transfer to an insider under an employment contract.[18]

50.    To establish whether a debtor was insolvent at the time of a transfer requires extensive analysis of documents, interviews or depositions of various witnesses, and the retention of qualified experts who require sufficient time to develop their opinions.[19] Because the Investigator had approximately 180 days to conduct the Investigation and prepare this Final Report, she did not have sufficient time to analyze and conclude whether the Debtor was insolvent on the dates when certain transfers were made.

51.    The Investigator did not conduct an insolvency analysis or higher professionals to do so to minimize the Investigation's fees and expenses to the bankruptcy

---

[17] *Id.*

[18] 11 U.S.C. § 548(a)(1)(B).

[19] *See, e.g., Whyte v. C/R Energy Coinvestment II, L.P. (In re SemCrude, L.P.)*, Nos. 08-11525 (BLS), 10-50840, 10-51808, 2013 Bankr. LEXIS 2351, at *17-39 (Bankr. D. Del. June 10, 2013) (weighing the parties' expert opinions and valuation methodologies to determine the debtor's solvency at the time the debtor made various transfers).

estate. In the event the Investigator prosecuted an Insider Claim, more than likely an insolvency analysis would have been needed to be prepared. The Investigator and her professional completed her investigation under the assumption that the Debtor was insolvent at all times during the five year Avoidance Period and/or was in and out of the zone of insolvency since the Debtor emerged from its prior bankruptcy in 2002.

## V.  KEY ENTITIES AND INDIVIDUALS

52.    The Investigator and her professionals identified the following entities and individuals as Insiders of the Debtor, whom were the primary focus of her investigation:

| Name | Description of Fansteel Involvement |
|---|---|
| Brain Cassady | Initially purchased 29% of Fansteel in 2008. Became CEO at the start of 2012. Cassady was never compensated through Payroll. |
| Leonard Levie | Initially purchased 30% of Fansteel in 2008. Subsequently purchased Curtis Zamec shares (10% ownership) in 2016. |
| Jim Mahoney | Appointed by Leonard Levie to CEO in June 2016. Resigned in August 2019. |
| Earl White | Hired by Curtis Zamec as CFO in 2009. Resigned March 5, 2012. |
| Curtis Zamec | Initially purchased 10% of Fansteel in 2008. Appointed CEO early 2009. Replaced by Brian Cassidy as CEO in 2012. Initially took no salary, subsequently added to payroll in 2010. Terminated September 4, 2011. |
| Todd Hymel | Member of the Board from 2009 to 2012. Appointed by Leonard Levie. |
| David Lietten | Long time Wellman Dynamics employee promoted to General Manager. Resigned December 23 2012. |
| Marcus Collardin | Member of the Board from 2012 to 2014. Appointed by Leonard Levie. |
| 510 Ocean Drive Debt Acquisition | Company created by Curtis Zamec, Brian Cassady and Leonard Levie. Sole purpose was to purchase a Fansteel note from the PBGC that was issued as part of Fansteel' s bankruptcy in 2002. |
| Black Management Advisors | Brian Cassady's financial consulting firm. During his tenure as CEO, a weekly consulting fee and related expenses were charged to Fansteel. |
| Greenwich Investment Company, LLC | Leonard Levie's investment company. During 2011 through 2016, no payments were made to Greenwich Investments. |

| | |
|---|---|
| Fansteel ENA USA, Inc. | A sand casting company with two plants in Germany that Cassady had Fansteel purchase in late 2013. Ultimately sold in 2016 to AIAC, which is owned by Leonard Levie. |
| FMRI, Inc. | Specialty Purpose Entity created as part of Fansteel's bankruptcy in 2002. Sole purpose of FMRI is the remediation of the former Fansteel manufacturing site in Muskogee, OK. |
| FDM Holdings, Inc. | Specialty Purpose Entity created as part of Fansteel's bankruptcy in 2002. Sole purpose of FDM Holdings was to hold one share of FNL de Mexico, a Maquiladora in Reynosa Mexico |
| Innovative Venture, LLC | They purchased 99 shares for $1 of Fansteel ENA USA, Inc in April 2016, leaving Fansteel with 1 share. Leonard Levie owns Innovative Venture LLC |
| Wellman Dynamics Corp. | A machining company that Brain Cassady had Fansteel purchase in 2011. Wellman Dynamics filed Chapter 11 on the same date as Fansteel and is currently being liquidated. |

53.    Of the above Insiders, Brian Cassady ("Cassady") (and his consulting business Black Management Advisors), Leonard Levie ("Levie"), and Curtis Zamec ("Zamec"), were of particular interest of the Investigator.

54.    In early 2008, Cassady, Levie, and Zamec began acquiring major holdings in the Debtor and formed a "Control Group" for SEC reporting purposes.

55.    By June 19, 2008, Cassady, Levie, and Zamec collectively owned about 69% of the Debtor's shares. Specifically, Zamec owned at least 10% of common stock, Cassady owned at least 29% of common stock and Levie owned at least 30% of common stock of Fansteel.  Upon information and belief, Cassady, Levie, and Zamec paid approximately $450,000 in total for the stock of Debtor.

56.    Cassady, Levie, and Zamec entered into a Cooperation Agreement, dated June 10th, 2008 (as subsequently amended on June 12, 2008, the "Cooperation Agreement"), in which they executed written consent resolutions in lieu of a meeting for the appointment of

new directors and otherwise agreed to vote their shares to take control of the Board of Directors and affairs of Debtor.

57.    On or about June 13, 2008, the entire Board of Directors of the Debtor resigned, other than Gary Tessitore, the President and Chief Executive Officer who had previously helped guide the Debtor through its first bankruptcy in 2002. In the latter part of 2008, Gary Tessitore, and R. Michael McEntee, the then Vice President and Chief Financial Officer, left the Debtor.

58.    Cassady, Levie, and Zamec appointed Zamec and Cassady to the vacated Board of Director positions of the Debtor along with Todd Hymel. Levie was never a director. Todd Hymel (until 2012) and Marcus Collardin, after Hymel's resignation, were appointed by Levie to be his board representative.  In early 2009, Zamec was appointed Chief Executive Officer.

59.    Through subsequent transactions, Cassady, Levie, and Zamec acquired approximately 90%, either directly or indirectly, of common equity shares of the Debtor. The Debtor's Directors and Officers converted the Debtor from a publicly traded entity to a privately held one in late 2009.

60.    Cassady was an officer and director of the Debtor from 2008 through 2016 and of Wellman Dynamics from 2012 through 2016. Since 2008, Cassady has been a principal owner of the Debtor.  Cassady was never compensated by the Debtor directly. All payments were made to Cassady's consulting company, Black Management Advisors. All fees paid were made pursuant to a consulting agreement between the Debtor and Black Management.

61.    Levie has been a director of the Debtor from 2012 through the present. Since 2008, Levie has been a principal owner of the Debtor.

62.    Zamec was an officer and director of the Debtor from 2008 through 2011 and of Wellman Dynamics from 2009 through 2011. Zamec was a principal owner of the Debtor but no longer owns any shares. Any compensation paid to Zamec after his termination (September 2011) were made to Prism Industrial, an LLC owned by Zamec.

63.    Jim Mahoney was appointed CEO in late May 2016. Jim Mahoney was not added to the Debtor's payroll until September 4, 2016. In the interim, Jim Mahoney continued to be paid by Ceremaspeed, which is a company owned by American Industrial Acquisition Corporation ("AIAC"). AIAC is owned by Levie. Jim resigned in August 2019.

## VI. FACTS DETERMINED FROM THE INVESTIGATION

### A. Investigation of Transfers to Insiders

64.    The Investigator and her professionals analyzed the financial records and documents produced and publicly available, and independent research to determine whether there were any avoidable transactions with the Debtor's Insiders or other causes of actions against the Debtor's Insider.

65.    The Investigator's review and analysis of the Debtor's financial records revealed that the Debtor's Insiders: (i) did not receive any transfers during the five (5) year Avoidance Period; or (ii) did not receive a transfer in an amount that would be beneficial the bankruptcy estate (i.e. inconsequential value) based on anticipated prosecution cost and likelihood of recovery; and/or (iii) received a transfer in the ordinary course of business or financial affairs of the Debtor without intent to hinder, delay, or defraud creditors .

18

| Name | Received No Transfer During Avoidance Period | Received a Transfer of Inconsequential Value | Received Transfers In Ordinary Course of Business |
|---|---|---|---|
| Brian Cassady | X | | |
| Leonard Levie | | X | X |
| Jim Mahoney | X | | |
| Earl White | | X | X |
| Curtis Zamec | X | | |
| Todd Hymel | | X | X |
| David Lietten | | X | X |
| Marcus Collardin | X | | |
| 510 Ocean Drive Debt Acquisition | X | | |
| Black Management Advisors | | | X |
| Greenwich Investment Company, LLC | X | | |
| Fansteel ENA USA, Inc. | | | X |
| FMRI, Inc. | | | X |
| Innovative Venture, LLC | | | X |
| Wellman Dynamics Corp. | | | X |

66.    The Investigator and her professionals initial review of the Debtor's financial records eliminated several Insiders from further Investigation.  In particular, Cassady, Jim Mahoney, Zamec, Marcus Collardin, 510 Ocean Drive Debt Acquisition, and Greenwich Investment Company, LLC, did not receive any transfers during the Avoidance Period.

67.    Cassady, who was CEO from 2012 until Jim Mahoney replaced him in 2016, was never paid directly. As discussed below, Cassady was compensated for his services to the Debtor indirectly through his consulting company Black Management Advisors.

68.     Jim Mahoney began as a CEO of the Debtor in June 2016 but was not added o

the Debtor's payroll until September 4, 2016, just days before the Debtor filed for

bankruptcy relief.

69.     Zamec was terminated by the Debtor on September 4, 2011, which is prior to

the Avoidance period beginning on September 13, 2011. Therefore, any transfers to Zamec

are beyond the purview of this Investigation.

70.     The Debtor stopped/eliminated paying director Fees in 2012[20]. Marcus

Collardin never received any director fees while he was a Member of the Board from 2012

to 2014.

71.     The Debtors financial records did not reflect any transfers to 510 Ocean

Drive Debt Acquisition and Greenwich Investment Company, LLC during the Avoidance

Period.

72.     The Investigation did reveal transfers of funds to Levie, Earl White, Todd

Hymel, and David Lietten for compensation within the Avoidance Period. However, the

amounts were either of inconsequential value; not in the best interest of the bankruptcy

estate under a cost benefit analysis if avoidable; or were made in the ordinary course of

business or financial affairs of the Debtor.

73.     For example, during the five (5) year Avoidance Period, Levie only received

approximately $3,000 and Todd Hymel received approximately $46,000.

74.     Earl White and David Lietten received six-figure salaries for their services as

CFO and General Manager, respectively. Both were employees of the Debtor and were paid

---

[20] The Directors' Fees were established and approved by the board prior to the new board members (Brian
Cassady, Curtis Zamec, and Todd Hymel/Marcus Collardin) being appointed.

in the ordinary course of business[21]. They both resigned from their employment with the Debtor in 2012. In the absence of fraud or proof that the Debtor received less than reasonable value for Earl White and David Lietten' s services, their compensation would not be recoverable by the Investigator.

75.    As summarized above, completing a review of the financial records, facts, circumstances, and applicable law relating to the avoidance of Insider transfers, the Investigator has determined that any potential claims or causes of action with respect to a majority of the Debtor's Insiders were diminutive either because no transfers occurred during the Avoidance Period or were of inconsequential value and in the ordinary course of business or financials affairs of the Debtor.

**B.  <u>Specific Matters</u>**

76.    The Insiders who received significant transfers during the Avoidance Period, received additional and extensive review and analysis by the Investigator and her professionals.  The following Insiders were of primary focus and concern of the Investigator, but, ultimately, the Investigator concluded that the transfers were made in the ordinary course of business or financial affairs of the Debtor without intent to hinder, delay, or defraud creditors. In some situations, the Investigator concluded had the transfers been avoidable, they were not likely recoverable.

---

[21] It should be noted that the Debtor was not in the practice of preparing Employment Contracts/Agreements unless specifically requested. The only instance here where such an agreement was prepared is between the Debtor and Black Management Advisors.

### i.  *Black Management Advisors*

77.     Of all the potential Insider Claims, the Investigator and her professional spent a significant number of hours reviewing and analyzing the Debtors transactions and relationship with Black Management Advisors.

78.     As previously stated, Black Management Advisors is Cassady's consulting company. When Cassady was appointed CEO of the Debtor in 2012, Cassady did not received any compensation directly from the Debtor, but rather indirectly through Black Management Advisors.

79.     The Debtor entered into an Agreement for the Provision of Consulting and Interim Officers Services ("Consultant Agreement") with Black Management Advisors, by which Cassady as an employee of Black Management Advisors provided the Debtor consulting services consisting of executive-level management, operational and financial consulting.

80.     The terms of the Consultant Agreement provided a base compensation of approximately $200,0000 annually for the consulting services. Plus, the Consultant Agreement provided for discretionary bonuses in recognition of performance of the consulting services. The discretionary bonuses were to be approved by a majority vote of the controlling shareholders of the Debtor. Per the agreement, Cassady was required to recuse himself from voting to approve any bonuses.

81.     The Consultant Agreement also provided for reimbursement of all reasonable out-of-pocket expenses incurred in connection with the consulting services. As an independent contractor, Cassady received no employee benefits.

82.    Per the Investigator and her professionals' review of the Debtor's financial records, the Debtor's transfers to Black Management appeared to be in accordance with the Consultant Agreement.  Black Management received bonuses and expense reimbursements as contemplated under the Consultant Agreement. Over the five (5) year Avoidance Period, the transfers made to Black Management were documented with tax Form 1099-Miscellaneous Income and other financial records.

83.    Further, considering CEO compensation of other similarly sized companies, Black Management Advisors base compensation of approximately $200,000 annually did not strike the Investigator as extraordinary. In addition, the compensation appeared to be in the range that the Debtor customarily paid other officers and directors of the Debtor.

84.    The Investigation revealed Black Management Advisors was the alter ego of Cassady, however, all interactions between the Debtor and Back Management Advisors was formalized.  It is, therefore, the opinion of the Investigator that the financial transfers to Black Management Advisors were made in the ordinary course of business and were a contemporaneous exchange of compensation for consulting services.  Furthermore, the Investigator and her professionals found no indications that the transfers were made with actual intent to hinder, delay, or defraud the Debtor's creditors.

**ii.    *FMRI, Inc.***

85.    The Investigator and her professionals' review and analysis of the Debtor's financial records revealed that the Debtor made significant transfers of funds to FRMI, Inc. over the five (5) year Avoidance Period. However, the Investigator has concluded that there is no cause of action to recover these funds because, in her opinion, they were transferred in the ordinary course of business or financial affairs of the Debtor.

86.     Under the Debtor's bankruptcy plan in 2002, FRMI, Inc. was formed as a special purpose entity to hold title to the Debtor's Muskogee Property and fulfill all of its environmental obligations to decommission and remediate the Muskogee Property. FMRI, Inc. had primary responsibility for the environmental liability at the Muskogee Property, but the Debtor also remained liable.

87.     The Debtor was was required under the 2002 bankruptcy plan to fund FRMI, Inc.'s environmental obligations directly and, if necessary, fund same from an established $2,000,000 "Decommissioning Trust."

88.     Funds in the Decommissioning Trust were to be used solely for payment of the environmental liabilities associated with the Muskogee Property.

89.     Three (3) unsecured promissory notes were made by the Debtor to FMRI, Inc. requiring payments over time such that FMRI would have sufficient funds to deal with the environmental issues at the Muskogee Property.   The Debtor was the only entity obligated to fund FMRI, Inc. and the Decommissioning Trust on a going forward basis.

90.     According to the NRC, the environmental liabilities of the Debtor and FMRI, Inc. at the Muskogee Property may be as high as or exceed $78,000,000.

91.     The Investigator upon information and belief has concluded any transfers of funds to FMRI, Inc. during the five (5) year Avoidance Period was made not only in the ordinary course of business, but as required by the Oklahoma and Federal Environmental Authorities[22], and under the Debtor's 2002 bankruptcy plan.

**iii.     *Innovative Venture LLC's Purchase of Fansteel ENA USA, Inc***

---

[22] Note that the Environment Authorities are creditors in the Debtor's bankruptcy and have filed proof of claims at 75 and 76. Any recovery against FMRI, Inc., likely would result in an increased claim by the Environmental Authorities and/or litigation with the Environmental Authorities.

92.    The Investigator reviewed and analyzed the Debtor's sale and transfer of Fansteel ENA USA, Inc. to Innovative Venture, LLC (which is owned by Levie) and whether or not the transaction could be found to be a fraudulent transfer.

93.    In 2013 the Debtor acquired ENA Guss GmbH ("ENA Germany"), an aluminum castings manufacturer in Germany, for 1,000,000 Euros. As part of the Debtor's 22nd Amendment to its loan and security agreement with Fifth Third Bank, a $1.4 million ENA acquisition Note was formalized.

94.    Fansteel EN USA, Inc. was formed as a subsidiary of the Debtor and ENA Germany became a wholly owned subsidiary of Fansteel ENA USA, Inc. Upon information and belief, Cassady was a managing Director of ENA Germany.

95.    Fansteel ENA USA, Inc. through its ENA Germany operations appeared to be a cash drain for the Debtor and a significant source of its indebtedness with Fifth Third Bank.

96.    In 2015, upon information and belief, just two (2) years after the initial acquisition, 99% of Fansteel ENA USA, Inc. was sold to Innovative Venture, LLC in return for assumption or repayment of the loan balance with Fifth Third Bank. It is believed the Debtor still retains 1% ownership in Fansteel ENA USA, Inc.

97.    After review of this transaction, the Investigator has concluded that the transfer though ripe with conflicts of interest and self-dealing by the Debtor and Levie as a principal of Innovative Venture, LLC, was not made with actual intent to hinder, delay, or defraud the Debtor's creditors.  The reasonable interference is that the transfer was a contemporaneous exchange between the Debtor and Innovative Venture, LLC. The Debtor was able to off load a subsidiary that was a significant cash drain, and in exchange

Innovative Venture, LLC assumed repayment of the Debtor's loan balance with Fifth Third Bank.

### iv. *Wellman Dynamics Corp.*

98.    The Investigator's review and analysis of the Debtor's financial records revealed that the Debtor made significant transfers of funds to Wellman Dynamics over the five (5) year Avoidance Period. However, the Investigator has concluded that any potential claim is likely barred (as further discussed below).

99.    In addition, any potential claims against Wellman Dynamics would likely be subject to the injunction against the pursuit of causes of actions provided for by Wellman Dynamics' confirmed plan of liquidation. Even if the Investigator was not enjoined, the likelihood of recovery is minimal. Wellman Dynamics is in the process of being liquidated and all of the assets of the bankruptcy estate were transferred and vested in the Liquidation Trust and Trustee pursuant to Wellman Dynamics' confirmed plan of liquidation.

### C. **The Wellman Dynamics Settlement**

100.    One of the issues the Investigator reviewed and analyzed is whether the Debtor's Insiders have already been released of any potential Insider Claims that may be pursued by the Investigator.

101.    In the Wellman Dynamics Case, the Official Committee of Unsecured Creditors investigated and pursued causes of actions against Wellman Dynamics and the Debtor's former and/or current officers, directors, and shareholders (namely, but without limitation, Cassady, Levie, and Zamec) and affiliated entities for breach of fiduciary duty, aiding and abetting, fraudulent transfers and preferential transfers among other claims.

26

102.    On September 12, 2018, the Official Committee of Unsecured Creditors filed a Complaint in the United States District Court for the Southern District of Iowa (the "District Court") against former officers and directors of the Wellman Dynamics and their affiliates, at Case No. 4:18-cv-00304-SMR-CFB (the "D&O Litigation"). Pursuant to the plan of liquidation in the Wellman Dynamics Case, the D&O Litigation vested in the Liquidation Trust and Daniel Dooley, as Liquidation Trustee upon the Plan Effective date. The Liquidation Trustee was substituted for the Committee as the Plaintiff in the D&O Litigation.

103.    After lengthy settlement discussions and mediation sessions involving the defendants to the D&O Litigation, as well as American International Group, Inc. ("AIG"), as insurer of the defendants for some or all of the claims at issue in the D&O Litigation, the parties to the D&O Litigation reached a settlement, resolving all claims, causes of action, defenses, and setoffs implicated in the D&O Litigation (the "Wellman Dynamics Settlement Agreement").

104.    As part of the Wellman Dynamics Settlement Agreement: AIG agreed to pay the Liquidation Trust $3,400,000; the parties exchanged mutual general releases, including a full release of AIG and the insurance policy[23]; and the parties obtained a Claims Bar Order[24] from this Court.

105.    The releases entered into by the Wellman Dynamics Settlement Agreement was among the following parties: Liquidation Trustee; AIG; Curtis Zamec; Brian Cassady; Leonard Levie; Earl White; Todd Hymel; David Lietten; Marcus Collardin; 510 Ocean Drive

---

[23] *See* Motion in Aid of Execution of Joint Combined Disclosure Statement and Plan of Liquidation Dated June 22, 2018 at Docket No. 1102 in the Wellman Dynamics Case No. 16-01825
[24] *See* Claims Bar Order at Docket No. 1103 in the Wellman Dynamics Case No. 16-01825

Debt Acquisition; Fansteel, Inc. (the "Debtor"); Wellman Dynamics; FMRI, Inc.; and Fansteel, ENA USA, Inc.

106.    The aforementioned individuals and entities represent 11 of the 13 Insiders, that the Investigator identified as recipients of transfers from the Debtor during the Avoidance Period and of which she thoroughly investigated for potential Insider Claims.

107.    The Wellman Dynamics Settlement Agreement by its terms is confidential, and therefore, the Investigator will not disclose the terms of the parties' releases as part of this Final Report. The Investigators is confident in her review and legal analysis that the releases more than likely cover any potential Insider Claims, she may have pursued had she discovered any such claims.

108.    In addition, despite the Investigator and her professionals' review and analysis of the D&O Policies' retroactive coverage for wrongful acts, the Investigator is confident the AIG's release voids any likely recovery from AIG if the Investigator were to make a claim against the D&O Polices or add the insurer as a party to any causes of actions that may be filed in court against the Debtor's Insiders.

109.    The Investigator's conclusion that the releases in the Wellman Dynamics Settlement Agreement likely prevents her from successfully prosecuting any Insider Claims, is only strengthened further when reviewed in conjunction with the Claims Bar Order.

110.    The Claims Bar Order entered by this Court (Judge Shodeen) in the Wellman Dynamics Case on April 16, 2019 specifically provides:

**All Barred Persons (as defined below) are permanently barred, prohibited, enjoined and restrained from the filing, commencing, prosecuting, conducting, asserting or continuing in any manner, directly, indirectly or derivatively, any**

**suit, action, cause of action, cross-claim, counterclaim, third party claim, or
other demand (including any of the Claims being released in the Settlement
Agreement) in any federal or state court or any other judicial or non-judicial
proceeding (including, without limitation, any proceeding in any judicial,
arbitral, mediation, administrative, or other forum) by any Barred Person
against or affecting any of the Defendant Releasees (per the Settlement
Agreement) which is based in whole and part on any allegation, claim,
demand, cause of action, matter or fact directly or indirectly relating in any
way to or arising in connection with the Case and Claims, whether asserted
therein or not, and the Policy (collectively, the "Barred Claims"). For purposes
of this Bar Order, "Barred Persons" shall mean any person or entity that has
held, holds, may hold, or purports to hold a Barred Claim.**

111.    Based on this broad language, it the opinion of the Investigator and her
professionals that any potential claims pursued by the Investigator against the Debtor's
Insiders in this case would be barred since said claims would be based in whole and part on
any allegation, claim, demand, cause of action, matter or fact directly or indirectly relating
in any way to or arising in connection with claims in  the Wellman Dynamics D&O litigation.
The Barred Persons include the Debtor and its Insiders who were a party to the Wellman
Dynamics D&0 Litigation and subsequent settlement agreement

112.    The Wellman Dynamics D&O Litigation and subsequent settlement
agreement have a common nucleus of operative facts and parties (i.e. same Insiders) as any
potential claims the Investigator may have brought or prosecuted in the Debtor's case. The
wrongful acts arise from a common causal connection or cause the same or related
damages.  As such, the Insiders as well as their insurer AIG have received releases through
the Wellman Dynamics Settlement Agreement or are barred from the Claims Bar Order.

113.    The Investigators notes that the Debtor and Wellman Dynamics cases were
never substantively consolidated; in fact, this Court reversed its early decision to
administratively or procedurally consolidate the cases.  Also, the Creditors Committee of

Wellman Dynamics and the subsequent Liquidation Trustee of Wellman Dynamics did not represent the creditors of Debtor at any time during the Settlement. However, as previously stated, the Debtor and the majority if it's Insiders were a party to the Wellman Dynamics Settlement Agreement. The Investigator is certain had she discovered any Insider Claims, the releases in the Wellman Dynamics Settlement Agreement and Claims Bar Order would have quickly disposed of any causes of actions and/or would be costly litigated at the expense of the Debtor's bankruptcy estate with no certainty of success.

## VII.    CONCLUSIONS

114.    Through the Investigation, the Investigator and her professionals found no evidence from which she believes a fact finder could conclude that the pre-petition transactions with the Debtor's Insiders were fraudulent and based on intent to hinder or delay the Debtor's creditors. Nor does she believe a fact finder would conclude that the transactions were not made in the ordinary course of business or financial affairs of the Debtor.

115.    Even if there had been potential Insider Claims for pre-petition transactions, this litigation would not be without risk and would require the expenditure of significant legal and expert fees on issues such as solvency and valuation.  Determining whether the Debtor was solvent or insolvent at the time of the transactions would be a questions of fact to be determined by this Court, at no small cost to the bankruptcy estate. Any potential claims would be subject to a fair consideration defense, as the transfers were in facts contemporaneous exchange (i.e. compensation) for consulting or management services to the benefit of the Debtor.

116.    In addition, any potential claims would likely be subject to a statute of limitation defense due to the transactions taking place between 2011 and 2016 and any potential lawsuit concerning those transactions being filed in 2021.

117.    Lastly, due to the party releases in the Wellman Dynamics D&O Settlement, and subsequent Claims Bar Order by this Court, any potential claims would likely be subject to a claim's preclusion defense.

Dated: February 1, 2021                          **GOOSMANN LAW FIRM, PLC**

By:    /s/*Elizabeth M. Lally*
       Elizabeth M. Lally, #AT0013010
       Goosmann Law Firm, PLC
       17838 Burke Street, Suite 250
       Omaha, NE 68118
       Phone:   (402) 280-7648
       Fax:      (402) 505-3967
       Email:  LallyE@GoosmannLaw.com

       **POST CONFIRMATION INVESTIGAOR**
       **FOR DEBTOR, FANSTEEL, INC.**

By:    /s/*Warren J. Ford III*
       Warren J. Ford III, AT1004332
       Goosmann Law Firm, PLC
       17838 Burke Street, Suite 250
       Omaha, NE 68118
       Tel:  (402) 315-1239
       Fax: (402) 505-3967
       Email: FordW@goosmannlaw.com

       **SPECIAL COUNSEL TO**
       **POST CONFIRMATION INVESTIGAOR**
       **FOR  REORGANIZED DEBTOR,**
       **FANSTEEL, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the above and foregoing document, Final Report, was electronically filed with the Clerk of the Bankruptcy Court on February 1, 2021 using the CM/ECF system, upon which system the undersigned relies to provide service of this document to the Debtor, U.S. Trustee, and all other parties of interest that are part of the CM/ECF system including the following:

United States Trustee
Attn: James L. Snyder
Federal Bldg, Room 793
210 Walnut Street
Des Moines, IA 50309

Fansteel, Inc.
c/o Dave Sands
Dorset Partners, LLC
PO Box 67
Dorset, VT 05251

Fansteel, Inc.
c/o Jeffrey D Goetz
801 Grand Ave, Ste 3700
Des Moines, IA 50309-8004

Official Committee of Unsecured Creditors
c/o Jeffrey W Courter
700 Walnut
Ste 1600
Des Moines, IA 50309

*/s/Warren J. Ford III*
Warren J. Ford III